UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| William O. Evans, Jr., as Trustee for the Heirs and Next-of-Kin for Benjamin Evans, | Civil Action number: <br><br>**COMPLAINT** |
| Plaintiff | JURY TRIAL DEMANDED |
| vs. | |
| Brian Jeffery Krook, individually and in his official capacity as a Deputy for Washington County Sheriff's Office; | |
| Michelle Folendorf, individually and in her official capacity as a Sergeant for Washington County Sheriff's Office; | |
| Joshua John Ramirez, individually and in his official capacity as a Deputy for Washington County Sheriff's Office; | |
| Michael Ramos, individually and in his official capacity as a Deputy for Washington County Sheriff's Office; | |
| Dan Starry, individually and in his official capacity as Washington County Sheriff and policymaker; | |
| Washington County as a political subdivision of the State of Minnesota. | |
| Defendants | |

## INTRODUCTION

1. On June 13, 2018, Olmsted County, Third District Court duly appointed Plaintiff, William O. Evans, Jr. as Trustee for the Heirs and Next-of-Kin of Benjamin Evans.

2. This is a civil rights case pursuant to the Fourth Amendment and 42 U.S.C. § 1983 and § 12101, *et seq*. Plaintiff alleges that Defendants used deadly force causing the wrongful death of Benjamin Evans and failed to accommodate his mental health disability, thereby depriving Evans of rights secured by the United States Constitution. Plaintiff now sues for redress.

1

## JURISDICTION

3. This Court has federal question jurisdiction pursuant to 28 U.S.C. § § 1331, 1343, 42 U.S.C. § § 1983, 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

## VENUE

4. Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391, as the Defendants are citizens of the State of Minnesota and the unconstitutional injury complained of herein occurred in Lake Elmo, Washington County, Minnesota.

## PARTIES

5. Benjamin Evans (hereinafter Evans) was 23 years old. He was the father of Lydia Evans, now age four. He was the son of Plaintiff William O. Evans and Kimberly Porter and the brother of Michael and Brianna Evans.

6. Evans was an EMT and Firefighter with plans to finish college and become a physician's assistant. He was born in Missouri and moved to Minnesota in July of 2017 to be with his girlfriend, Lauren Hintz.

7. Plaintiff, William O. Evans, Jr. is the Trustee for the Heirs and Next-of-Kin for Benjamin Evans and a citizen of the State of Missouri.

8. At all times relevant herein, Defendant Brian Jeffery Krook (Krook) is a citizen of the United States, a resident of the State of Wisconsin and a deputy as to all actions or inactions stated or alleged in this complaint, those actions or inactions were done in the scope and course of his employment with Washington County Sheriff's Office.

9. At all times relevant herein upon information and belief, Defendants Joshua John Ramirez (Ramirez) and Michael Ramos (Ramos) are citizens of the United States,

residents of Minnesota and deputies as to all actions or inactions stated or alleged in this complaint, those actions or inactions were done in the scope and course of their employment with Washington County Sheriff's Office.

10. At all times relevant herein upon information and belief, Defendant Michelle Folendorf (Folendorf) was a sergeant as to all actions or inactions stated or alleged in this complaint, those actions or inactions were done in the scope and course of her employment with Washington County Sheriff's Office. She is a citizen of the United States and an adult resident of the State of Minnesota.

11. At all times relevant herein upon information and belief, Defendant Dan Starry was the Sheriff for Washington County. He is a citizen of the United States and a resident and of Minnesota. As Sheriff, Defendant Starry is a policymaking official for the Washington County Sheriff's Office with the power to make official and final policy.

12. At all times relevant herein, Defendant Washington County was a political subdivision of Minnesota and employed Defendants Krook, Folendorf, Ramirez, Ramos and Starry.

13. Each of the Defendants was wrongful, negligent or otherwise responsible in some manner for the events that led to the wrongful death of Evans. Defendants Folendorf, Starry and Washington County also acted in such a manner and are so responsible, and are responsible for the customs, policies, practices, training, supervision, and/or discipline of the other Defendants. Plaintiff reserves the right to amend and explicitly name other parties as this matter proceeds.

14. The acts and omissions of the Defendants were pursuant to the actual customs, policies, practices and procedures of the Washington County Sheriff's Office. Defendants gave consent, aid, and assistance to the other Defendants and ratified and/or authorized the acts

or omissions of the other Defendants as alleged herein, except as may be otherwise specifically alleged. At all times relevant herein, each Defendant was jointly engaged in tortious activity, resulting in the deprivation of Evans's constitutional rights and other harm.

15. At all times relevant herein, Defendants acted under color of state law and in the scope of their duties, as within the meaning of 42 U.S.C. § § 1983 and 12101, *et seq*.

16. This Complaint may be pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2).

## FACTUAL ALLEGATIONS

17. Evans's girlfriend, Lauren Hintz (Hintz), broke up with him because she was dating his best friend.

18. Evans spent the day at the Mall of America with his friend Brianna Gysbers (Gysbers). They went back to his apartment to play video games.

19. On April 12, 2018, Evans called Hintz from his apartment and proposed marriage to her. She refused.

20. Evans texted his friend Amanda Marie Schmidt, who was on-duty as an EMT, that he was about to make a bad choice. He did not answer any more of her texts or take her calls. She called the dispatcher and asked the police for a welfare check.

21. Evans changed into his full-dress firefighter uniform, picked up his gun, said goodbye to Gysbers, took her phone and walked out of his front door.

22. Gysbers ran to a neighbor's apartment and together they called 911. They told the dispatcher that Evans was suicidal and had a gun. They asked for the police to help him.

23. Ramirez found Evans in the middle of painted crosswalk at an intersection in Lake Elmo around midnight.

24. Evans was kneeling on the frozen ground in the middle of the crosswalk.

25. The squad cameras and the Body Worn Cameras (BWCs) captured the interaction on video.

26. Evans had a gun pointed at his own head.

27. Ramirez took cover behind his squad car and started talking to Evans, attempting to understand what brought him to this point and telling him to put the gun down so they could continue working on the problem.

28. Other officers and Deputies arrived shortly thereafter. A total of nine uniformed and armed officers surrounded Evans in a semi-circle.

29. All the officers pointed their service weapons at Evans.

30. Folendorf was the Sergeant and shift commander on the scene. She had been a Sergeant for only nine months and had never trained on a scenario where a suicidal individual was holding a gun.

31. Krook worked the evening shift and was about to go home. Folendorf asked him to come along to help.

32. Folendorf and Krook retrieved a bunker and a less-lethal shotgun out of the Sergeant's squad car.

33. Folendorf's plan was to keep him talking and use the less-lethal shotgun if necessary.

34. Folendorf attempted to call the SWAT and Crisis Intervention Commanders for help. She asked the dispatcher to send out a system-wide page and call a code red. No one responded.

35. Krook positioned himself on the passenger side of Ramirez's squad car with a clear view of Evans and the less-lethal shotgun leaning against the car. Krook had his service weapon pointed at Evans.

36. Krook made no attempt at cover or concealment. He was plainly visible to Evans as Evans was plainly visible to him.

37. Evans remained on his knees in the crosswalk with the gun pointed to his head for almost 45 minutes.

38. Evans never threatened the deputies. He told them that he did not want to hurt anyone and that he did not want to give them a reason to shoot "a 23-year-old kid". He never made a move toward the officers. He never pointed his gun at the officers.

39. Evans threw away Gysbers's phone down the street and away from him. The phone was without power.

40. Evans kept asking to call and speak to Hintz. Ramirez would reply that he must drop the gun first.

41. Evans took the magazine out of his gun and threw it down the street away from him and out of his reach.

42. Evans had only one, live shell chambered in his gun.

43. Evans asked to speak to his father.

44. The deputies ordered Evans to drop the gun multiple times.

45. Evans would visually inspect the area around and behind him, moving his head with the gun, and did so several times during the encounter while talking with Ramirez.

46. Ramirez and Evans talked for approximately forty-five minutes. Evans and Ramirez were making progress.

47. Krook can be heard on the audio saying that he was uncomfortable with the movements that Evans was making. No one acknowledged his comment.

48. Krook did not warn Evans to stop moving his head or looking around.

49. No other deputy warned Evans to stop moving his head or looking around.

50. Evans remained on his knees in the crosswalk with the gun to his head while talking to Ramirez.

51. While Evans was moving his head and looking around, with the gun to his temple and talking to Ramirez, Krook shot him multiple times and without warning.

52. Krook used his service weapon and not the less-lethal shotgun that was leaning against the car next to him.

53. Evans slumped to the ground still holding the gun to his temple.

54. Krook then advanced on Evans and shot him several more times at close range.

55. Ramirez, Ramos and Folendorf also advanced on Evans while ordering him to drop the gun.

56. No other officers fired.

57. The Defendant Deputies rolled Evans over and handcuffed him.

58. An ambulance crew that was waiting nearby performed CPR, intubated Evans and transported him to Regions Hospital.

59. Evans was pronounced dead at 1:21 am on April 12, 2018.

60. Butch Huston, M.D., Assistant Medical Examiner for Ramsey County, found bullet wounds in the left chest, right chest, left side and left lower thigh and an exit wound on the upper back.

61. The bullets crossed paths in Evans's chest, puncturing his lung, severing his aorta and causing a great deal of internal bleeding. Evans's left femur was also shattered into multiple pieces.

62. Dr. Huston ruled Evans's death a homicide.

63. There was no lawful basis to use deadly force and kill Evans. It has long been clearly established that it is unlawful for a police officer to use deadly force on a suspect, even an armed one, when that suspect has not threatened anyone with such force. Further, it has long been established that it is unlawful to use lethal force without first giving a warning, where feasible.

64. Defendants' command structure was unresponsive during the approximately forty-five minutes that Evans was in the middle of the crosswalk, despite multiple attempts at calling various commanders and a page-out that was sent to dispatch from Folendorf at the scene.

65. Defendants did not provide or secure the presence of an especially trained SWAT team or Crisis Negotiator trained to deal with emotionally disturbed persons or those with clearly observed mental problems or disabilities.

66. Krook, in violation of Washington County Sheriff's Office policy and his own training, did not allow the negotiations with Evans to continue, did not seek cover or concealment to protect himself, instead shot Evans without warning even though Evans's behavior had not changed for more than forty minutes, and no other officer was threatened enough to warn him or fire their weapon.

67. The acts and conduct of Krook were in violation of the Fourth and Fourteenth Amendments in that Defendant used deadly force where no such force was justified and

where with deliberate indifference, and in violation of Washington County Sheriff's Office policy, did not use the less-lethal shotgun leaning against the squad car, thus failing to comply with official policy.

68. Defendant Washington County, with deliberate indifference, has failed to properly train, supervise and discipline deputies with respect to the policies and procedures mandated for police confrontations or other involvement with emotionally disturbed persons who may be at risk to themselves or others. Specifically, deputies are not properly trained with respect to this type of police interaction and to the procedures to be used in detaining or arresting emotionally disturbed persons who may be armed, in the deployment and use of less-lethal weapons, in the deployment of SWAT or Crisis Intervention units that have, and in supervising incidents involving emotionally disturbed persons where force may have to be use to resolve the incident.

69. Krook failed to use appropriate intervention techniques in an encounter with an emotionally disturbed individual and used excessive and unreasonable force in his encounter with Evans.

70. Washington County Sheriff's Office allowed Krook to attend "The Bulletproof Warrior" training which teaches police officers to view everyone as a threat, even a man on his knees with a gun to his own head.

71. The actions and conduct of the individual Defendants were the direct result of the failure of Defendant Washington County to provide programs and services to qualified persons with mental disabilities, to ensure that deputies follow established crisis intervention procedures, and to provide sufficient resources for specialized teams to respond to unfolding encounters.

72. Evans did not bring an action against Defendants for damages for the injuries causing his death.

73. Plaintiff, by reason of Evans's death and injury, has suffered pecuniary loss and has incurred expenses for the cost of Evans's funeral expenses, the administration of Evans's estate and the loss of Evans's care, comfort, guidance and support.

74. As a direct result of the actions and conduct of all Defendants, Evans suffered physical injuries, pain, emotional distress, deprivation and death, all caused by the violation of rights under the United States constitution, 42 U.S.C. § § 12101 and 12132, and 29 U.S.C. § 794.

## COUNT I-FEDERAL CIVIL RIGHTS CLAIMS UNDER 42 U.S.C. § 1983

75. Plaintiff incorporates the allegations set forth in each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

76. The acts and conduct of Krook constituted an illegal and unconstitutional use of deadly force under the Fourth Amendment.

77. Plaintiff claims damages for the wrongful death of Evans and his loss of income, services, companionship, and for funeral and burial expenses under 42 U.S.C. § 1983.

78. Defendant Washington County caused the constitutional violations by reason of its practice and custom, with deliberate indifference, of failing to properly train, supervise and discipline deputies, including Krook, in the proper use of deadly force. Defendant Washington County has also failed, with deliberate indifference, to properly train, supervise, provide for, make resources available to and discipline police officers in situations involving emotionally disturbed persons and in the proper means of detaining or protecting such persons from harming themselves or others.

## COUNT II-FEDERAL CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 12132 AND 29 U.S.C. § 794

79. Plaintiff incorporates the allegations set forth in each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

80. Defendants discriminated against Evans by reason of his mental disability denying him the benefits of the services, programs and activities to which he was entitled as a person with mental health disability, including but not limited to the right to be free of discriminatory or disparate treatment by virtue of his mental disability, and to due process of the law. As a result, Evans suffered harm in violation of his rights under the laws and Constitution of the United States, 24 U.S.C. § 12101 and 12132 and 29 U.S.C. § 794.

81. Defendant Washington County failed to comply with the 24 U.S.C. §§ 12101 and 12132 and 29 U.S.C. § 794 in the following ways:

    a. Failure to properly train, supervise and discipline Defendants regarding crisis intervention techniques for individuals who exhibit signs of mental disabilities;

    b. Failure to properly train Defendants in handling calls to intervene with suicidal individuals holding a firearm;

    c. Failure to provide adequate training and resources for Crisis Intervention and SWAT teams to respond to emergencies involving persons with mental disabilities;

    d. Failure of Defendants to follow established policies, procedures, directives and instructions regarding crisis intervention techniques for individuals who exhibit signs of mental health disabilities.

82. By these actions, Defendants have deprived Evans of rights secured by the United States Constitution, 42 U.S.C. § § 12101 and 12132 and 29 U.S.C. § 794.

## COUNT III-CONSPIRACY

83. Plaintiff incorporates the allegations set forth in each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

84. Before the Grand Jury, Ramirez said: "This wasn't a situation that happened in just a matter of seconds.[1] I got him to remove the magazine out of the weapon. I felt like I was making some progress and I felt he was beginning to trust me.[2] Q: Did he ever point the gun at you – A: No. Q: -- or any of the officers? A: No. Did he ever say he wanted to kill you or shoot you? A: No.[3] Q: did he say he ever wanted to shoot the other officers? A: No.[4] Did he do anything that caused you to consider shooting him? A: No. Q: So did you feel any immediate threat to your safety or the safety of the other officers that would cause you to shoot him? A: No.[5] Q: When you say it did concern us, have you talked with other officers about it, the situation? A: In – I mean, we've had debriefs, yes.[6] Q: Who were you debriefing with? A: Pretty much every other officer except Deputy Krook."[7]

---

[1] Ramirez, Grand Jury Transcript, p. 60, line 3-4.
[2] Ramirez, p. 60, line 18-19.
[3] Ramirez, p. 65, line 18-24.
[4] Ramirez, p. 65, line 25 and p. 66, line 1-2.
[5] Ramirez, p. 66, line 15-21.
[6] Ramirez, p. 68, line 9-11.
[7] Ramirez, p. 69, line 22-24.

85. Before the Grand Jury, Ramos said: "He said he didn't want to hurt us and that he wouldn't hurt us. I thought the negotiations were going good. I mean, he took the magazine out. He mentioned that [the bullet remaining in the gun] and said it was for him.[8] Q: To be clear, just before the first round of shots, did you see anything in Mr. Evans's behavior that caused you to fear for your life or the lives of the other law enforcement officers? A: "…, but nothing that made me feel the need to fire."[9]

86. Before the Grand Jury, Folendorf said: "Q: You never saw him point [the gun] at anyone -- A: No. Q: -- other than himself? A: Correct.[10] Q: Did Mr. Evans ever say anything to suggest to you that he would hurt any of the law enforcement personnel? A: No. Q: Did he, in fact, say just the opposite, that he had no intention of hurting law enforcement and that the bullet in the chamber was for him? A: Oh, I do recall him saying something to that effect, yes.[11] So I think, ultimately, the goal was to continue to talk to him and get him to set the firearm down so that we could get him some help, get him the phone call that he wanted to make and resolve the situation.[12] Q: How long were you willing to continue the negotiation? A: As long as it took.[13] Q: did you feel that there needed to be any change in what was happening when you arrived on the scene? A: The only change was in the works and that was contacting the SWAT team and the SWAT negotiators to see if  -- my hope was that they would maybe give some advice and obviously respond to the scene, and maybe have some training and experience that I didn't have to, I don't know, change the situation or maybe just to help essentially.[14] I have had 40 hours of

---

[8] Ramos, Grand Jury Transcript, p. 106, line 6-10.
[9] Ramos, p. 114, line 9-15.
[10] Folendorf, Grand Jury Transcript, p. 137, line 21-24.
[11] Folendorf, p. 139, line 9-17.
[12] Folendorf, p. 141, line 15-19.
[13] Folendorf, p. 141, line 20-22.
[14] Folendorf, p. 142, line 9-18.

13

crisis intervention training. Q: Are there simulations done of a suicidal person and whether to approach that person when they have a loaded weapon in their hand? A: In none of the training that I had was it simulated with a person with a firearm."[15]

87. On July 19, 2019, the Grand Jury returned an indictment charging Defendant Krook with Manslaughter in the Second Degree.

88. The matter went to trial before Judge Yunker in Washington County in March of 2020.

89. The Defendant Deputies, including Deputy Krook, changed their testimony at trial after conferring with Krook's defense lawyer.[16] The prosecutor was faced with the "blue wall of silence".

90. Defendant Deputies' trial testimony conveniently provided multiple subjective and irrelevant justifications for Krook's actions. They changed their testimony to protect one of their own, in violation of their sworn duties as peace officers, in violation of their ethical obligations to tell the truth, in violation of their policies and with utter disregard to their obligations under the Constitution.

91. At trial, Ramirez testified to the following: "Q: How long were you willing to wait for him to put the gun down? A: That I don't know. Maybe I made – maybe I waited too long.[17] He didn't point the gun at us. I know that he had – he had certainly flagged officers to the north, especially when he was turning.[18] Q: Before the first shots were fired, was there anything that you saw that would provoke you to fire your weapon? A: I was so focused on just trying to help him that I – I didn't. Q: You didn't see anything? A:

---

[15] Folendorf, p. 152, line 22-25 and p. 153, line 1-3.
[16] Ramirez, State of MN v. Brian Jeffrey Krook, Jury Trial Transcript, p. 619, line 1-7.
[17] Ramirez, Jury Trial Transcript, p. 613, line 23-25 and p. 614, line 1.
[18] Ramirez, p. 617, line 10-13.

No, but that doesn't mean that I wasn't at fault for that either. Maybe there was something that I missed that Krook saw."[19]

92. At trial, Ramos testified to the following: "He was talking to us. He didn't put the gun down, so I don't know if it's progress.[20] I know he did move his body. Made me a little nervous, yeah.[21] Q: Okay, but at the grand jury you were asked if him moving his body caused you concern. And your answer was no, right? A: I believe I said no."[22]

93. At trial, Folendorf testified to the following: "Q: And before the first round of shots were fired; did you ever see Mr. Evans point his gun at any of the law enforcement? A: Point it directly at, no. But his head movement caused the muzzle -- I guess I would call it a laser – to be in line with all four of the deputies – all four of us.[23] Q: So is it fair to say, Sgt. Folendorf, that on your first assessment here when you approach the rear of the that squad, you did not believe that it was necessary to use deadly force? A: I believed that it was necessary, but we did not use deadly force.[24] I believe it was necessary, but I did not use deadly force. That's the best way I can describe it. I should have.[25] Q: And you did that consistent with your training, didn't you, Sgt. Folendorf? A: Unfortunately, yes.[26] Q: Were they acting inconsistent or consistent with their training? A: Inconsistent.[27] Q: They should have shot Mr. Evans? A: Unfortunately, yes. Q: And what you just told us previously was that you never directed them to shoot him? A: Correct."[28]

---

[19] Ramirez, p. 626, line 22-25 and p. 627, line 1-5.
[20] Ramos, State of MN v. Brian Jeffrey Krook, Jury Trial Transcript, p. 840, line 13-14.
[21] Ramos, Jury Trial Transcript, p. 848, line 10-13. "
[22] Ramos, p. 848, line 18-20 and p. 849, line 1-4.
[23] Folendorf, State of MN v. Brian Jeffrey Krook, Jury Trial Transcript, p. 1026, line 11- 17.
[24] Folendorf, Jury Trial Transcript, p. 995, line 12- 17.
[25] Folendorf, p. 996, line 11-13.
[26] Folendorf, p. 995, line 21-23.
[27] Folendorf, p. 997, line 22-24.
[28] Folendorf, p. P. 998, line 2-6.

94. The Washington County Sheriff's Office did not discipline any of these officers for these violations and the "blue wall of silence" remains alive and well. All Defendant Deputies remained employed and on the streets of Washington County despite killing Evans.

## STATE LAW CLAIMS

95. Plaintiff incorporates the allegations set forth in each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

96. The conduct of Defendants was willful, reckless and intentional constituting assault, battery, un-authorized use of deadly force, negligence and wrongful death under M.S.A § 573.02.

## CLAIM FOR RELIEF

Wherefore, Plaintiff requests this Court to order the following relief against Defendants, jointly and severally:

   a. Compensatory damages in the sum the Jury awards;

   b. Punitive damages against the individual Defendants in the sum Jury awards;

   c. Attorney's fees and expenses together with costs and disbursements;

   d. All other appropriate relief.

Plaintiff hereby demands a jury trial.

Dated: December 4, 2020

> s/Peter C. Sandberg
> Peter C. Sandberg
> Registration No: 095515
> Elham B. Haddon
> Registration No: 0398698
> Attorneys for Plaintiff William O.
> Evans, Jr., as Trustee for the Heirs
> and Next-of-Kin for Benjamin Evans

Sandberg Law Firm  
4057 28th St. NW Suite 300  
Rochester, MN 55901  
Phone: (507) 282-3521  
Fax: (507)-282-3532  
psandberg@sandberg-law.com