**EXHIBIT B**

```
 1   STATE OF MINNESOTA                      IN DISTRICT COURT

 2   COUNTY OF WASHINGTON                    TENTH JUDICIAL DISTRICT

 3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 4   State of Minnesota,        )
                                )
 5              Plaintiff,      )     TRANSCRIPT OF
                                )       PROCEEDINGS
 6       -vs-                   )
                                )     JURY TRIAL
 7   BRIAN JEFFREY KROOK,       )
                                )     Court File No.
                                )     82-CR-19-2887
 8              Defendant.      )

 9   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10              The above-entitled matter came on for **JURY

11   TRIAL** before the Honorable Mary A. Yunker, one of the

12   judges of the Court, **the 9th day of March, 2020, and

13   continuing through the 19th day of March, 2020,** in the

14   Courthouse, in the City of Stillwater, County of

15   Washington, State of Minnesota.

16

17   APPEARANCES:

18

19              Mr. Thomas B. Hatch
                Special Assistant County Attorney
20              345 Wabasha Street North, Suite 120
                St. Paul, Minnesota   55102-1432
21
                     for the State of Minnesota.
22
                Mr. Andrew R. Johnson
23              Special Assistant County Attorney
                345 Wabasha Street North, Suite 120
24              St. Paul, Minnesota   55102-1432

25                   for the State of Minnesota.
```

JOSHUA JOHN RAMIREZ - DIRECT                            613

```
 1        I said I'd happily call anybody you want.  I just need
 2        you to drop the gun.  And he wouldn't.  He threw me his
 3        cellphone and said it was dead.
 4    Q   Okay.  All right, so maybe you should explain to the
 5        jury exactly what a magazine is.
 6    A   It is an item that goes into the bottom of a handgun
 7        and it holds multiple rounds.  And it also helps to put
 8        the next round into the chamber for semiautomatic
 9        weapons.
10    Q   Okay, and by removing the magazine, what did that mean
11        as far as how many bullets he might have left?
12    A   Potentially it may have one in the chamber.
13    Q   Okay.  So if he did not put the gun down, did he -- did
14        he change the position of the gun from pointing it at
15        his head?
16    A   He did.  I did get him to bring it down to his chest.
17        He eventually brought it back up to his head.
18    Q   Did he pretty much keep it pointed at his head the
19        whole time?
20    A   Yes, either his head or his chest.  But mostly his
21        head.
22    Q   Okay.  Did Mr. Evans ever give you any ultimatums, like
23        if you don't do this, I'm going to do that?
24    A   Yes, he had given me a time limit with how long I have
25        to make a phone call.  Otherwise he was going to shoot
```

JOSHUA JOHN RAMIREZ - DIRECT                614

```
 1        himself in the head.
 2    Q   And what happened?
 3    A   I continued negotiations with him.  And I think he
 4        said, one minute, or something like that.  It was a
 5        very short amount of time.  I was able to deflect him
 6        and he actually forgot all about the timeframe that he
 7        had given us.
 8    Q   Okay.  Was he -- was he ever threatening in his tone
 9        towards you?
10    A   It was a roller coaster.  You know, he was calm one
11        minute and then he was agitative the next.  It was
12        unpredictable.  And so --
13    Q   But did he ever use any words that were -- that
14        indicated that he was wanting to threaten you -- he was
15        threatening you?
16    A   No.  He never said I was going to hurt you or anybody.
17    Q   All right.  Was there a ballistic shield or bunker
18        available?
19    A   I believe Sgt. Folendorf had retrieved a -- what's
20        called a bunker or a shield, as most people would
21        imagine it.  And she did bring it over to the -- to my
22        squad car there to the back.  But we never used it.
23    Q   Okay.  How long were you willing to wait for him to put
24        the gun down?
25    A   That I don't know.  Maybe I made -- maybe I waited too
```

1   A   Correct.
2   Q   But nobody behind him?
3   A   Correct.
4   Q   And was he -- when he was turning, was he looking both
5       to his right and then to his left behind him?
6   A   That's how I remember it, yes.
7   Q   Okay. Did he ever point the gun directly at -- before
8       the first round of shots were fired -- did he ever
9       point the gun directly at you or at any other officers?
10  A   I don't recall. I mean he didn't do this motion
11      (indicating). He didn't point the gun at us. I know
12      that he had -- he had certainly flagged officers to the
13      north, especially when he was turning. So that's also
14      cause for concern as well.
15  Q   Did you say, "flagged officers to the north"?
16  A   So when he turns his head and his torso, the trajectory
17      of the -- of the gun is also sweeping across the street
18      as well. And he's coming all the way across. So, yes,
19      I'd say he flagged probably a few people.
20  Q   Now do you remember giving testimony at the grand jury?
21  A   I do.
22              MR. HATCH: And may I approach the
23      witness?
24              THE COURT: You may.
25              MR. SHORT: I'm going to ask for a page

JOSHUA JOHN RAMIREZ - DIRECT                619

```
 1   Q   And since your grand jury testimony, you have had some
 2       meetings with defense counsel, correct?
 3   A   Yes.
 4   Q   And they've suggested some ways in which you could
 5       approach this case?
 6   A   We have just gone over some things.  They never gave me
 7       answers to anything.
 8   Q   All right.  Did you have your eyes on Mr. Evans the
 9       whole time that this conversation went on?
10   A   Except for the few instances where I had looked back at
11       Krook or Ramos.
12   Q   Okay.  Did Mr. Evans do anything that caused you to
13       consider shooting him before that first round of shots?
14   A   Yes.  So in the grand jury I said "no" to this question
15       as well.  So after thinking about what I had said, the
16       way I perceived the question was, did he do anything
17       else, like try to point the gun at us or threaten us
18       verbally or get up and try to walk towards us?  That's
19       what I was thinking during that questioning.  So with
20       that being said, I did say "no", he didn't.  But I also
21       pointed my gun at him.  He had a gun and was pointing
22       at himself.  I don't pull my gun out on every call I go
23       to.  If he -- if there's a reason why I had my gun out,
24       it's because the suspect or the person involved is
25       giving me more than ample reason to do so.  It's not
```

```
 1        the trigger well.  The handgun was still to his head.
 2        But he had slumped over slightly, almost like his head
 3        was resting on it, as we moved in.
 4   Q    So he, even after firing -- even after this first round
 5        of shots, he had not separated himself?  He had not
 6        been separated from his gun?
 7   A    Correct.
 8   Q    So he's still a man holding a gun to his head?
 9   A    Yes.
10   Q    And that's the same situation that you were in when you
11        first arrived?
12   A    Yes.
13   Q    And that's the situation that you perceived is one
14        where you should not approach, correct?
15   A    Correct.
16   Q    All right.  So even though Mr. Evans is still with a
17        gun to his head, Deputy Krook approached, right?
18   A    I believe multiple officers approached, not just Deputy
19        Krook.
20   Q    Was Deputy Krook the first?
21   A    I don't know.
22   Q    Before the first shots were fired, was there anything
23        that you saw that would provoke you to fire your
24        weapon?
25   A    I was so focused on just trying to help him that I -- I
```

JOSHUA JOHN RAMIREZ - DIRECT                              627

1           didn't.
2       Q   You didn't see anything?
3       A   No, but that doesn't mean that I wasn't at fault for
4           that either.  Maybe there was something that I missed
5           that Krook saw.
6       Q   You had your eyes on Mr. Evans?
7       A   You're right.
8       Q   Now did you approach after Deputy Krook approached?  I
9           am talking about --
10      A   Around the same time, yes.
11      Q   I'm talking about after the first round of shots?
12      A   Yes.
13      Q   Okay.  And would you describe what happened?
14      A   I moved in.  I still had my gun drawn on Mr. Evans.  I
15          gave commands to drop the gun.  I kept repeating that.
16          Drop the gun.  As we approached, his hand came down in
17          what appeared to be in my line of sight and that's when
18          Deputy Krook shot again.
19      Q   Okay.  And you did not shoot?
20      A   I did not shoot.
21      Q   You stepped out of the way?
22      A   I reacted and kind of jerked to the left, yes.
23      Q   Okay.  And the gun was not pointed or was -- excuse
24          me -- was the gun pointed at Deputy Krook as it came
25          down?

MICHAEL RAMOS - DIRECT                                            840

1         you take over the conversation between law enforcement
2         and the individual?
3    A    For a few minutes, I think, yes.
4    Q    Okay, was that shortly after you got there?
5    A    Yes.
6    Q    But you only kept doing that for a few minutes?
7    A    I think so, yeah.
8    Q    And why did you stop?
9    A    Ramirez took back over.
10   Q    How did you feel that conversation was going?
11   A    He wasn't putting the gun down, so --
12   Q    Okay, but some progress was being made, right?
13   A    He was talking to us.  He didn't put the gun down, so I
14        don't know if it's progress.
15   Q    He ended up dropping the magazine though, taking it out
16        and tossing it, right?
17   A    Much later, yes.
18   Q    Okay.  And did he say that he was not going to hurt law
19        enforcement?
20   A    He said something to that effect, yes.
21   Q    In fact he said that over and over and over again,
22        right?
23   A    I couldn't tell you how many times.
24   Q    He said it more than once?
25   A    I think so, yes.

MICHAEL RAMOS - DIRECT                                         848

1  Q  Okay, so when you say flag it, that's all you mean?
2  A  Correct.  The barrel of the gun is pointed in our
3     direction.
4  Q  Okay.  When he was moving -- he was moving his body and
5     his head quite a few times, right?
6  A  Correct.
7  Q  Both to the left and to the right?
8  A  I couldn't tell you which direction.
9  Q  Okay, but it happened way more than three times, right?
10 A  I couldn't tell you how many times either.  I know he
11    did move his body.
12 Q  Okay.  And was that causing you concern?
13 A  Made me a little nervous, yeah.
14 Q  Okay, do you remember testifying to the grand jury that
15    it was not causing you concern?
16 A  Not any additional concern, but I'm already concerned
17    when he's got a gun.
18 Q  Okay, but at the grand jury you were asked if him
19    moving his body caused you concern.  And your answer
20    was no, right?
21              MR. SHORT:  Objection, leading, Your
22    Honor.
23              THE COURT:  Objection sustained.
24
25

```
 1   BY MR. JOHNSON:
 2   Q   Okay, do you recall what you told the grand jury about
 3       whether it concerned you?
 4   A   I believe I said, "no".
 5   Q   Okay.  In fact, did you say that a couple of times?
 6   A   I couldn't tell you how many times.
 7   Q   Do you recall at the grand jury talking about how
 8       Deputy Krook said to you, that turning is making me
 9       uncomfortable?
10   A   I don't know the exact phrase, but being uncomfortable,
11       yes.
12   Q   Okay, and you remember that conversation we had at the
13       grand jury?
14   A   Yes.
15   Q   Okay.  And do you remember me asking you if you shared
16       that discomfort?
17               MR. SHORT:  Objection to the continuing
18       leading nature of the questions, Your Honor.
19               THE COURT:  Sustained.
20
21   BY MR. JOHNSON:
22   Q   Well, do you recall me asking you that question?
23   A   Which question exactly.
24   Q   Whether you shared Deputy Krook's concern?
25   A   I don't remember that exact question, no.
```

MICHELLE FOLENDORF - DIRECT                           995

```
 1    A    If he did, I didn't hear it.
 2    Q    All right.  Did you ever tell Deputy Ramirez to stop
 3         the talking and just shoot him?
 4    A    Absolutely not.
 5    Q    Okay.  Did you tell any of the deputies, just take him
 6         out, shoot him?
 7    A    I would never direct anybody to shoot anybody.
 8    Q    Well, you understand that deadly force may be used when
 9         it's necessary to protect yourself or another from
10         apparent death or great bodily harm?
11    A    I understand that.
12    Q    So is it fair to say, Sgt. Folendorf, that on your
13         first assessment here when you approach the rear of
14         that squad, you did not believe that it was necessary
15         to use deadly force?
16    A    I believed it was necessary but we did not use deadly
17         force.
18    Q    You stood behind that squad and did not use deadly
19         force?
20    A    Correct.
21    Q    And you did that consistent with your training, didn't
22         you, Sgt. Folendorf?
23    A    Unfortunately, yes.
24    Q    What do you mean, "unfortunately"?
25    A    Because where I was standing for me personally, it
```

1   would not have been tactically responsible to shoot
2   with two of my partners in between myself and
3   Mr. Evans. And I say unfortunately, because the lives
4   of every single person that was out there was put in
5   jeopardy because we wanted so badly for this young man
6   to put that gun down and for this to be over with.
7 Q Okay. And I -- I'm not questioning that,
8   Sgt. Folendorf. What I want to know is you did not use
9   deadly force because you determined that it was not
10  necessary at that time. That's true, isn't it?
11 A No, I believe it was necessary, but I did not use
12  deadly force. That's the best way I can describe it.
13  I should have.
14 Q So you -- you were standing there believing that there
15  was -- and no action was being taken to protect your
16  deputies from an apparent death or great bodily harm?
17  Is that your testimony?
18 A I believe action was being taken. Again, I did not --
19 Q No, no, no --
20            MR. TIERNEY: Your Honor, I would object
21  and I would ask that Mr. Hatch allow her to answer the
22  question.
23            THE COURT: I will sustain the
24  objection, allow her to answer, but the answer has to
25  be responsive to the question.

MICHELLE FOLENDORF - DIRECT                                997

```
 1                    THE WITNESS:  Okay.
 2                    THE COURT:  Would you restate it again
 3        please, Mr. Hatch?
 4
 5   BY MR. HATCH:
 6   Q    You did not use deadly force because your assessment at
 7        that point was that it was not necessary to protect
 8        yourself or another from apparent death or great bodily
 9        harm; isn't that true?
10   A    No, I did not use deadly force because of where I was
11        positioned behind that squad car.
12   Q    All right, and so then is your testimony that who was
13        in a position that could have used deadly force; Deputy
14        Ramirez?
15   A    Deputy Ramirez, Deputy Ramos, and Deputy Krook.
16   Q    All right.  And those three individuals during that
17        first assessment when you arrived at the rear of the
18        squad, did not use deadly force --
19   A    Correct.
20   Q    -- right?
21   A    Correct.
22   Q    Were they acting inconsistent or consistent with their
23        training?
24   A    Inconsistent.
25   Q    Inconsistent?
```

MICHELLE FOLENDORF - DIRECT                998

```
 1   A   Yes.
 2   Q   They should have shot Mr. Evans?
 3   A   Unfortunately, yes.
 4   Q   All right.  And what you just told us previously was
 5       that you never directed them to shoot him?
 6   A   Correct.
 7   Q   You are the incident commander in charge of this scene
 8       and you're telling us this is a situation involving
 9       apparent death or great bodily harm, and you did
10       nothing to protect your deputies under your control at
11       that moment; is that what you're saying?
12   A   I believe I was trying -- it's a difficult question to
13       answer.  I believe I was trying to exhaust all options
14       and should I have done something different to protect
15       them?  I don't know what that would have been.  We all
16       are trained.  We all have to make our own decision
17       whether or not we pull that trigger, and I would never
18       direct somebody to do that.  That's why I tried some
19       other things throughout the course of the event.
20   Q   All right.  Both Mr. Ramirez and Mr. Ramos were using
21       the squad as cover, is that right?
22   A   I know Deputy Ramirez was.  I can't say for certain
23       what Deputy Ramos was doing.
24   Q   Okay.  How about Deputy Krook?  Was he using cover of
25       any kind?
```

1       MR. HATCH:  Thank you.
2
3   BY MR. HATCH:
4   Q   Sgt. Folendorf, where were you when the first volley of
5       shots were made by Deputy Krook?
6   A   I was at the rear of the squad closer to the right
7       side.
8   Q   All right, and had you been there for five minutes or
9       so?
10  A   If I had to guess, yes.
11  Q   Okay.  And before the first round of shots were fired;
12      did you ever see Mr. Evans point his gun at any of the
13      law enforcement?
14  A   Point it directly at, no.  But his head movement caused
15      the muzzle -- I guess I would call it a laser -- to be
16      in line with all four of the deputies -- all four of
17      us.
18  Q   His head would be between the gun and any of the
19      deputies, right?
20  A   Yes.
21  Q   Okay, and so you never saw him point -- before the
22      first volley of shots, you never saw him point the gun
23      at anyone other than himself?
24  A   Correct.
25  Q   And did Mr. Evans ever say anything to you to suggest