EXHIBIT 1



**SANDBERG**
PERSONAL INJURY LAW

Peter C. Sandberg

Elhaim B. Haddon

October 30, 2020

Joseph E. Flynn
Jardine, Logan and O'Brien, PLLP
Suite 100
8519 Eagle Point Blvd
Lake Elmo MN 55042

Re:     Evans v. Krook and Washington County
        Our File No. 2-7048

Dear Mr. Flynn,

Late Wednesday night, April 11, 2018, a twenty-three-year-old man was threatening to kill himself. Answering a welfare check were three Washington County Deputies, Brian Krook, Joshua Ramirez and Michael Ramos, and Sergeant Michelle Folendorf. They found him kneeling on the pavement inside a painted crosswalk on a street in Lake Elmo with a handgun aimed at his head and its muzzle pressing against his skull. Deputy Ramirez parked his squad car across the street from where Evans was kneeling with his squad car facing Evans, stepped outside his squad car and stood behind an open driver's door for cover. Standing behind him on the same side was Deputy Ramos. Standing next to him looking over the squad car's truck was Sergeant Folendorf. Deputy Krook stood in the street next to Ramirez's squad car with the passenger door closed.

For the next forty-five minutes to an hour, Deputy Ramirez and Evans talked while Evans was kneeling in the painted crosswalk. Ramirez told Evans to put down his gun. Evans said, "no." He wanted the gun to kill himself and told Deputy Ramirez his only aim was killing himself. He was a threat to no one else. None of the deputies were confused or mistaken about what he meant. His plan was plain. The gun was pointed at his head, and he was planning to kill himself.

Ramirez and Evans were still talking. They were making progress. As a good, steady first step consistent with Ben Evans' plan, Deputy Ramirez asked Evans to empty the magazine. Evans freed the magazine from his handgun, dropped the magazine into his left hand and threw it across the street far beyond his reach and near enough to the deputies could see and realize there was only one live shell chambered in a handgun with its muzzle pressed against his head, leaving him nearly unarmed and defenseless against overwhelming firepower.

Ramirez and Evans were still talking. They were making progress. Ramirez asked Evans to shift the handgun from his head to his chest. Evans did exactly that, shifting his handgun back-and-forth between his head and chest a few times while the deputies kept him firmly in their crosshairs. Their guns stayed silent. Moving his handgun freely back-and-forth was no signal to them he was about to shoot.

Deputy Ramirez and Evans were still talking. They were making progress. Their conversation turned to Ben's failed romance with his ex-girlfriend. Evans asked for a cellphone saying his cellphone was dead and sliding his cellphone across the street so Deputy Ramirez could see he was telling the truth. Ramirez's answer was "no," not without dropping the gun first, fearing he'd call his girlfriend and fire the fatal shot killing himself while she was listening. Deputy Ramirez was protecting Evans from himself. Evans offered to drop the handgun to the pavement once he had the phone. The answer was "no."

They were still talking. They were making progress. Evans gave Deputy Ramirez a two-minute deadline for getting a cellphone, like a two-minute warning in football before the game ends. Two minutes elapsed, the clock kept ticking and the football game didn't end. Evans was bluffing.

They were still talking. They were still making progress. Throughout the whole time they talked, Evans was turning his head from side-to-side to see what the deputies, State Troopers and City police officers were doing as they stood along a concave edge of a roughly assembled crescent moon made with squad cars. Planted against the right side of his skull was the barrel of his handgun with its muzzle aimed at his skull. As he turned his head from side-to-side watching to see what's happening, the barrel and its muzzle turned as well but always at a 90° angle facing away from where his eyes were looking. When looking north, the sight on his handgun was facing west. Aiming a handgun this way is as handy as shooting ducks while wearing a blindfold. Throughout the time Deputy Ramirez and Evans were talking, Evans moved his head from side-to-side as he watched. Their guns stayed silent. Moving his head from side-to-side was no signal to them he was about to shoot. Their impression was simple and unmistakable. Evans wasn't aiming for them. He was aiming only for himself.

They were still talking. They were still making progress. Deputy Krook was standing on the opposite side of Deputy Ramirez's squad car with the beanbag shotgun resting against the squad car. Sergeant Folendorf handed Deputy Krook the beanbag shotgun when they arrived and told him to shoot with it when he got a clear shot. The beanbag shotgun isn't deadly weapon. The shotgun shoots beanbags rather than bullets. When a beanbag hits its target, the beanbag acts like a stone, and coldcocks its target like a closing blow in a prizefight.

Deputy Ramirez and Evans were still talking. They were still making progress. Evans wanted to call his dad, who was Bill Evans, a twenty-five-year veteran, paramedic firefighter with an engine house in St. Louis, Missouri. Evans talked with his dad each day. Evans was shopping for help. While they were talking, one of the deputies shouted

at a stranger who was behind Evans over his right shoulder and ordered the stranger to get back inside his house. As Deputy Ramirez was talking to him, Evans turned his head to look over his right shoulder and see what was happening. While he was looking away, shots filled the air. Deputies Ramos and Ramirez and Sergeant Folendorf thought Deputy Krook had fired the beanbag shotgun first and pulled the service revolver from his holster afterwards. A week later, while attending a debriefing, they were surprised to learn for the first time that Deputy Krook didn't deploy the beanbag shotgun. Neither Ramirez, Ramos nor Folendorf felt Evans was a threat, considered killing him or thought he was about to shoot them. Their impression was simple and unmistakable. To summarize what they said under oath:

Deputy Ramirez: "He was on his knees the whole time. I felt like I was making progress with him. He didn't point the gun at me or anyone else or say he wanted to kill me or anyone else except him. Gave no thought to shooting him. He was no immediate threat to me or the other officers. Turning his head from side-to-side wasn't a threat and I didn't tell him to stop or consider shooting him. I was talking to him when the shots were fired. He did nothing to provoke the shooting."

Deputy Ramos: "He said he wasn't here to hurt us, the bullet left in his gun was only him and he didn't point his gun at us. We were making progress. Turning his head from side-to-side with the gun aimed at his head was no threat. I had no concerns, didn't think what he was doing was a threat and didn't ask him to stop."

Sergeant Folendorf: "He didn't aim his gun at anyone except himself and made no threat to shoot us. He only threatened to kill himself. Talking to him was working, and we were willing to talk with him for as long as it took. None of the turning his head from side-to-side signaled to her Ben Evans was about to shoot or pull the trigger. 'Deputy Krook said…he had a clear view of the young man. And that he believed he would be able to fire a less lethal round at him.'" She tried to call for help, no one responded. No Crisis Negotiator, No SWAT team and no supervisor were there from Washington County when Evans was in the middle of the intersection.

Standing unshielded in the street next to Deputy Ramirez's squad car on the passenger side, with the door closed and his beanbag shotgun resting against it, was Deputy Krook. Ramirez and Evans were talking. They were still making progress, getting close to the end. Deputy Krook heard them talking. "Keep him talking, take your time" were Sergeant Folendorf's words. Evans talked to Deputy Ramirez about his shortcomings, his mistakes and his stumbling blocks. Deputy Ramirez was inside his head and heart, where there was no longer a place for talk about pulling a trigger and killing himself. Evans wanted to call his dad. His airplane was in a flight path with the landing gear down, locked into place and ready to land, lay down his shame, call his dad and trust his father with the final answer to one question: "Dad, what do I do?" While he was plainly looking away over his right shoulder, Deputy Sheriff Brian Krook shot and killed him.

3

That same night, after Deputy Krook conferred with his lawyer, he said: "[Ben Evans] wanted that phone and *to me that seemed like* he wanted the phone *and then* he was goanna kill himself and so I didn't want him to take one of us with him was my big worry." (Emphasis added.) What he imagined might happen was far from what was readily seen and apparent to the other deputies and their Sergeant. Ben Evans wasn't holding a phone. He wasn't asking to call his girlfriend. He was asking to call his dad. Deputy Ramirez told him "no," and told him he couldn't have a phone until he put the gun down. What Krook and his lawyer told the investigator was make-believe. His story doesn't fit with what happened. Killing Ben Evans was unnecessary. There was no need for it to end this way.

Deputy Krook used deadly force against Evans, killing him, separating Ben Evans as a citizen from his constitutionally protected right to live. Meeting the burden of proof is straightforward for Evans. Minn.Stat., §609.066, Subds. 1 and 2(1) and Baker v. Chaplin, 517 N.W.2d 911, 914-915 (Minn.1994). The burden to show the need for deadly force falls on Deputy Krook and Washington County, and must be more than make-believe.

> "The facts and circumstances in this case must be measured *objectively* by asking whether an objectively reasonable police officer would have believed that the force [the police officer] used was lawful in light of the clearly established law and the information [the police office] possessed. *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039-40. An objectively reasonable police office is one who is reasonably well trained. *Malley*, 475 U.S. at 345, 106 S.Ct. at 1098." (Emphasis in original.) Baker v. Chaplin, 517 N.W.2d at 916.

Deputy Krook was a trained crisis negotiator. Both he and Washington County had programs and personnel in their arsenal to meet what Deputy Krook faced. Squeezing a trigger wasn't their only option. Simply saying, "stop moving your head" would have been enough with Evans. Deadly force wasn't the only option. Proving what Deputy Krook imagined was more than make-believe at a time when a deputy wasn't thinking clearly rests with Deputy Krook and Washington County.

Claims against Krook and Washington County whether direct, vicarious or supervisory will be assault, battery, wrongful death under MINN. STAT. §573.02, Subd. 1 and 42 U.S.C.A §1983 (deprivation of constitutionally protected right to live) for compensatory and punitive damages plus reasonable attorney fees and expenses. Punitive damages are allowed under both MINN. STAT. §573.02, Subd. 1 (Wrongful Death) and 42 U.S.C.A §1983. Assault and battery as a basis for punitive damages was established years ago in Minnesota. Moore v. Fisher, 117 Minn. 339, 135 N.W. 1126 (1912). Punitive damages are unavoidable if a jury chooses to award them. Police officers who testified under oath at a criminal trial contrary to what they testified to under oath to a Grand Jury serves as a strong case for deterrence based upon public policy and erasing the "blue line" especially if Deputy Krook played a hand in it.

4

Enclosed is the following:

Criminal Case File:

     a.  A thumb drive containing all audio, video, training records and electronic data from the investigation.
     b.  5 bound volumes containing over 1600 pages of paper records from the investigation.
     c.  Court filings from indictment through trial, including Grand Jury Transcript

Sandberg Law Firm records:

1. Kim Porter's Credit Card Statement
2. Lindenwood University Transcript
3. Evans' email to Inver Hills College
4. Evans' email to Health East after his termination, pictures, receipt for interview shirt
5. Evans calendar
6. Pharmacy records
7. Tax returns
8. Education records
9. Evans' EMSRB, EMT, EMT Basic and Discharge from Active Duty certificates
10. Evans' Facebook page
11. Employment records
12. Workers' Compensation records
13. Medical Records
14. James L. Greenstone, Ed.D., J.D., DABECI

Ben Evans lived in a household where public service was a family heirloom. His father was a paramedic fire-fighter with the St. Louis County Fire Department. His maternal grandfather was Colonel Percy Wayne Harrell, and his maternal uncle was Lt. Colonel Michael Harrell, both of whom were graduates from the United States Air Force Academy, flew as fighter pilots for the USAF and Lt. Colonel Harrell decorated as "Top Gun." Colonel Harrell retired as Squadron Commander of the 131st Fighter Wing, and Lt. Colonel Harrell as Squadron Commander for Logistical Readiness. Both of them went on to fly as commercial pilots for United Airlines. These men were Ben's heroes. He saw firsthand the stature that could fasten itself to a son who followed in his father's footsteps. His family was all-blue at home, on the street or in the air. Their favorite color was blue, a color Ben wore when he died clothed in his parade dress uniform and service cap: Fire-Fighter blue.

Too young to work as a fire fighter, Ben enlisted as a Marine in high school with his parents' consent and reported for boot camp where a muscle in his left shoulder was torn,

surgery was done and he was discharged. Following his graduation from high school, Ben enlisted in the Air Force, reported to boot camp, tore a meniscus in his knee and received a second discharge. August 2014, he enrolled as a freshman in the EMT/paramedic student at Lindenwood University, met and dated Stevie Legate and they had a daughter, Lydia Rose, who was born on June 28, 2016. On vacation in Mexico, he met Lauren Hintz who lived in Western Wisconsin across the Mississippi River from Wabasha, Minnesota. The Wabasha City Ambulance posted a help-wanted ad for a certified EMT. Ben was hired, deferred his education as a paramedic and moved to Wabasha to work as an EMT close to Lauren Hintz starting on July 14, 2017.

On August 9, 2017, while lifting a patient into the ambulance, Ben tore muscles in his left shoulder. Surgery was done on September 13, 2017. He returned to work, hurt his left shoulder for a third time and was removed from the active duty roster. When he returned to work on January 26, 2018, the City of Wabasha had streamlined its ambulance service and eliminated his job. On February 19, 2018, Health East near Lake Elmo, Minnesota hired Ben as an EMT but let him go three days later since he was unable do the work. His left shoulder was still bothering him. On April 10, 2018, a day before his attempted suicide, he was seen at Twin Cities Pain Clinic as a pain management patient where he described an unrelenting pain in his left shoulder worse with movement and lifting. His physical therapist scheduled him for an appointment on April 23, 2018 with an orthopedic surgeon for further evaluation. His pain was gradually getting worse, and "can lift heavy weights but it gives extra pain." Dr. McNamara scheduled a return visit on April 25, 2018 following his consultation with the orthopedic surgeon.

Wednesday night, April 11, 2018, Ben Evans was having a bad day, facing a failed romance and an interview scheduled one or two days later for a job he already knew was too painful for him to do safely. He wasn't a young man without his troubles, but his troubles weren't insurmountable. His criminal and mental health record read like a blank sheet of white paper. His days working as a fire fighter, EMT or paramedic were done. But neither his health, his attitude nor his aptitude stood between him and a good-paying job as a physician's assistant. He was bright, ambitious, physically and mentally fit to finish college; move on, make something out of himself, hold down a good job as a physician's assistant, get married and raise a family. A physician assistant in Missouri earns $92,500 per year as salary without adding the benefits. Ben was born on November 16, 1994. He was 23 years old, had a 54-year life expectancy and a 40-year, work-life expectancy, earning him $3,700,000 without adding benefits. His heirs are as follows:

> William O. Evans, Jr., his father, 58 years old;
> Kimberly Harrell Porter, his mother, 54 years old;
> Brianna Evans, his sister, 32 years old;
> Matthew Ryan Evans, his brother, 30 years old; and,
> █████████ his daughter, 4 years old.

Ben's family respected Deputy Sheriff Krook's constitutional right to a fair trial on his criminal charges, stayed quiet and didn't openly criticize or embarrass him. Their family is all-blue, and their first choice is settlement. They'd like to put this calamity behind

them. It appears to me this claim will land in a jury's hands, with a good chance they'll see it our way.   It seems to us the best time to get this done without a lot of fanfare is now.   What are your thoughts?  Please let us know.

Your cooperation is deeply appreciated.  Thank you.

Yours truly,

Peter C. Sandberg
Attorney at Law

EXHIBIT 2

## AUTHORIZATION TO RELEASE INFORMATION

Our File No.: 40194

Name of Patient:     Benjamin William Evans
Date of Birth:

### AUTHORIZATION FOR RELEASE OF INFORMATION AND FOR REDISCLOSURE

I authorize _____
whose address is _____,

to disclose and deliver to **JARDINE, LOGAN, & O'BRIEN, PLLP**, whose address is 8519 EAGLE POINT BLVD., SUITE 100, LAKE ELMO, MN 55042, their representatives, employees, and/or the Minnesota Counties Intergovernmental Trust (MCIT) all medical information, x-rays, etc. (including, but not limited to that which involves genetic information, treatment for psychiatric and/or psychological conditions, sickle cell anemia, alcohol and/or drug abuse, and for testing and/or treatment of human immunodeficiency virus [HIV], or acquired immunodeficiency syndrome [AIDS], which are protected by FEDERAL LAW [42 CFR Part 2]) maintained on Benjamin William Evans, Decedent, at your facility at any time that he was a patient at the facility, on any date, with the following exceptions: NONE --- **This authorization allows release of ALL portions of your files regarding Benjamin William Evans, Decedent, including x-ray films, lab and testing results, correspondence and records/reports you have from other medical providers or facilities.**

I UNDERSTAND THAT THIS AUTHORIZATION SPECIFICALLY INCLUDES RECORDS PREPARED PRIOR TO THE DATE OF THIS AUTHORIZATION AND RECORDS PREPARED AFTER THE DATE OF THIS AUTHORIZATION DURING THE PENDENCY OF THIS PROCEEDING UP TO THE AUTOMATIC EXPIRATION DATE OF ONE YEAR FROM THE DATE OF THE AUTHORIZATION.

I understand the information is being disclosed for the purpose of litigation.

I understand that my signing or not signing this authorization does not affect the treatment, payment, enrollment or eligibility for benefits by the facility.

I further understand that the Recipient, WITHOUT FURTHER AUTHORIZATION, may redisclose said information to: Parties and their legal counsel; insurers; experts; potential experts; anyone against whom claim is or has been made; administrative agency and court officials hearing the claim; and any agents; employees; or representatives if any of said persons.

I understand, that if this information is disclosed to a third party, the information may be redisclosed by the person or entity that receives the information and may no longer be protected by federal privacy regulations.

I understand that I may revoke this authorization, in writing by sending a written notice to the healthcare provider listed above, at any time and it will not affect the ability to obtain health care services. I also understand that if I revoke, the revocation will take effect on the day it is received by the entity from which written disclosure is sought, but it does not apply to information that has already been released under this authorization.

I understand that I have a right to receive a copy of this authorization.

Conversations with the above-noted provider **ARE/ARE NOT (cross out one)** allowed by this authorization.

**I SPECIFICALLY AUTHORIZE AND CONSENT TO THE DISCLOSURE AND REDISCLOSURE DESCRIBED ABOVE. A** photocopy of this authorization will be treated in the same manner as an original.

_____        Date   7/21/21
**Signature of Patient or Patient's Legal Representative**

William O. Evans, Jr., as Trustee for the Heirs and nok of Benjamin Evans (Deceased)
**Print Name and Relationship of Patient's Legal Representative**

I verify that the proceeding requiring this information is still pending and that information provided pursuant to this authorization will not be re-released for purposes not related to this proceeding.

_____        _____
**Signature of Party Requesting Information**                   **Date**

**ATTENTION PUBLIC FACILITIES: Minnesota Statute Section 13.05, subd. 4(d)(7) requires automatic expiration of this authorization one year from date of authorization.**

Rev.0612

**Minnesota Department of Employment & Economic Development**

## Consent to Release Private Data ~ Account Records

Your name or name of entity ____ Unemployment Insurance (UI) Applicant ID or Employer Account No.

BENJAMIN W. EVANS DOB:

Street address

City ____ State ____ Zip code

*I authorize the following person or organization to receive the private and nonpublic data checked below:*

| Name of person to receive private data | Name of organization (if applicable) |
|---|---|
| | JARDINE, LOGAN & O'BRIEN, PLLP |

Street address ____ City ____ State ____ Zip code
8519 Eagle Point Blvd., #100 ____ Lake Elmo ____ MN ____ 55042

Phone number ____ FAX number
(651) 290-6500 ____ (651) 223-5070

Check all that apply:

☒ Contact / General Information (Personal Data - i.e., date of birth, 4 digits of social security number, driver's license number, etc.)

☒ Applications/Reactivations ____ ☒ Correspondence/FactFinding ____

☒ Determination of Eligibility and Decisions ____ ☒ Payment/Overpayment ____

☐ Other ____

*I voluntarily authorize the Department of Employment & Economic Development to release the selected private data to the above individual/organization. I am aware of the purpose for releasing the private data and I understand that there may be consequences for releasing the data to the individual/organization.*

Print your name (and title, if applicable) ____ Phone ____ Date 7/21/21
William O. Evans, Jr., as Trustee
for heirs and nok of Benjamin W. Evans

valid until it is signed and dated. It will expire three months after the
ued documentation with a signature for the above-referenced individual.

Examples of supporting government documentation include a copy of a driver's license, state issued ID or social security card. If you are not the subject of the data (e.g., guardian, power of attorney, or other personal representative), you must provide documented proof that you are entitled to access the data in addition to a consent form

☐ Check this box if copies should also be mailed to the data subject.

## Explanation of your rights

**Purpose of this form**
You must complete, sign and return this form if you want to authorize a person or organization to receive certain private or nonpublic information that we collect to administer the Unemployment Insurance Program.

You have the right to choose what data we release. This means you can let us release all of the data, some of the data, or none of the data listed on this consent.

You have the right to allow us to release the data to all, some or none of the persons or entities listed on this form. This means you can choose which entities or persons may receive the data and what data they may receive.

You may withdraw your permission at any time. Withdrawing your permission will not affect the data that we have already released because we had your permission to release the data.

**Reviewing the Information**
You have the right to look at all data described on this form and have copies of the data. We encourage you to look at the data before you decide to give your consent. If you want copies of the above data mailed only to you, fill out this form without adding an authorized person or organization.

**Questions?**
If you have any questions about your private data, how to complete this consent form, or if you want to withdraw your consent, call Jim S. at (651)259-0806.

Send completed forms to:
DEED – UI Attn: Jim S.
PO Box 4629
Saint Paul, MN 55101-4629
Or fax Attn: Jim S. at 651-205-4007

**m¹ MINNESOTA**
UNEMPLOYMENT INSURANCE

<u>AUTHORIZATION FOR RELEASE OF INFORMATION</u>
<u>WITH REGARD TO LAW ENFORCEMENT INVESTIGATION</u>

TO:


I, William O. Evans, Jr., as Trustee for the Heirs and Next-of-Kin of Benjamin Evans, do hereby authorize ___BCA_____ to provide Washington County, Sheriff Dan Starry, Sgt. Michelle Folendorf, and Deputies Brian Krook, Michael Ramos and Joshua Ramirez, Attorneys Joseph Flynn and Vicki Hruby of Jardine, Logan & O'Brien, P.L.L.P., and Sandberg Law Firm, a copy of any and all information regarding Benjamin Evans's involvement with your agency. This is to include, but is not limited to, police reports, investigation reports, statements, evidence log, video surveillance, and photographs.

The purpose for which this information will be used is in a lawsuit brought by William O. Evans, Jr., as Trustee for the Heirs and Next-of-Kin of Benjamin Evans against Washington County, Sheriff Dan Starry, Sgt. Michelle Folendorf, and Deputies Brian Krook, Michael Ramos and Joshua Ramirez, arising out of an incident on 4/12/2018, resulting in his death. The information to be released is private and any subsequent use and release is controlled under the Minnesota Government Data Practices Act (Minn. Stat. Ch. 13).

I have been informed of my right to refuse to release this information.

I understand that I may revoke this consent upon written notice (not retroactive) and that the consent will automatically expire within one year of the date of my signature or on the expiration date specified below, whichever is earlier.

A copy of this authorization is as valid as the original.


Dated ___7\20\21___

Heirs and Next-of-kin of Benjamin Evans
(Decedent's Date of Birth: 11/16/1994)

**AUTHORIZATION FOR FILE
REVIEW OR RELEASE OF
COPIES OF WORKERS'
COMPENSATION CLAIM FILE**



DO NOT USE THIS SPACE

TO:   Department of Labor and Industry
      Workers' Compensation File Review
      PO Box 64226
      St. Paul, MN 55164-0226
      (651) 284-5200
      Fax: (651) 284-5731

I hereby authorize Jardine, Logan & O'Brien, P.L.L.P., its authorized representative and/or the Minnesota Counties Intergovernmental Trust (MCIT) to review and/or receive copies of any or all parts of the Minnesota workers' compensation claim file(s) maintained by the Department of Labor and Industry (DLI) for the employee and date(s) of injury indicated below.

| EMPLOYEE<br>Benjamin W. Evans | WID or SSN | | DATE(S) OF INJURY<br>ANY & ALL |
|---|---|---|---|
| EMPLOYER<br>ANY & ALL | | INSURER (if known)<br>ANY & ALL | |

- Following receipt of this properly completed authorization, DLI may release information from the workers' compensation claim file about the above-named employee, employer and insurer, including the employee's worker identification number (WID) and social security number, that would not otherwise be accessible to the public. The WID is a unique number assigned by DLI to an injured worker and may be used instead of the employee's SSN.

- Once this information is released, DLI does not control how it is used or further distributed by the recipient.

- A copy of this authorization may be used in the same manner and with the same effect as the original document.

- This authorization is valid for six months from the date signed, or until this consent is withdrawn by notifying DLI in writing at the above address or facsimile number.

| Print name of person authorizing release | am authorized to sign this form because I am the: |
|---|---|
| | ☐ employee |
| William O. Evans, Jr., as Trustee for the Heirs and Next-of-kin of Benjamin Evans (Decedent's Date of Birth: 11/16/1994) | ☐ parent/guardian of a minor or incapacitated employee (if not the parent, attach a court order documenting guardianship)<br>☐ employer (state title at employer): |
| Signature of person authorizing release | ☐ insurer (state title at insurer): |
| | ☐ dependent of deceased employee (state relationship): |
| | ☒ representative of employee's estate (attach court order) |
| 7/21/21 | ☐ representative of the DLI Special Compensation Fund |

**NOTICE:** Information concerning disability may not be used to make a job decision unless state or federal law permits use of this information. Unless authorized by state or federal law, any use or distribution of this information beyond that authorized by the subject of this data is prohibited. Questions concerning use of disability information may be directed to the Minnesota Department of Human Rights at (651) 296-5663 or 1-800-657-3704.

MN FE0005 (6/11)

AUTHORIZATION FOR RELEASE OF EMPLOYMENT INFORMATION

TO:     _____

        _____

        _____

This authorization is to allow Jardine, Logan & O'Brien, P.L.L.P., its authorized representatives and/or the Minnesota Counties Intergovernmental Trust (MCIT) to review and copy any and all information regarding Decedent Benjamin Evans's employment with your company.  Responsive data should include all data otherwise protected by law and is to include review and copying of the personnel file and any and all work records, correspondence, job performance reviews, wages, bonuses, commissions, rate or pay, salary, benefits, payroll, records pertaining to an fitness for duty, any disability or requests for accommodation, including medical records, and workers' compensation records, including medical records, vocational rehabilitation records, pleadings/discovery, correspondence, billing invoices and workers' compensation benefit information records.

A copy of this authorization is as valid as the original.

I hereby knowingly and voluntarily waive all claims and privileges, including those under the Minnesota Government Data Practices Act, Minn. Ch. 13, federal and state laws relating to medical information (including Health Insurance Portability and Accountability Act of 1996 and Minn. Stat. ch. 144), and all other statutory and common law privileges and protections of my medical information.

Dated _____7|2|21_____                   ████████████████████████████
                                         ████████████████████████████
                                         Heirs and Next-of-kin of Benjamin Evans
                                         (Decedent's Date of Birth: 11/16/1994)

## AUTHORIZATION

TO:

Please give to Jardine, Logan & O'Brien, P.L.L.P., and/or its personal representative, any information they may desire concerning the school records of Benjamin W. Evans. This is to include any and all health records, academic and test records, records regarding special education and psychological testing and study, teacher evaluations and ratings, report cards, records of suspension, dismissal, etc., and all other records and files held by the above-named institution regarding Benjamin W. Evans. This authorization is to include any correspondence file relative to Benjamin W. Evans.

A photocopy of this authorization is as valid as the original.

Dated 7|21|21

Heirs and Next-of-kin of Benjamin Evans
(Decedent's Date of Birth: 11/16/1994)

# AUTHORIZATION TO RELEASE INFORMATION

Our File No.: 40194

Name of Patient:      Benjamin William Evans
Date of Birth:        11/16/1994

## AUTHORIZATION FOR RELEASE OF INFORMATION AND FOR REDISCLOSURE

I authorize Ramsey County Medical Examiner _____

whose address is _____,

to disclose and deliver to JARDINE, LOGAN, & O'BRIEN, PLLP, whose address is 8519 EAGLE POINT BLVD., SUITE 100, LAKE ELMO, MN 55042, their representatives, employees, and/or the Minnesota Counties Intergovernmental Trust (MCIT) all medical information, x-rays, etc. (including, but not limited to that which involves genetic information, treatment for psychiatric and/or psychological conditions, sickle cell anemia, alcohol and/or drug abuse, and for testing and/or treatment of human immunodeficiency virus [HIV], or acquired immunodeficiency syndrome [AIDS], which are protected by FEDERAL LAW [42 CFR Part 2]) maintained on Benjamin William Evans, Decedent at your facility at any time that he was a patient at the facility, on any date, with the following exceptions: NONE --- This authorization allows release of ALL portions of your files regarding Benjamin William Evans, Decedent, including x-ray films, lab and testing results, correspondence and records/reports you have from other medical providers or facilities.

I UNDERSTAND THAT THIS AUTHORIZATION SPECIFICALLY INCLUDES RECORDS PREPARED PRIOR TO THE DATE OF THIS AUTHORIZATION AND RECORDS PREPARED AFTER THE DATE OF THIS AUTHORIZATION DURING THE PENDENCY OF THIS PROCEEDING UP TO THE AUTOMATIC EXPIRATION DATE OF ONE YEAR FROM THE DATE OF THE AUTHORIZATION.

I understand the information is being disclosed for the purpose of litigation.

I understand that my signing or not signing this authorization does not affect the treatment, payment, enrollment or eligibility for benefits by the facility.

I further understand that the Recipient, WITHOUT FURTHER AUTHORIZATION, may redisclose said information to: Parties and their legal counsel; insurers; experts; potential experts; anyone against whom claim is or has been made; administrative agency and court officials hearing the claim; and any agents; employees; or representatives if any of said persons.

I understand, that if this information is disclosed to a third party, the information may be redisclosed by the person or entity that receives the information and may no longer be protected by federal privacy regulations.

I understand that I may revoke this authorization, in writing by sending a written notice to the healthcare provider listed above, at any time and it will not affect the ability to obtain health care services. I also understand that if I revoke, the revocation will take effect on the day it is received by the entity from which written disclosure is sought, but it does not apply to information that has already been released under this authorization.

I understand that I have a right to receive a copy of this authorization.

Conversations with the above-noted provider ARE/ARE NOT (cross out one) allowed by this authorization.

I SPECIFICALLY AUTHORIZE AND CONSENT TO THE DISCLOSURE AND REDISCLOSURE DESCRIBED ABOVE. A ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ me manner as an original.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇          7|21|21
Signature of Patient or Patient's Legal Representative          Date

William O. Evans, Jr., as Trustee for the Heirs and nok of Benjamin Evans (Deceased)
Print Name and Relationship of Patient's Legal Representative

I verify that the proceeding requiring this information is still pending and that information provided pursuant to this authorization will not be re-released for purposes not related to this proceeding.

_____          _____
Signature of Party Requesting Information          Date

ATTENTION PUBLIC FACILITIES: Minnesota Statute Section 13.05, subd. 4(d)(7) requires automatic expiration of this authorization one year from date of authorization.

Rev.0612

**m1 DEPARTMENT OF REVENUE**

## Form REV185i, Authorization to Release Individual or Sole Proprietor Tax Information

Read instructions before completing this form.

**Taxpayer**

| Taxpayer Name | | | Social Security Number or ITIN |
|---|---|---|---|
| Benjamin W. Evans | | | |
| Street Address or PO Box | | | Minnesota or Federal Employer Identification Number (FEIN)(Sole Proprietors) |
| Apt. or Suite | | | Phone Number | Fax Number |
| City | State | ZIP Code | Email Address |

**Recipient**

| Name of Person to Receive Return Information | | | Attorney Number, Accountant Number, or PTIN |
|---|---|---|---|
| Jardine, Logan & O'Brien, P.L.L.P. | | | |
| Street Address or PO Box | | | Phone Number |
| 8519 Eagle Point Blvd. | | | 651-290-6500 |
| Apt. or Suite | | | Fax Number |
| Suite 100 | | | 651-223-5070 |
| City | State | ZIP Code | Email Address |
| Lake Elmo | MN | 55042 | dwavra@jlolaw.com |

**Type of Information**

I authorize the person above to receive private data for the following:

| Type of Tax (Such as Income, Estate, Property Tax Refund, Withholding) or Debt Issue | Document Type (Such as returns, W-2s, 1099s) | Extended Expiration Date |
|---|---|---|
| Individual Income 2013-2018 | Returns, W-2s | /  / |
| | | /  / |
| | | /  / |

**Signature**

This authorization is not valid until it is signed and dated by the taxpayer.
Parent, Guardian, Conservator: I certify that I have the legal authority to sign this form.

| | Date | Address, If Different from Taxpayer | | |
|---|---|---|---|---|
| | 7 /21 /21 | | | |
| William O. Evans, Jr. as Trustee for the Heirs and Next-of-kin of Benjamin Evans | Phone Number | City | State | ZIP Code |

Send a signed copy of this form to the department
Mail     Minnesota Department of Revenue, Mail Station 7703, 600 Robert Street North, St. Paul, MN 55146
Fax       651-556-5210
Email:    MNDOR.POA@state.mn.us

## Form REV185i Instructions

### Purpose of This Form
By signing this form, you authorize the Minnesota Department of Revenue to release private data to the person above.

An authorized recipient may inspect or receive private data, but may not act on your behalf. To grant additional authority, complete Form REV184i, *Individual Power of Attorney*.

### Business Entities
To authorize the department to release nonpublic data about a business, complete Form REV185b, *Authorization to Release Business Tax Information*.

### Your Signature
This authorization is not valid until it is signed and dated by someone with legal authority to sign it. For most people, this is the taxpayer whose data is being shared.

If granting authority for a joint return, only one spouse needs to sign. Parents or legal guardians must sign for minors.

For legal guardians, conservators, personal representatives, and others signing on behalf of the taxpayer, we require documents and a photo ID to confirm your legal authority.

We reserve the right to request additional information as needed.

### Expiration
This authorization expires once the data is released. To extend the amount of time this authorization is valid for, indicate when you want it to expire in the Tax Type or Issue section of this form.

### Questions?
Website: www.revenue.state.mn.us
Email:   MNDOR.POA@state.mn.us
Phone:   651-556-3003 or 1-800-657-3909

Rev 11/19

| Form **4506** | **Request for Copy of Tax Return** | OMB No. 1545-0429 |
|---|---|---|
| (November 2020) | ▶ Do not sign this form unless all applicable lines have been completed. | |
| Department of the Treasury Internal Revenue Service | ▶ Request may be rejected if the form is incomplete or illegible. ▶ For more information about Form 4506, visit *www.irs.gov/form4506*. | |

**Tip.** You may be able to get your tax return or return information from other sources. If you had your tax return completed by a paid preparer, they should be able to provide you a copy of the return. The IRS can provide a **Tax Return Transcript** for many returns free of charge. The transcript provides most of the line entries from the original tax return and usually contains the information that a third party (such as a mortgage company) requires. See Form 4506-T, Request for Transcript of Tax Return, or you can quickly request transcripts by using our automated self-help service tools. Please visit us at IRS.gov and click on "Get a Tax Transcript..." or call 1-800-908-9946.

| 1a Name shown on tax return. If a joint return, enter the name shown first. | 1b First social security number on tax return, individual taxpayer identification number, or employer identification number (see instructions) |
|---|---|
| BENJAMIN W EVANS | |
| 2a If a joint return, enter spouse's name shown on tax return. | 2b Second social security number or individual taxpayer identification number if joint tax return |

3 Current name, address (including apt., room, or suite no.), city, state, and ZIP code (see instructions)

4 Previous address shown on the last return filed if different from line 3 (see instructions)

5 If the tax return is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number.

JARDINE LOGAN & O'BRIEN, PLLP, 8519 EAGLE POINT BLVD, SUITE 100, LAKE ELMO, MN 55042   651-290-6500

**Caution:** If the tax return is being sent to the third party, ensure that lines 5 through 7 are completed before signing. (see instructions).

6 Tax return requested. Form 1040, 1120, 941, etc. and all attachments as originally submitted to the IRS, including Form(s) W-2, schedules, or amended returns. Copies of Forms 1040, 1040A, and 1040EZ are generally available for 7 years from filing before they are destroyed by law. Other returns may be available for a longer period of time. Enter only one return number. If you need more than one type of return, you must complete another Form 4506. ▶ ____1040____

Note: If the copies must be certified for court or administrative proceedings, check here . . . . . . . . . . . . . . . . ☑

7 Year or period requested. Enter the ending date of the tax year or period using the mm/dd/yyyy format (see instructions).

| 12 / 31 / 2013 | 12 / 31 / 2014 | 12 / 31 / 2015 | 12 / 31 / 2016 |
|---|---|---|---|
| 12 / 31 / 2017 | 12 / 31 / 2018 | __ / __ / ____ | __ / __ / ____ |

8 Fee. There is a $43 fee for each return requested. Full payment must be included with your request or it will be rejected. Make your check or money order payable to "United States Treasury." Enter your SSN, ITIN, or EIN and "Form 4506 request" on your check or money order.

| a | Cost for each return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 43.00 |
|---|---|---|---|
| b | Number of returns requested on line 7 . . . . . . . . . . . . . . . . . . . . | | 6 |
| c | Total cost. Multiply line 8a by line 8b . . . . . . . . . . . . . . . . . . . . | $ | 258.00 |

9 If we cannot find the tax return, we will refund the fee. If the refund should go to the third party listed on line 5, check here . . . . . . ☑

**Caution:** Do not sign this form unless all applicable lines have been completed.

Signature of taxpayer(s). I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax return requested. If the request applies to a joint return, at least one spouse must sign. If signed by a corporate officer, 1 percent or more shareholder, partner, managing member, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506 on behalf of the taxpayer. **Note:** This form must be received by IRS within 120 days of the signature date.

☐ Signatory attests that he/she has read the attestation clause and upon so reading declares that he/she has the authority to sign the Form 4506. See instructions.

| | Phone number of taxpayer on line 1a or 2a |
|---|---|

**Sign Here**

Signature _____  Date 7|21|21

William O. Evans, Jr
Print/Type name

Trustee for Heirs and Next-of-Kin of Benjamin Evans
Title (if line 1a above is a corporation, partnership, estate, or trust)

Spouse's signature   Date

Print/Type name

For Privacy Act and Paperwork Reduction Act Notice, see page 2.     Cat. No. 41721E     Form **4506** (Rev. 11-2020)

Form SSA-7050-F4 (02-2021)                                                                                    Page 2 of 4

## REQUEST FOR SOCIAL SECURITY EARNING INFORMATION

1. Provide your name as it appears on your most recent Social Security card or the name of the individual whose earnings you are requesting.

| First Name: | B | E | N | J | A | M | I | N | | | | | | | | | | Middle Initial: | W |

| Last Name: | E | V | A | N | S | | | | | | | | | | | | | |

Social Security Number (SSN) [ ] [ ] [ ] [ ] [ ] [ ] [ ] [ ] [ ]     One SSN per request

Date of Birth:   11/16/1994          Date of Death:   4/12/2018

Other Name(s) Used
Maiden Name

2. What kind of earnings information do you need? (Choose **ONE** of the following types of earnings or SSA must return this request.)

☒ **Itemized Statement of Earnings $92.00**

(Includes the names and addresses of employers)

If you check this box, tell us why you need this information below.

Litigation

Year(s) Requested: | 2 | 0 | 1 | 3 | to | 2 | 0 | 1 | 8 |

Year(s) Requested: | | | | | to | | | | |

☒ Check this box if you want the earnings information **CERTIFIED** for an additional $30.00 fee.

☐ **Certified Yearly Totals of Earnings $30.00**

(Does not include the names and addresses of employers) Yearly earnings totals are FREE to the public if you do not require certification. To obtain FREE yearly totals of earnings, visit our website at www.ssa.gov/myaccount.

Year(s) Requested: | | | | to | | | |

Year(s) Requested: | | | | to | | | |

3. If you would like this information **sent to someone else**, please fill in the information below.

I authorize the Social Security Administration to release the earnings information to:

| Name | JARDINE, LOGAN & O'BRIEN, PLLP | |
| Address | 8519 EAGLE POINT BLVD., #100 | State MN |
| City | LAKE ELMO | ZIP Code 55042 |

4. I am the individual to whom the record pertains (or a person authorized to sign on behalf of that individual). I declare under penalty of perjury that I have examined all the information on this form, and on any accompanying statements or forms, and it is true and correct to the best of my knowledge.

SSA must receive this form within 120 days from the date signed

Date   7 | 21 | 21

Daytime Phone:

| Address | | State |
| City | | ZIP Code |

Witnesses must sign this form ONLY if the above signature is by marked (X). If signed by mark (X), two witnesses to the signing who know the signee must sign below and provide their full addresses. Please print the signee's name next to the mark (X) on the signature line above.

| 1. Signature of Witness | 2. Signature of Witness |
| --- | --- |
| Address (Number and Street, City, State and ZIP Code) | Address (Number and Street, City, State and ZIP Code) |

 Minnesota Department of **Human Services**



DHS-3549 ENG                                    1-13

## General Consent/Authorization
## for Release of Information

**Office Use Only**

| CASE NUMBER |
|---|
|  |

**To be completed by the person giving consent/authorization** *(please print)*: This information is being requested solely to verify the identity of the person giving consent/authorization.

| NAME |
|---|
| William O. Evans, Jr., as Trustee for the Heirs and next-of-kin of Benjamin William Evans (deceased) |

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
|  |  |  |  |

| BIRTHDATE | SOCIAL SECURITY NUMBER |
|---|---|
|  |  |

If you are receiving SNAP, cash assistance, health care or child support services, or are a license holder, please provide at least **one** of the following numbers:

| MEDICAID IDENTIFIER (PMI) | NATIONAL PROVIDER IDENTIFIER (NPI) NUMBER | SINGLE MEMBER INDEX (SMI) NUMBER |
|---|---|---|
| FAMILY DAY CARE LICENSE NUMBER | FOSTER CARE LICENSE NUMBER | |

**Authorization/Consent:** I authorize the Minnesota Department of Humane Services ("DHS") to release the following information about me: **(Must be completed)**

Any and all applications, assessments and records re: Benjamin William Evans (DOB: 11/16/1994), including medical, mental health and substance abuse treatment records and testing, education, disciplinary, court records, and benefits received.

**The information will be release to: (Must be completed)**

| NAME | COMPANY/AGENCY | | |
|---|---|---|---|
| Jardine, Logan & O'Brien, PLLP | | | |
| ADDRESS | CITY | STATE | ZIP CODE |
| 8519 Eagle Point Blvd, Suite 100 | Lake Elmo | MN | 55042 |

**This information will be used for: (Must be completed)** Litigation

**Consequences:** I know that state and federal privacy laws protect my records. I know:

- Why I am being asked to release this information.
- I do not have to consent to the release of this information.
- That, generally, I must give my written consent for DHS to give out the information.
- If I do not consent, the information will not be released unless the law otherwise allows it.
- I may stop this consent with a written notice at any time, but this written notice will not affect information the agency has already released.
- The person or agency who gets my information may be able to pass it on to others.
- If my information is passed on to others by DHS, it may no longer be protected by this authorization.
- This consent will end one year from the date I sign it, unless the law allows for a longer period.

| CLIENT SIGNATURE | OR |
|---|---|
| DATE: | 7 31 21 |

EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Case No: 0:20-cv-02474 MJD/ECW

William O. Evans, Jr., as Trustee for the
Heirs and Next-of-Kin for Benjamin Evans,

**PLAINTIFF'S SUPPLEMENTAL
ANSWERS TO INTERROGATORIES
FROM DEFENDANTS**

Plaintiff

vs.

Brian Jeffery Krook, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Michelle Folendorf, individually and in her official capacity
as a Sergeant for Washington County Sheriff's Office;

Joshua John Ramirez, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Michael Ramos, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Dan Starry, individually and in his official capacity as
Washington County Sheriff and policymaker;

Washington County as a political subdivision of the State
of Minnesota.

---

Defendants

---

TO: Defendants named above.

## INTERROGATORIES

3.     State Decedent's full name, social security number, driver's license number, and
each residential address Decedent had in the 10 years preceding his death, beginning with the most
recent address and proceeding in reverse chronological order.

ANSWER: Benjamin William Evans, social security number ▮▮▮▮▮▮▮ MO DL
number ▮▮▮▮▮▮▮ MN DL application is attached; his addresses for the last ten years are the
following in chronological order:



SUPPLEMENTAL ANSWER: This was disclosed by letter on 08/26/2021. Ben Evans resided on ▓▓▓▓▓▓ from approximately January 2016 to May 2017.

6.      Set forth the names and addresses of employers (or self-employment) for whom Decedent worked during the five-year period of time immediately preceding Decedent's death and with regard to each such place of employment (or self-employment), set forth the name and address of the employer, Decedent's job title at the employment, the inclusive dates of each such employment, a specific description of Decedent's duties of employment, a breakdown of Decedent's hourly, weekly and monthly earnings, and the reason for the termination of each such employment. For military service specify all ranks, work assignments, dates of service, location of assignments, and nature of discharge (i.e., honorable or dishonorable).

ANSWER: See Rule 26 Disclosures.

SUPPLEMENTAL ANSWER: This was disclosed as a Supplemental Request for Documents on 10/07/2021 with Benjamin Evans's employment records from Mayo Clinic.

Here is a list of all of Ben Evans' Employers in the five years before his death:

CPR-N-MORE (November 2013- July 2017)
Abbott EMS (No information available)
Accucare Home Health (June 2015-2016)
Air Force (September to October 2013)
City of Wabasha (June 2017- January 2018)
Health East- Lake City (February to March 2018)
St. Louis Fire Department (October to November 2016)
Mayo Clinic (August 2017-April 2018)

7.      Set forth in detail a chronological education history of Decedent including the name and address of each school attended, the inclusive dates of attendance, the date of graduation, a description of any degrees awarded, a description of the major area of study and the grade point average upon graduation.

ANSWER: See Rule 26 Disclosures.

SUPPLEMENTAL ANSWER: Here is a list of Ben Evans' schools:

Bellerive School- Parkway School District, 455 North Woods Mill Road, Chesterfield MO 63017 from 2000-2006.
Westminster Christian Academy, 800 Maryville Centre Drive, Town and Country MO 63017 from 2011-2013 (graduated).

2

Mary Institute and St. Louis County Day School, 101 North Warson Road, St. Louis County MO 63124 from 2006-2011.

Central High School, 369 North Woods Mill Road, Chesterfield MO 63017 from 2011-2012.

Respond Right EMS Academy, 7491 Mexico Road, St. Peters MO 63376, 2012.

Lindenwood University, 209 S Kings Highway St. Charles MO 63301, 53 credit hours earned with 3.22 GPA.

8.    Did the Decedent make any contribution of money, property, or other items having a monetary value toward the support, maintenance, or well-being of any next of kin and, if so, please itemize the following:

   a.    The amount and nature of the contribution.
   b.    The date(s) upon which each contribution was made;
   c.    The person(s) receiving each contribution;
   d.    The period of time over which the contributions were made;
   e.    The regularity or irregularity of the contributions; and
   f.    Identify by date, author, type, recipient, and present custodian of each and every document referring to or otherwise evidencing each contribution.

ANSWER: See answer to Interrogatory number 5.

SUPPLEMENTAL ANSWER: This was disclosed by letter on 07/21/2021. Decedent paid the following checks from his ▮▮▮▮▮ Account to Stevie Legate for ▮▮▮▮▮ support:

April 4, 2017 check ▮▮▮▮ for $1,225.00
April 18, 2017 check ▮▮▮▮ for $225.00
May 18, 2017 check ▮▮▮▮ for $625.00
June 19, 2017 check ▮▮▮▮ for $800.00

12.    Set forth in specific detail a breakdown of all assets and liabilities of the Decedent as of the time of Decedent's death. In particular, itemize in detail all monies expended or owed by you or by the estate of the Decedent or expended or owed on your behalf or on behalf of the estate of the Decedent as a result of the injury and death of the Decedent.

ANSWER: Benjamin Evans owned a truck for which he was making loan payments. He owed $24,081.60 when he was killed. This was paid off. Funeral expenses were $12,564.17. The family spent an additional $16,167.77 on travel and accommodations to empty his apartment and attend the criminal trial.

SUPPLEMENTAL ANSWER: Total Family expenses to date (excluding all expenses for counseling services) are $28,003.35 (**excluding** all expenses for mental health visits for William Evans, Tyler Evans, and Brianna Evans (who is no longer involved in this suit).

Assets of Benjamin Evans paid out upon his death:

3

For the death of Benjamin Evans, Prudential Life Insurance paid two policies in the amount of $94,482.20;

The Social Security Administration paid survivor benefit for ▇▇▇▇▇▇ of $845 for the period of December 2019 to November 2020, and $856 a month beginning December 2020 to the present;

The Public Employees Retirement Association for the State of MN paid $793.54 to the estate;

The Mayo Clinic 403(B) contained $74.35;

Liabilities:

▇▇▇▇▇ Credit Card, jointly with Stevie Legate: $4,217.93; Ms. Legate assumed full responsibility for the balance and continues to use the credit card;

▇▇▇▇▇ Credit Card: $574.87;

▇▇▇▇▇ Credit Card: $7721.69 which was forgiven.

16.     If Decedent or next-of-kin was ever arrested and/or charged with the commission of any crime or juvenile offense, for each arrest and/or charge state the date and place of arrest, state the name(s) of all law enforcement agency(ies) involved, and detail all charge(s) made against him. For each charge, state whether Decedent or next-of-kin was convicted, or adjudicated delinquent, and, if so, the sentence or other punishment given for each conviction. If Decedent or next-of-kin was incarcerated, state the name and address of the institution in which Decedent or next-of-kin was confined and the inclusive dates of his/their confinement.

ANSWER: Plaintiff objects to this interrogatory as being overly broad and vague, seeking information protected by privilege, seeking information that is irrelevant, inadmissible, prejudicial and outside the scope of Rule 26 of the Federal Rules of Civil Procedure. Without waiving any of these objections, Decedent was never arrested or charged with any crime. Plaintiff has no information as to charges or crimes involving the next-of-kin.

SUPPLEMENTAL ANSWER: This was addressed by letter on 08/26/2021.
No heirs or next-of-kin have ever been arrested or had criminal charges filed against them.

17.     Identify all damages (including special damages), expenses, injuries, or pecuniary loss that you allege have been incurred as a result of the incident and/or that you are requesting as a result of the incident. For each type of damage, expense, injury or pecuniary loss, identify the following:

        a.     The nature of the damage, expense, injury or pecuniary loss;
        b.     The extent of the injury and the amount of damage, expense or pecuniary loss;
        c.     The manner in which you calculated the value of damage, expense, injury and pecuniary loss; and
        d.     Identify all facts, evidence and documents that relates to or supports your claim of injury, damage, expense or pecuniary loss.

4

ANSWER: Benjamin Evans was a father, a son, and a brother. He was 23 years old. His daughter was an infant when he died. He was deprived of his right to live his life and to enjoy his family relationships. ▮▮▮ was deprived of the support of her father. His parents and siblings have a permanent hole in their family. See Plaintiff's Demand letter, dated October 30, 2020.

SUPPLEMENTAL ANSWER:

This was supplement by letter on 10/28/2021.
Plaintiff demands $33,000,000.00 for the killing of Benjamin Evans, as follows:

      Compensatory Damages:
          Loss of Future earnings: $4,249,560.00
          Evans Family Expenses: $28,003.35
      Care, Comfort, Guidance, and Support: $8,750,440.00
      Loss of Life: $10,000,000.00
      Punitive Damages: $10,000,000.00

US Bureau of Labor Statistics, Occupational Employment and Wages, May 2020, Physicians Assistants, attached.

20.    Set forth in detail all known activities of Decedent on April 11 and 12, 2018 including times, locations and persons personally known to you who were present.

ANSWER: See Rule 26 Disclosures and the BCA file.

SUPPLEMENTAL ANSWER: Ben Evans spent the day with Brianna Gysbers at the Mall of America. They made a brief stop at the liquor store in Lake Elmo and the Lake Elmo Fire house. They returned to Ben's apartment and were there until he walked out to the intersection.

I declare under penalty of perjury that everything I have stated in this document is true and correct.

                                 _____
                                   Plaintiff, William O. Evans, Jr.

Dated: November 2, 2021          SANDBERG LAW FIRM

                                 Elham B. Haddon
                                   Registration No. 0398698
                                   Attorney for Plaintiff

4057 28th Street N.W., Suite #300
Rochester, Minnesota 55901
Telephone: (507) 282-3521

Subscribed and sworn to before me
on November 2, 2021.

_____
Notary Public

6

EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

William O. Evans, Jr., as Trustee for the
Heirs and Next-of-Kin for Benjamin Evans,

Plaintiff

vs.

Brian Jeffery Krook, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Michelle Folendorf, individually and in her official capacity
as a Sergeant for Washington County Sheriff's Office;

Joshua John Ramirez, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Michael Ramos, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Dan Starry, individually and in his official capacity as
Washington County Sheriff and policymaker;

Washington County as a political subdivision of the State
of Minnesota.

Defendants

Case No: 0:20-cv-02474 MJD/ECW

**PLAINTIFF'S SUPPLEMENTAL
ANSWERS TO INTERROGATORIES
FROM DEFENDANTS**

---

TO: Defendants named above.

## INTERROGATORIES

9.      Identify by name and address of each and every physician, surgeon, medical
practitioner, or other health care practitioner, hospital, treatment center, or institution whom the
Decedent consulted or who provided advice, treatment, or care for the Decedent at any time within
7 years prior to death and, with respect to the contact, consultation, treatment, or advice, describe
the same with particularity and indicate the reasons for the same.

ANSWER: Plaintiff already provided Decedent's entire medical record from birth to death.
See Rule 26 Disclosures.

SUPPLEMENTAL ANSWER:  Here are all of the providers in the 7 years prior to Ben Evans Death:

Mercy Hospital (St. Louis): 615 S. New Ballas Rd, Creve Coeur MO 63141.
St. Anthony Medical Center (St. Louis): See above address.
Gateway Oral and Maxillofacial Surgeons of St. Louis: 165 N Meramec Ave #300, Clayton MO 63105.
St. Louis County Oral Maxillary Surgery: 11810 Gravios Rd Suite 102, St. Louis MO 63127.
St. Louis Children's Hospital: 1 Children's Place Suite C, St. Louis MO 63110.
Washington University Orthopedic Surgeons
Washington University Physicians: 14532 South Outer 40 Rd Ste 200, Chesterfield MO 63017.
Pro Rehab: 13537 Barrett Parkway Drive, Suite 105, Ballwin MO 63021.
Mayo Clinic: 200 First St SW, Rochester MN 55906.
Lake City Hospital, Lake City Clinic
Srdjan Milosavljevic- PA: Family Medicine, 500 W Grant Street, Lake City, MN.
Red Wing Hospital (Mayo): Dr. Matthew Eich

I declare under penalty of perjury that everything I have stated in this document is true and correct.


_____
Plaintiff, William O. Evans, Jr.


Dated: November 3, 2021        SANDBERG LAW FIRM


Elham B. Haddon
Registration No. 0398698
Attorney for Plaintiff
4057 28th Street N.W., Suite #300
Rochester, Minnesota 55901
Telephone: (507) 282-3521


Subscribed and sworn to before me
on November 3, 2021.


_____
Notary Public

2

EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

William O. Evans, Jr., as Trustee for the
Heirs and Next-of-Kin for Benjamin Evans,

Case No: 0:20-cv-02474 MJD/ECW

**PLAINTIFF'S SECOND
SUPPLEMENTAL ANSWERS TO
INTERROGATORIES FROM
DEFENDANTS**

Plaintiff

vs.

Brian Jeffery Krook, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Michelle Folendorf, individually and in her official capacity
as a Sergeant for Washington County Sheriff's Office;

Joshua John Ramirez, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Michael Ramos, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Dan Starry, individually and in his official capacity as
Washington County Sheriff and policymaker;

Washington County as a political subdivision of the State
of Minnesota.

Defendants

TO: Defendants named above.

## **INTERROGATORIES**

12.     Set forth in specific detail a breakdown of all assets and liabilities of the Decedent
as of the time of Decedent's death. In particular, itemize in detail all monies expended or owed
by you or by the estate of the Decedent or expended or owed on your behalf or on behalf of the
estate of the Decedent as a result of the injury and death of the Decedent.

ANSWER: Benjamin Evans owned a truck for which he was making loan payments. He
owed $24,081.60 when he was killed. This was paid off. Funeral expenses were $12,564.17. The
family spent an additional $16,167.77 on travel and accommodations to empty his apartment and
attend the criminal trial.

**SUPPLEMENTAL ANSWER**: Decedent had a joint credit card from Capital One with Stevie Legate. Stevie Legate paid this off after receiving lump sum Social Security payment. Decedent also had a US Bank credit card. This loan was forgiven. Decedent paid his own rent.

Dated: August 27, 2021                    SANDBERG LAW FIRM


                                          Elham B. Haddon
                                          Registration No. 0398698
                                          Attorney for Plaintiff
                                          4057 28th Street N.W., Suite #300
                                          Rochester, Minnesota 55901
                                          Telephone: (507) 282-3521

GENA L. ANDERSON
NOTARY PUBLIC - MINNESOTA
My Comm. Exp. Jan. 31, 2023

Subscribed and sworn to before me
on August 27, 2021.

Notary Public

2

EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Case No: 0:20-cv-02474 MJD/ECW

William O. Evans, Jr., as Trustee for the
Heirs and Next-of-Kin for Benjamin Evans,

**PLAINTIFF'S SECOND
SUPPLEMENTAL ANSWERS TO
REQUEST FOR DOCUMENTS FROM
DEFENDANTS**

Plaintiff

vs.

Brian Jeffery Krook, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Michelle Folendorf, individually and in her official capacity
as a Sergeant for Washington County Sheriff's Office;

Joshua John Ramirez, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Michael Ramos, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Dan Starry, individually and in his official capacity as
Washington County Sheriff and policymaker;

Washington County as a political subdivision of the State
of Minnesota.

Defendants

TO: Defendants named above.

## REQUEST FOR DOCUMENTS

23.    Any and all documents which Plaintiff claims relates in any manner to his claim for
damages in this matter.

REPLY: See Rule 26 Disclosures.

**Supplemental Reply:**

Enclosed are:

1. Pictures and videos of Benjamin Evans with ▮▮▮▮▮▮

2. ▮▮▮▮▮▮▮▮ uthorized user statement for February 22, 2018 to March 26, 2018;

3. Spreadsheet of Kim Porter's parental support of Benjamin Evans;

4. Evans Family expenses incurred for the death of Benjamin Evans;

5. Documents related to the loan pay-off and transfer of ownership of Benjamin Evans' Dodge Ram truck;

6. Documents related to Benjamin Evans's credit cards: ▮▮▮▮▮ personal account, ▮▮ ▮▮ joint account with Stevie Legate, and ▮▮▮▮▮ account;

7. Documents relating to Mayo Clinic's 403B account for Benjamin Evans;

8. Documents relating to PERRA Retirement Account-City of Wabasha for Benjamin Evans;

9. Documents relating to the Mayo benefit Prudential Life Insurance Policies for Benjamin Evans and the investment of their proceeds for ▮▮▮▮▮▮

10. Documents relating to Social Security Survival benefits from the death of Benjamin Evans for ▮▮▮▮▮▮

11. Mayo Clinic employment record for Benjamin Evans;

12. Lack of records notice from Harbesrtroh Insurance for Benjamin Evans.


Dated: October 7, 2021                    SANDBERG LAW FIRM


                                          Elham B. Haddon
                                          Registration No. 0398698
                                          Attorney for Plaintiff
                                          4057 28th Street N.W., Suite #300
                                          Rochester, Minnesota 55901
                                          Telephone: (507) 282-3521

EXHIBIT 7

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

William O. Evans, Jr., as Trustee for the
Heirs and Next-of-Kin for Benjamin Evans,

Civil Action number:

**COMPLAINT**

Plaintiff

JURY TRIAL DEMANDED

vs.

Brian Jeffery Krook, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Michelle Folendorf, individually and in her official capacity
as a Sergeant for Washington County Sheriff's Office;

Joshua John Ramirez, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Michael Ramos, individually and in his official capacity
as a Deputy for Washington County Sheriff's Office;

Dan Starry, individually and in his official capacity as
Washington County Sheriff and policymaker;

Washington County as a political subdivision of the State
of Minnesota.

Defendants

## INTRODUCTION

1. On June 13, 2018, Olmsted County, Third District Court duly appointed Plaintiff,

   William O. Evans, Jr. as Trustee for the Heirs and Next-of-Kin of Benjamin Evans.

2. This is a civil rights case pursuant to the Fourth Amendment and 42 U.S.C. § 1983 and §

   12101, *et seq*. Plaintiff alleges that Defendants used deadly force causing the wrongful

   death of Benjamin Evans and failed to accommodate his mental health disability, thereby

   depriving Evans of rights secured by the United States Constitution. Plaintiff now sues

   for redress.

1

## JURISDICTION

3. This Court has federal question jurisdiction pursuant to 28 U.S.C. § § 1331, 1343, 42

   U.S.C. § § 1983, 1988, and the Fourth and Fourteenth Amendments to the United States

   Constitution. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

## VENUE

4. Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391, as the Defendants are

   citizens of the State of Minnesota and the unconstitutional injury complained of herein

   occurred in Lake Elmo, Washington County, Minnesota.

## PARTIES

5. Benjamin Evans (hereinafter Evans) was 23 years old. He was the father of Lydia Evans,

   now age four. He was the son of Plaintiff William O. Evans and Kimberly Porter and the

   brother of Michael and Brianna Evans.

6. Evans was an EMT and Firefighter with plans to finish college and become a physician's

   assistant. He was born in Missouri and moved to Minnesota in July of 2017 to be with his

   girlfriend, Lauren Hintz.

7. Plaintiff, William O. Evans, Jr. is the Trustee for the Heirs and Next-of-Kin for Benjamin

   Evans and a citizen of the State of Missouri.

8. At all times relevant herein, Defendant Brian Jeffery Krook (Krook) is a citizen of the

   United States, a resident of the State of Wisconsin and a deputy as to all actions or

   inactions stated or alleged in this complaint, those actions or inactions were done in the

   scope and course of his employment with Washington County Sheriff's Office.

9. At all times relevant herein upon information and belief, Defendants Joshua John

   Ramirez (Ramirez) and Michael Ramos (Ramos) are citizens of the United States,

2

residents of Minnesota and deputies as to all actions or inactions stated or alleged in this
complaint, those actions or inactions were done in the scope and course of their
employment with Washington County Sheriff's Office.

10. At all times relevant herein upon information and belief, Defendant Michelle Folendorf
(Folendorf) was a sergeant as to all actions or inactions stated or alleged in this
complaint, those actions or inactions were done in the scope and course of her
employment with Washington County Sheriff's Office. She is a citizen of the United
States and an adult resident of the State of Minnesota.

11. At all times relevant herein upon information and belief, Defendant Dan Starry was the
Sheriff for Washington County. He is a citizen of the United States and a resident and of
Minnesota. As Sheriff, Defendant Starry is a policymaking official for the Washington
County Sheriff's Office with the power to make official and final policy.

12. At all times relevant herein, Defendant Washington County was a political subdivision of
Minnesota and employed Defendants Krook, Folendorf, Ramirez, Ramos and Starry.

13. Each of the Defendants was wrongful, negligent or otherwise responsible in some manner
for the events that led to the wrongful death of Evans. Defendants Folendorf, Starry and
Washington County also acted in such a manner and are so responsible, and are
responsible for the customs, policies, practices, training, supervision, and/or discipline of
the other Defendants. Plaintiff reserves the right to amend and explicitly name other
parties as this matter proceeds.

14. The acts and omissions of the Defendants were pursuant to the actual customs, policies,
practices and procedures of the Washington County Sheriff's Office. Defendants gave
consent, aid, and assistance to the other Defendants and ratified and/or authorized the acts

3

or omissions of the other Defendants as alleged herein, except as may be otherwise

specifically alleged. At all times relevant herein, each Defendant was jointly engaged in

tortious activity, resulting in the deprivation of Evans's constitutional rights and other

harm.

15. At all times relevant herein, Defendants acted under color of state law and in the scope of

their duties, as within the meaning of 42 U.S.C. § § 1983 and 12101, *et seq.*

16. This Complaint may be pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2).

## FACTUAL ALLEGATIONS

17. Evans's girlfriend, Lauren Hintz (Hintz), broke up with him because she was dating his

best friend.

18. Evans spent the day at the Mall of America with his friend Brianna Gysbers (Gysbers).

They went back to his apartment to play video games.

19. On April 12, 2018, Evans called Hintz from his apartment and proposed marriage to her.

She refused.

20. Evans texted his friend Amanda Marie Schmidt, who was on-duty as an EMT, that he

was about to make a bad choice. He did not answer any more of her texts or take her

calls. She called the dispatcher and asked the police for a welfare check.

21. Evans changed into his full-dress firefighter uniform, picked up his gun, said goodbye to

Gysbers, took her phone and walked out of his front door.

22. Gysbers ran to a neighbor's apartment and together they called 911. They told the

dispatcher that Evans was suicidal and had a gun. They asked for the police to help him.

23. Ramirez found Evans in the middle of painted crosswalk at an intersection in Lake Elmo

around midnight.

4

24. Evans was kneeling on the frozen ground in the middle of the crosswalk.

25. The squad cameras and the Body Worn Cameras (BWCs) captured the interaction on
video.

26. Evans had a gun pointed at his own head.

27. Ramirez took cover behind his squad car and started talking to Evans, attempting to
understand what brought him to this point and telling him to put the gun down so they
could continue working on the problem.

28. Other officers and Deputies arrived shortly thereafter. A total of nine uniformed and
armed officers surrounded Evans in a semi-circle.

29. All the officers pointed their service weapons at Evans.

30. Folendorf was the Sergeant and shift commander on the scene. She had been a Sergeant
for only nine months and had never trained on a scenario where a suicidal individual was
holding a gun.

31. Krook worked the evening shift and was about to go home. Folendorf asked him to come
along to help.

32. Folendorf and Krook retrieved a bunker and a less-lethal shotgun out of the Sergeant's
squad car.

33. Folendorf's plan was to keep him talking and use the less-lethal shotgun if necessary.

34. Folendorf attempted to call the SWAT and Crisis Intervention Commanders for help. She
asked the dispatcher to send out a system-wide page and call a code red. No one
responded.

5

35. Krook positioned himself on the passenger side of Ramirez's squad car with a clear view
   of Evans and the less-lethal shotgun leaning against the car. Krook had his service
   weapon pointed at Evans.

36. Krook made no attempt at cover or concealment. He was plainly visible to Evans as
   Evans was plainly visible to him.

37. Evans remained on his knees in the crosswalk with the gun pointed to his head for almost
   45 minutes.

38. Evans never threatened the deputies. He told them that he did not want to hurt anyone
   and that he did not want to give them a reason to shoot "a 23-year-old kid". He never
   made a move toward the officers. He never pointed his gun at the officers.

39. Evans threw away Gysbers's phone down the street and away from him. The phone was
   without power.

40. Evans kept asking to call and speak to Hintz. Ramirez would reply that he must drop the
   gun first.

41. Evans took the magazine out of his gun and threw it down the street away from him and
   out of his reach.

42. Evans had only one, live shell chambered in his gun.

43. Evans asked to speak to his father.

44. The deputies ordered Evans to drop the gun multiple times.

45. Evans would visually inspect the area around and behind him, moving his head with the
   gun, and did so several times during the encounter while talking with Ramirez.

46. Ramirez and Evans talked for approximately forty-five minutes. Evans and Ramirez were
   making progress.

6

47. Krook can be heard on the audio saying that he was uncomfortable with the movements that Evans was making. No one acknowledged his comment.

48. Krook did not warn Evans to stop moving his head or looking around.

49. No other deputy warned Evans to stop moving his head or looking around.

50. Evans remained on his knees in the crosswalk with the gun to his head while talking to Ramirez.

51. While Evans was moving his head and looking around, with the gun to his temple and talking to Ramirez, Krook shot him multiple times and without warning.

52. Krook used his service weapon and not the less-lethal shotgun that was leaning against the car next to him.

53. Evans slumped to the ground still holding the gun to his temple.

54. Krook then advanced on Evans and shot him several more times at close range.

55. Ramirez, Ramos and Folendorf also advanced on Evans while ordering him to drop the gun.

56. No other officers fired.

57. The Defendant Deputies rolled Evans over and handcuffed him.

58. An ambulance crew that was waiting nearby performed CPR, intubated Evans and transported him to Regions Hospital.

59. Evans was pronounced dead at 1:21 am on April 12, 2018.

60. Butch Huston, M.D., Assistant Medical Examiner for Ramsey County, found bullet wounds in the left chest, right chest, left side and left lower thigh and an exit wound on the upper back.

7

61. The bullets crossed paths in Evans's chest, puncturing his lung, severing his aorta and causing a great deal of internal bleeding. Evans's left femur was also shattered into multiple pieces.

62. Dr. Huston ruled Evans's death a homicide.

63. There was no lawful basis to use deadly force and kill Evans. It has long been clearly established that it is unlawful for a police officer to use deadly force on a suspect, even an armed one, when that suspect has not threatened anyone with such force. Further, it has long been established that it is unlawful to use lethal force without first giving a warning, where feasible.

64. Defendants' command structure was unresponsive during the approximately forty-five minutes that Evans was in the middle of the crosswalk, despite multiple attempts at calling various commanders and a page-out that was sent to dispatch from Folendorf at the scene.

65. Defendants did not provide or secure the presence of an especially trained SWAT team or Crisis Negotiator trained to deal with emotionally disturbed persons or those with clearly observed mental problems or disabilities.

66. Krook, in violation of Washington County Sheriff's Office policy and his own training, did not allow the negotiations with Evans to continue, did not seek cover or concealment to protect himself, instead shot Evans without warning even though Evans's behavior had not changed for more than forty minutes, and no other officer was threatened enough to warn him or fire their weapon.

67. The acts and conduct of Krook were in violation of the Fourth and Fourteenth Amendments in that Defendant used deadly force where no such force was justified and

8

where with deliberate indifference, and in violation of Washington County Sheriff's
Office policy, did not use the less-lethal shotgun leaning against the squad car, thus
failing to comply with official policy.

68. Defendant Washington County, with deliberate indifference, has failed to properly train,
supervise and discipline deputies with respect to the policies and procedures mandated
for police confrontations or other involvement with emotionally disturbed persons who
may be at risk to themselves or others. Specifically, deputies are not properly trained with
respect to this type of police interaction and to the procedures to be used in detaining or
arresting emotionally disturbed persons who may be armed, in the deployment and use of
less-lethal weapons, in the deployment of SWAT or Crisis Intervention units that have,
and in supervising incidents involving emotionally disturbed persons where force may
have to be use to resolve the incident.

69. Krook failed to use appropriate intervention techniques in an encounter with an
emotionally disturbed individual and used excessive and unreasonable force in his
encounter with Evans.

70. Washington County Sheriff's Office allowed Krook to attend "The Bulletproof Warrior"
training which teaches police officers to view everyone as a threat, even a man on his
knees with a gun to his own head.

71. The actions and conduct of the individual Defendants were the direct result of the failure
of Defendant Washington County to provide programs and services to qualified persons
with mental disabilities, to ensure that deputies follow established crisis intervention
procedures, and to provide sufficient resources for specialized teams to respond to
unfolding encounters.

9

72. Evans did not bring an action against Defendants for damages for the injuries causing his death.

73. Plaintiff, by reason of Evans's death and injury, has suffered pecuniary loss and has incurred expenses for the cost of Evans's funeral expenses, the administration of Evans's estate and the loss of Evans's care, comfort, guidance and support.

74. As a direct result of the actions and conduct of all Defendants, Evans suffered physical injuries, pain, emotional distress, deprivation and death, all caused by the violation of rights under the United States constitution, 42 U.S.C. § § 12101 and 12132, and 29 U.S.C. § 794.

## COUNT I-FEDERAL CIVIL RIGHTS CLAIMS UNDER 42 U.S.C. § 1983

75. Plaintiff incorporates the allegations set forth in each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

76. The acts and conduct of Krook constituted an illegal and unconstitutional use of deadly force under the Fourth Amendment.

77. Plaintiff claims damages for the wrongful death of Evans and his loss of income, services, companionship, and for funeral and burial expenses under 42 U.S.C. § 1983.

78. Defendant Washington County caused the constitutional violations by reason of its practice and custom, with deliberate indifference, of failing to properly train, supervise and discipline deputies, including Krook, in the proper use of deadly force. Defendant Washington County has also failed, with deliberate indifference, to properly train, supervise, provide for, make resources available to and discipline police officers in situations involving emotionally disturbed persons and in the proper means of detaining or protecting such persons from harming themselves or others.

10

## COUNT II-FEDERAL CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 12132

## AND 29 U.S.C. § 794

79. Plaintiff incorporates the allegations set forth in each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

80. Defendants discriminated against Evans by reason of his mental disability denying him the benefits of the services, programs and activities to which he was entitled as a person with mental health disability, including but not limited to the right to be free of discriminatory or disparate treatment by virtue of his mental disability, and to due process of the law. As a result, Evans suffered harm in violation of his rights under the laws and Constitution of the United States, 24 U.S.C. § 12101 and 12132 and 29 U.S.C. § 794.

81. Defendant Washington County failed to comply with the 24 U.S.C. § § 12101 and 12132 and 29 U.S.C. § 794 in the following ways:

    a. Failure to properly train, supervise and discipline Defendants regarding crisis intervention techniques for individuals who exhibit signs of mental disabilities;

    b. Failure to properly train Defendants in handling calls to intervene with suicidal individuals holding a firearm;

    c. Failure to provide adequate training and resources for Crisis Intervention and SWAT teams to respond to emergencies involving persons with mental disabilities;

11

CASE 0:20-cv-02474-MJD-ECW   Doc. 67   Filed 11/17/21   Page 49 of 58
CASE 0:20-cv-02474   Doc. 1   Filed 12/04/20   Page 12 of 17

d. Failure of Defendants to follow established policies, procedures, directives
   and instructions regarding crisis intervention techniques for individuals who
   exhibit signs of mental health disabilities.

82. By these actions, Defendants have deprived Evans of rights secured by the United States
Constitution, 42 U.S.C. § § 12101 and 12132 and 29 U.S.C. § 794.

## COUNT III-CONSPIRACY

83. Plaintiff incorporates the allegations set forth in each of the preceding and subsequent
paragraphs as if fully set forth herein and throughout.

84. Before the Grand Jury, Ramirez said: "This wasn't a situation that happened in just a
matter of seconds.[1] I got him to remove the magazine out of the weapon. I felt like I was
making some progress and I felt he was beginning to trust me.[2] Q: Did he ever point the
gun at you – A: No. Q: -- or any of the officers? A: No. Did he ever say he wanted to kill
you or shoot you? A: No.[3] Q: did he say he ever wanted to shoot the other officers? A:
No.[4] Did he do anything that caused you to consider shooting him? A: No. Q: So did you
feel any immediate threat to your safety or the safety of the other officers that would
cause you to shoot him? A: No.[5] Q: When you say it did concern us, have you talked with
other officers about it, the situation? A: In – I mean, we've had debriefs, yes.[6] Q: Who
were you debriefing with? A: Pretty much every other officer except Deputy Krook."[7]

---

[1] Ramirez, Grand Jury Transcript, p. 60, line 3-4.
[2] Ramirez, p. 60, line 18-19.
[3] Ramirez, p. 65, line 18-24.
[4] Ramirez, p. 65, line 25 and p. 66, line 1-2.
[5] Ramirez, p. 66, line 15-21.
[6] Ramirez, p. 68, line 9-11.
[7] Ramirez, p. 69, line 22-24.

12

85. Before the Grand Jury, Ramos said: "He said he didn't want to hurt us and that he
wouldn't hurt us. I thought the negotiations were going good. I mean, he took the
magazine out. He mentioned that [the bullet remaining in the gun] and said it was for
him.[8] Q: To be clear, just before the first round of shots, did you see anything in Mr.
Evans's behavior that caused you to fear for your life or the lives of the other law
enforcement officers? A: "…, but nothing that made me feel the need to fire."[9]

86. Before the Grand Jury, Folendorf said: "Q: You never saw him point [the gun] at anyone
-- A: No. Q: -- other than himself? A: Correct.[10] Q: Did Mr. Evans ever say anything to
suggest to you that he would hurt any of the law enforcement personnel? A: No. Q: Did
he, in fact, say just the opposite, that he had no intention of hurting law enforcement and
that the bullet in the chamber was for him? A: Oh, I do recall him saying something to
that effect, yes.[11] So I think, ultimately, the goal was to continue to talk to him and get
him to set the firearm down so that we could get him some help, get him the phone call
that he wanted to make and resolve the situation.[12] Q: How long were you willing to
continue the negotiation? A: As long as it took.[13] Q: did you feel that there needed to be
any change in what was happening when you arrived on the scene? A: The only change
was in the works and that was contacting the SWAT team and the SWAT negotiators to
see if -- my hope was that they would maybe give some advice and obviously respond to
the scene, and maybe have some training and experience that I didn't have to, I don't
know, change the situation or maybe just to help essentially.[14] I have had 40 hours of

---

[8] Ramos, Grand Jury Transcript, p. 106, line 6-10.
[9] Ramos, p. 114, line 9-15.
[10] Folendorf, Grand Jury Transcript, p. 137, line 21-24.
[11] Folendorf, p. 139, line 9-17.
[12] Folendorf, p. 141, line 15-19.
[13] Folendorf, p. 141, line 20-22.
[14] Folendorf, p. 142, line 9-18.

13

crisis intervention training. Q: Are there simulations done of a suicidal person and whether to approach that person when they have a loaded weapon in their hand? A: In none of the training that I had was it simulated with a person with a firearm."[15]

87. On July 19, 2019, the Grand Jury returned an indictment charging Defendant Krook with Manslaughter in the Second Degree.

88. The matter went to trial before Judge Yunker in Washington County in March of 2020.

89. The Defendant Deputies, including Deputy Krook, changed their testimony at trial after conferring with Krook's defense lawyer.[16] The prosecutor was faced with the "blue wall of silence".

90. Defendant Deputies' trial testimony conveniently provided multiple subjective and irrelevant justifications for Krook's actions. They changed their testimony to protect one of their own, in violation of their sworn duties as peace officers, in violation of their ethical obligations to tell the truth, in violation of their policies and with utter disregard to their obligations under the Constitution.

91. At trial, Ramirez testified to the following: "Q: How long were you willing to wait for him to put the gun down? A: That I don't know. Maybe I made – maybe I waited too long.[17] He didn't point the gun at us. I know that he had – he had certainly flagged officers to the north, especially when he was turning.[18] Q: Before the first shots were fired, was there anything that you saw that would provoke you to fire your weapon? A: I was so focused on just trying to help him that I – I didn't. Q: You didn't see anything? A:

---

[15] Folendorf, p. 152, line 22-25 and p. 153, line 1-3.
[16] Ramirez, State of MN v. Brian Jeffrey Krook, Jury Trial Transcript, p. 619, line 1-7.
[17] Ramirez, Jury Trial Transcript, p. 613, line 23-25 and p. 614, line 1.
[18] Ramirez, p. 617, line 10-13.

14

No, but that doesn't mean that I wasn't at fault for that either. Maybe there was something that I missed that Krook saw."[19]

92. At trial, Ramos testified to the following: "He was talking to us. He didn't put the gun down, so I don't know if it's progress.[20] I know he did move his body. Made me a little nervous, yeah.[21] Q: Okay, but at the grand jury you were asked if him moving his body caused you concern. And your answer was no, right? A: I believe I said no."[22]

93. At trial, Folendorf testified to the following: "Q: And before the first round of shots were fired; did you ever see Mr. Evans point his gun at any of the law enforcement? A: Point it directly at, no. But his head movement caused the muzzle -- I guess I would call it a laser – to be in line with all four of the deputies – all four of us.[23] Q: So is it fair to say, Sgt. Folendorf, that on your first assessment here when you approach the rear of the that squad, you did not believe that it was necessary to use deadly force? A: I believed that it was necessary, but we did not use deadly force.[24] I believe it was necessary, but I did not use deadly force. That's the best way I can describe it. I should have.[25] Q: And you did that consistent with your training, didn't you, Sgt. Folendorf? A: Unfortunately, yes.[26] Q: Were they acting inconsistent or consistent with their training? A: Inconsistent.[27] Q: They should have shot Mr. Evans? A: Unfortunately, yes. Q: And what you just told us previously was that you never directed them to shoot him? A: Correct."[28]

---

[19] Ramirez, p. 626, line 22-25 and p. 627, line 1-5.

[20] Ramos, State of MN v. Brian Jeffrey Krook, Jury Trial Transcript, p. 840, line 13-14.

[21] Ramos, Jury Trial Transcript, p. 848, line 10-13. "

[22] Ramos, p. 848, line 18-20 and p. 849, line 1-4.

[23] Folendorf, State of MN v. Brian Jeffrey Krook, Jury Trial Transcript, p. 1026, line 11-17.

[24] Folendorf, Jury Trial Transcript, p. 995, line 12-17.

[25] Folendorf, p. 996, line 11-13.

[26] Folendorf, p. 995, line 21-23.

[27] Folendorf, p. 997, line 22-24.

[28] Folendorf, p. P. 998, line 2-6.

15

94. The Washington County Sheriff's Office did not discipline any of these officers for these violations and the "blue wall of silence" remains alive and well. All Defendant Deputies remained employed and on the streets of Washington County despite killing Evans.

## STATE LAW CLAIMS

95. Plaintiff incorporates the allegations set forth in each of the preceding and subsequent paragraphs as if fully set forth herein and throughout.

96. The conduct of Defendants was willful, reckless and intentional constituting assault, battery, un-authorized use of deadly force, negligence and wrongful death under M.S.A § 573.02.

## CLAIM FOR RELIEF

Wherefore, Plaintiff requests this Court to order the following relief against Defendants, jointly and severally:

   a. Compensatory damages in the sum the Jury awards;

   b. Punitive damages against the individual Defendants in the sum Jury awards;

   c. Attorney's fees and expenses together with costs and disbursements;

   d. All other appropriate relief.

Plaintiff hereby demands a jury trial.

Dated: December 4, 2020

s/Peter C. Sandberg
Peter C. Sandberg
Registration No: 095515
Elham B. Haddon
Registration No: 0398698
Attorneys for Plaintiff William O.
Evans, Jr., as Trustee for the Heirs
and Next-of-Kin for Benjamin Evans

16

Sandberg Law Firm
4057 28th St. NW Suite 300
Rochester, MN 55901
Phone: (507) 282-3521
Fax: (507)-282-3532
psandberg@sandberg-law.com

EXHIBIT 8



# SANDBERG
## PERSONAL INJURY LAW

Peter C. Sandberg
Attorney at Law
sandberg@sandberglawoffice.com

Elnam B. Haddon
Attorney at Law
ehaddon@sandberglawoffice.com

October 21, 2021

Joseph E. Flynn
Vicki A. Hruby
Jardine Logan & O'Brien
8519 Eagle Point Boulevard, Suite 100
Lake Elmo, MN 55042
Jflynn@jlolaw.com
vhruby@jlolaw.com

RE:   William Evans, Jr., as Trustee for the Heirs and Next-of-Kin of Benjamin Evans v. Brian
      Krook, et. al.
      Case No: 20-cv-2474-MJD-ECW
      Our File No.: 2-7048

Dear Counsel:

We served 30(b)(6) deposition notices in this case on October 13, 2021. Per my conversation
with Mr. Flynn on October 12, 2021, the notices did not specify the date, to give Defendants
sufficient time to identify the designees. As of this writing, Defendants' designees have not been
identified and we have not been able to schedule these depositions.

In a letter dated September 28, 2021, I informed Defendant Washington County that the response
to Plaintiff's Interrogatory number 10, which was served on May 21, 2021, was unacceptable
and baseless. Defendant had objected to Interrogatory number 10 as "vague", "ambiguous",
"ambiguous as to time", and as "seeking information protected by the attorney-client privilege
and the work product doctrine." In response to my letter, Defendant produced a document
entitled "Call Summary" which detailed 21 calls allegedly made on April 12, 2018; with data
fields redacted or blank. In the same conversation on October 12, 2021, I relayed to Mr. Flynn
that the Call Summary was not an adequate response to Interrogatory number 10 and that the
source documents are required. On October 13, we received Defendant Washington County's
Supplemental Answers to Plaintiff's Interrogatories with an answer to Interrogatory number 10.
In that Supplement, Defendant outlined the process that was allegedly used to produce the Call
Summary from the Intrado Power 911 reporting software. The Supplement stated: The County
manually added the callee data in the last column to provide identifying information as
private/non-public telephone numbers were redacted." No one signed this Supplement, not
Counsel or Defendant. We are still waiting for a response to this Interrogatory. The response
provided was incomplete and inadequate.

On October 15, 2021, we received a lengthy letter detailing alleged discovery deficiencies from Plaintiff. I will address each in turn.

████ is Benjamin Evans's half-brother. ████ looked up to Benjamin and enjoyed his company. ████ needed counseling to process the tragedy of his brother's killing. During her deposition on September 8, 2021, Mr. Flynn requested that Ms. Porter provide him with the family's expenses to date in this case. Ms. Porter and Mr. Evans provided all the receipts that they have accumulated over the last three years on 10/07/2021. That list of expenses included $2,096.91 of payments for 9 psychotherapy sessions for ████ from 10/08/2019 to 01/14/2020. ████ is no longer receiving treatments in connection with his brother's death and his mental health is not at issue.

Brianna Evans is not interested in participating in any claim against Defendants. Ms. Porter, as per Mr. Flynn's request, provided the paperwork that the family filed with the Minnesota Crime Victims' Reparations Board, which included $480 in mental health visits for Brianna. Counsel had been made aware, verbally and on multiple occasions, of Brianna's position. Consequently, Defense Counsel cancelled her deposition, which was scheduled for September 8, 2021. In a letter dated October 18, 2021, I reiterated that Brianna will not be asserting a claim against Defendants. Her trivial counseling expenses can be disregarded.

As to Defendants Interrogatory number 17, we have answered that Interrogatory on two occasions, beginning with Plaintiff's Demand letter from October 20, 2020. In an attempt to comply, Plaintiff demands $33,000,000.00 for the killing of Benjamin Evans, as follows:

Compensatory Damages:

Loss of Future earnings: $4,249,560.00

Evans Family Expenses: $30,100.00

Care, Comfort, Guidance, and Support: $8,720,340.00

Loss of Life: $10,000,000.00

Punitive Damages: $10,000,000.00

We requested Ben Evans's Mayo Clinic and Harberstroh Insurance employment files in early 2020. Neither entity responded despite multiple attempts. We finally obtained Mayo's records and disclosed them to Defendants on October 7, 2021. Harberstroh responded recently with a handwritten statement that they do not have any records for Ben Evans. This was also disclosed on October 7, 2021.

As to the insurance policies that provided coverage for Ben Evans by virtue of his employment at Mayo Clinic, we provided Kim Porter's Petition for Appointment of Conservator for ████ on March 30, 2021. The Petition clearly stated that the reason that Ms. Porter was seeking a conservatorship for her granddaughter was because ████ was the beneficiary of a policy with Prudential Insurance Company. Mr. Flynn discussed the conservatorship with Ms. Porter at her deposition and she told him that there were two policies at Prudential for ████ and they were

both invested for her at Stifel Investment Company. Defendants did not request any authorizations to obtain records from Prudential until October 15, 2021.

Ben Evans's employment record with the City of Wabasha Ambulance Service was disclosed to Defendants with Plaintiff's Demand letter on October 20, 2020. Defense Counsel questioned Ms. Porter and Mr. Evans about Ben Evans's employment with Wabasha during their depositions in early September as well. Defendants did not ask for authorizations to the Public Employees Retirement Association of Minnesota until October 15, 2021. The signed authorization is enclosed.

Plaintiff provided a blank authorization addressed to health care entities for Benjamin Evans with Plaintiff's Responses to Defendants Interrogatories on 06/28/2021. That remains a valid authorization and Plaintiff has no objection to its use to obtain Ben's records from the St. Louis Emergency Medical Services, though we are not aware that any such records exist. The signed authorization is enclosed.

Benjamin Evans's records from the Air Force were provided with Plaintiff's Demand letter on October 20, 2020. Defendants did not request an authorization to the Air Force until October 15, 2021. The signed authorization is enclosed.

The Discovery deadline expires on January 3, 2022. Please cure these deficiencies in time to comply with the Court's order. Plaintiff repeatedly complied with requests and the delays complained of, as already mentioned, are not of Plaintiff's doing. Defendants had all the information necessary to request more authorizations for any additional records that they required. The fact that they have chosen not to or neglected to do so is not Plaintiff's problem. As I have already discussed with Counsel, we are not interested in extending the discovery deadline and will not be signing any stipulations to that effect.

Sincerely,

Elham B. Haddon
Attorney at Law

EBH/gla

enclosures