## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| William O. Evans, Jr *as Trustee for the Heirs and Next-of-Kin for Benjamin Evans*, | Case No. 20-cv-2474 (MJD/ECW) |
| Plaintiff, | |
| v. | **ORDER** |
| Brian Jeffery Krook, et al., | |
| Defendants. | |

This matter comes before the Court on Plaintiff's Motion to Compel and for Contempt ("Plaintiff's Motion to Compel") (Dkt. 163), Defendants' Motion for Rule 37 Sanctions ("Defendants' Sanctions Motion") (Dkt. 180), and the parties' Joint Motions for Continued Sealing (Dkts. 209, 210). For the reasons stated below, Plaintiff's Motion to Compel is denied, Defendants' Sanctions Motion is granted in part and denied in part, and the Joint Motions for Continued Sealing are granted.

## I.   PLAINTIFF'S MOTION TO COMPEL

### A.   Background

The general background of this case has been discussed in detail in the Court's Order dated May 16, 2022 (*see* Dkt. 192), and the Court will not reiterate it here except as necessary. Briefly, Plaintiff William O. Evans, as trustee for the heirs and next of kin of Decedent Benjamin Evans, alleges in the Complaint that Defendants "used deadly force causing the wrongful death of Benjamin Evans and failed to accommodate his

mental health disability, thereby depriving [Benjamin] Evans of rights secured by the United States Constitution" when law enforcement shot Benjamin Evans ("the Decedent"), resulting in his death in April 2018.  (Dkt. 1 ¶¶ 2, 17-34.)  Plaintiff asserts Section 1983 and Minnesota state law claims against Washington County, Brian Krook, Michelle Folendorf, Joshua Ramirez, Michael Ramos, and Dan Starry (collectively, "Defendants").  (*See generally id.*)

For purposes of Plaintiff's Motion to Compel, the Court provides the following additional background.  The April 12, 2018 shooting led to an investigation by the Minnesota Bureau of Criminal Apprehension ("BCA").  (*See* Dkt. 165 at 1.)[1]  During that investigation, the BCA interviewed Defendants Michelle Folendorf, Joshua Ramirez, and Michael Ramos, who were all "present when the shooting took place."  (*Id.*)  Folendorf, Ramirez, and Ramos testified before a Grand Jury regarding the April 12 shooting, and that Grand Jury "indicted Krook for the killing of Benjamin Evans," with a criminal trial against Krook proceeding in March of 2020[2] ("Criminal Case").  (*Id.* at 1-3.)  Krook's attorneys for the Criminal Case, Paul Engh and Kevin Short, hired experts Steve Ijames and Chief Steven Frazier, as well as investigator William O'Keefe, who all interviewed Folendorf, Ramirez, and Ramos separately on February 4, 2020 ("2020 Criminal Interviews").  (*Id.* at 3; Dkt. 176 at 2.)  According to Plaintiff, Folendorf, Ramirez, and

---

[1]     All page number citations are to the CM/ECF pagination unless otherwise noted.

[2]     Folendorf, Ramirez, and Ramos were not defendants in the Criminal Case.

Ramos's testimony during the Criminal Case trial contradicted their testimony before the Grand Jury.  (Dkt. 165 at 3-4.)

In October 2021, Plaintiff issued subpoenas to Ijames, Frazier, O'Keefe, Attorney Engh, and Attorney Short for depositions scheduled to proceed on October 25 and 26, 2021 ("Initial Subpoenas").  (*See* Dkt. 212-1, Pl.'s Ex. 1 at 4-5 (Subpoena for William O'Keefe to Attend Deposition on October 25, 2021); *Id.* at 8-9 (Subpoena for Steven Ijames to Attend Deposition on October 26, 2021); *Id.* at 10-11 (Subpoena for Steven Frazier to Attend Deposition on October 25, 2021).)  On June 2, 2022, the Court held a hearing on Plaintiff's Motion to Compel ("June 2 Hearing"), after which Plaintiff filed proofs of service for the Initial Subpoenas, and Defendants have not challenged whether they show effective service.  (*See id.* at 5, 9, 11; Dkt. 201.)

Defendants apparently objected to the depositions at some point in September 2021 (Dkt. 166-4, Pl.'s Ex. Q at 1), and on October 19, 2021, Attorney Engh sent a letter to Plaintiff's counsel raising a number of objections to the Initial Subpoenas, including work product protection and lack of compensation (Dkt. 166-3, Pl.'s Ex. P).  On October 14, 2021, Plaintiff's counsel sent a letter indicating that depositions scheduled for October 25 and 26 "are continued to a later date."  (Dkt. 212-3, Pl.'s Ex. 3 at 1.)

Plaintiff took no action with respect to the depositions until February 14, 2022, when Plaintiff re-raised the issue of deposing Ijames, Frazier, and O'Keefe.  (*See* Dkt. 177-3, Defs.' Ex. 7 at 1; Dkt. 166-4, Pl.'s Ex. Q at 1.)  In a letter dated February 23, 2022, Defendants' counsel noted that they did not represent Ijames, Frazier, and O'Keefe, and stated: "While we are willing to allow the depositions of the criminal defense team to

proceed, Deputy Brian Krook has not waived his objections to various lines of questioning as outlined in our February 17, 2022 correspondence to you." (Dkt. 178, Defs.' Ex. 2 at 12.)

On February 25, 2022,[3] Attorney Engh objected over the telephone to the depositions on the basis of work product and insufficient compensation, and reasserted those objections on March 3, 2022. (Dkt. 166-5, Pl.'s Ex. R; Dkt. 166-6, Pl.'s Ex. S at 1-2.) On March 8, 2022, Plaintiff proposed to limit "the questioning to what was said when the person interviewed, Folendorf, Ramirez, or Ramos, was present" and "assured [Attorney] Engh that his deposition questions will not inquire into his opinions or conclusions stated when the person interviewed was not present." (Dkt. 166-7, Pl.'s Ex. T; Dkt. 165 at 4.) Attorney Engh again objected in letters sent on March 9 and 11, 2022 to Plaintiff taking any depositions of Ijames, Frazier, and O'Keefe on work product and insufficient compensation grounds, "insisting that it is an undue hardship for these individuals to appear for their testimony" and demanding payment. (Dkt. 166-8, Pl.'s Ex. U; Dkt. 166-9, Pl.'s Ex. V.)

Based on the record, Plaintiff never served amended subpoenas setting new deposition dates. Plaintiff drafted letters dated February 24, 2022 addressed to Ijames, Frazier, and O'Keefe informing them their depositions were scheduled for March 17, 2022. (Dkt. 177-3, Defs.' Ex. 9 at 39-41.) Each letter includes the recipient's physical

---

[3]     Plaintiff stated that Attorney Engh objected on February 25, 2020 to the March 17, 2022 depositions. (*See* Dkt. 165 at 4.) Based on the date this case was initiated and the parties' filings, the correct date appears to be February 25, 2022. (*See* Dkt. 166-5, Pl.'s Ex. R.)

address, and Ijames' and Frazier's letters also include their email addresses, but the letters do not indicate how they were sent to those individuals. (*Id.*) Plaintiff has filed no proofs of service for the letters. On March 9, 2022, Plaintiff sent an email containing a Zoom link to Attorney Engh for the March 17 deposition date. (Dkt. 212-8, Pl.'s Ex. 8 at 1-3.)

Counsel for Plaintiff and Defendants appeared on March 17, 2022 for the depositions. (Dkt. 166-10, Pl.'s Ex. W.) Ijames, Frazier, and O'Keefe did not appear, nor did any attorney appear on their behalf. (*Id.*)

On April 13, 2022, Plaintiff filed the Motion to Compel, seeking:

1. An order to compel deponents Ijames, Frazer [sic], and O'Keefe to comply with Plaintiff's subpoena[;]

2. An order to compel deponents Ijames, Frazer [sic], and O'Keefe to appear for their depositions by Zoom at a date and time of the Court's choosing[;] and

3. An order for contempt if they fail to appear for their depositions.

(Dkt. 163 at 1.)[4]

On April 20, 2022, Defendants filed an opposition to Plaintiff's Motion to Compel. (Dkt. 176.) On June 2, 2022, the Court held a hearing on Plaintiff's Motion to Compel and took the Motion under advisement. (*See* Dkt. 201.) Ijames, Frazier, and O'Keefe did not file an opposition or appear at the hearing, nor did any attorney appear on their behalf.

---

[4]     Plaintiff has not moved to compel Attorneys Engh and Short's depositions. (*See* Dkt. 163.)

### B.      Plaintiff's Arguments

Plaintiff describes the relevant conduct by Krook, Attorney Engh, Attorney Short, Ijames, Frazier, and O'Keefe as follows: Krook furnished summaries of the experts' and investigator's interviews "to the prosecution without objection and as required by the Minnesota Rules of Criminal Procedure"; Frazier "testified at the Omnibus Hearing before the criminal trial and his testimony was accepted in lieu of a written report"; and on February 8, 2020, Krook produced to the prosecution a copy of Ijames' expert report "containing his opinions, conclusions, and impressions."  (Dkt. 165 at 3.)

According to Plaintiff, the work product doctrine and attorney-client privilege do not apply to Ijames, Frazier, and O'Keefe's depositions in this case regarding the 2020 Criminal Interviews "because Krook was obligated to disclose the contents of those meetings to the prosecution, and he did so."  (*Id.* at 5.)  Specifically as to attorney-client privilege, Plaintiff contends that the privilege does not apply here because Krook was not present during the 2020 Criminal Interviews; Attorneys Engh and Short were not representing Folendorf, Ramirez, and Ramos during the 2020 Criminal Interviews; and that to the extent the privilege is applicable, it was waived because the 2020 Criminal Interviews were "disclosed in the presence of third parties" and the common interest doctrine does not apply.  (*Id.* at 7-8.)

Regarding the work product doctrine, Plaintiff claims that because the subpoenas served on Ijames, Frazier, and O'Keefe were "for in-person depositions of fact witnesses and not for any documents or tangible things" and because the information Plaintiff seeks from Ijames, Frazier, and O'Keefe is factual in nature, that doctrine is also inapplicable.

(*Id.* at 8-10.)  Specifically, as to O'Keefe, Plaintiff contends that: "[O'Keefe] gathered facts for Defendant Krook's criminal defense team.  He was present during the meetings with Folendorf, Ramirez, and Ramos who were third party witnesses.  The facts that he gathered, witnessed, or heard during those meetings are not protected by the work product doctrine."  (*Id.* at 9.)  Plaintiff also claims that Ijames and Frazier "both testified as defense expert witnesses during the criminal trial . . . . Any facts that they relied upon to form their opinions, including facts gathered from Mr. O'Keefe's investigation or acquired from discussions with witnesses, are exempted from the protection of the rules"; that "[t]hey are required, as testifying experts, to disclose the facts they rely upon in forming their opinions"; and that even though Ijames' and Frazier's evaluations and opinions in the Criminal Case were based, in part, on the 2020 Criminal Interviews, Ijames did "not indicate what about the in-person interviews he based his evaluation, nor d[id] he elaborate on what Folendorf, Ramos, and Ramirez told him or what he said to them" and Frazier "did not indicate what information gleaned from his discussions with Folendorf, Ramos, and Ramirez to form those opinions."  (*Id.*)  Plaintiff maintains that "Ijames' and Frazier's live deposition testimony about the facts they gleaned during meetings with third party witnesses are outside the protections of the work product doctrine[]" and that Plaintiff's interest in deposing Ijames, Frazier, and O'Keefe relates to "their recollections as to the conversations that they had with and in the presence of prosecution witnesses, Folendorf, Ramos, and Ramirez[,]" which are not protected by the work product doctrine, attorney client privilege, or Minnesota Rule of Criminal Procedure, 9.02, subd. 3.  (*Id.* at 9-10.)

Plaintiff further argues that Krook produced written summaries of the 2020 Criminal Interviews to the prosecutor during the Criminal Case as required by Minnesota Rule of Criminal Procedure 9.02, Subdivision 1(4), and therefore, the work product doctrine does not "attach[] to these interviews or summaries per Minnesota law." (*Id.* at 10-11.) Plaintiff contends that given the alleged inconsistencies in Folendorf's, Ramirez's, and Ramos' testimonies to the Grand Jury and during the Criminal Case, the "explanation seems to rest with the interviews that took place on February 4, 2020" and argues that the "interviews are relevant to questions of excessive force, punitive damages, qualified immunity, and witness credibility." (*Id.* at 11.)

Lastly, Plaintiff argues that Ijames, Frazier, and O'Keefe are not entitled to any more compensation than that permitted under 28 U.S.C. § 1821(a)(2)(b) for witnesses as they are not being subpoenaed to testify as expert witnesses, and because the depositions are scheduled to proceed by Zoom, no travel is necessary and no per diem is required. (*Id.* at 11.) Plaintiff contends that he is "not interested in their opinions or conclusions unless those opinions or conclusions were discussed while the person interviewed was present," "[n]o preparation is required[,]" and neither Ijames, Frazier, or O'Keefe have filed a motion to quash. (*Id.*)

## C.    Defendants' Arguments

In their opposition to Plaintiff's Motion to Compel, Defendants claim Krook's criminal attorneys hired Ijames, Frazier, and O'Keefe as part of his defense, who conducted witness interviews of Folendorf, Ramirez, and Ramos in the presence of Attorneys Engh and Short. (Dkt. 176 at 2.) Defendants argue that Plaintiff's Motion to

Compel should be denied because Plaintiff has not provided any evidence to show that the Motion was served or that the subpoenas for the depositions of Ijames, Frazier, and O'Keefe were noticed as required by Federal Rule of Civil Procedure 45, and that a motion to quash was not filed because there is no valid subpoena to be quashed.  (*Id.* at 1, 9-11.)  Defendants also argue that the information Plaintiff seeks regarding the 2020 Criminal Interviews is not relevant to this litigation given that Ijames, Frazier, and O'Keefe did not witness the events that occurred on April 12, 2018 and have no "personal knowledge of the amount of force used, nor witnessed any conduct of Defendants which would warrant punitive damages," and Plaintiff has not made the preliminary showing that the depositions are within the scope of discovery.  (*Id.* at 11-13.)  Finally, Defendants argue that Plaintiff already deposed Folendorf, Ramirez, and Ramos, and therefore had the opportunity to access the information requested and in fact, questioned them about the 2020 Criminal Interviews and their testimonies in the Criminal Case.  (*Id.* at 1, 19-21.)

Moreover, Krook and Attorneys Engh and Short "have asserted [that] the work product doctrine protects any trial preparation materials that were not actually disclosed in the course of the Minnesota State Court criminal matter."  (*Id.* at 1.)  Defendants further argue that "Plaintiff misses the essential point that . . . deposing the Criminal Defense Team [defined by Defendants as including Ijames, Frazier, and O'Keefe] about their recollection and notes from the interviews implicitly requires invading their thoughts and mental impressions, to which Krook, [Attorney] Engh, and [Attorney] Short have nearly absolute work product immunity."  (*Id.* at 15-16.)  According to Defendants,

9

opinion work product attaches to the information Plaintiff seeks because Ijames, Frazier, and O'Keefe's mental impressions, recollections, or any notes taken by them goes beyond the written summaries of the 2020 Criminal Interviews that were provided to the prosecutor during the Criminal Case.  (*Id.*)  Defendants further contend that the information Plaintiff seeks is opinion work product as it contains the trial strategy of Attorneys Engh and Short and would reveal their impressions of witnesses and facts or documents they found of particular importance.  (*Id.*)  Defendants also argue that Krook did not waive the work product protection by producing the written summaries of the 2020 Criminal Interviews to the prosecutor in the Criminal Case and moreover, Plaintiff is in possession of those summaries; that Plaintiff has not offered the presence of any rare and extraordinary circumstances to overcome the protection of opinion work product; that Defendants have not named Ijames, Frazier, and O'Keefe as testifying experts in this case; and that attorney-client privilege is not at issue as it relates to the subpoenas.  (*Id.* at 16-18.)

Defendants seek attorneys' fees incurred in opposing Plaintiff's Motion to Compel under Rule 37(a)(5)(B) of the Federal Rules of Civil Procedure because Plaintiff failed to provide proof of service for the depositions and "otherwise did not have substantial justification for this Motion."  (*Id.* at 21-22.)

## D.   Legal Standard

### 1.   Rule 45

Rule 45 permits a party to command a person who is not a party to appear at a deposition.  Fed. R. Civ. P. 45(a)(1)(A)(iii).  Pursuant to Rule 45(b), "[a]ny person who is

at least 18 years old and not a party may serve a subpoena.  Serving a subpoena requires delivering a copy to the named person, and if the subpoena requires that person's attendance, tendering the fees for 1 day's attendance and the mileage allowed by law." Fed. R. Civ. P. 45(b)(1).  "Proving service, when necessary, requires filing . . . a statement showing the date and manner of service and the names of the persons served. The statement must be certified by the server."  Fed. R. Civ. P. 45(b)(4).

## 2.      Work-Product Doctrine

The work-product doctrine, first articulated in *Hickman v. Taylor*, 329 U.S. 495 (1947), is codified in Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure, and provides in pertinent part that:

> [A] party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But . . . those materials may be discovered if:
>
> > (i) they are otherwise discoverable under Rule 26(b)(1); and
>
> > (ii) the party shows that it has substantial needs for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26(b)(3)(A)(i)-(ii).  The work-product doctrine serves to "promote the operation of the adversary system by ensuring that a party cannot obtain materials that his opponent has prepared in anticipation of litigation."  *Pittman v. Frazier*, 129 F.3d 983, 988 (8th Cir. 1997) (citing *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991)).

The applicability of the work-product doctrine is factually intensive and depends on the circumstances of the particular case. *See Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 168 F.R.D. 641, 645 (D. Minn. 1996). "While the 'work product' may be, and often is, that of an attorney, the concept of 'work product' is not confined to information or materials gathered or assembled by a lawyer." *Diversified Indus. Inc. v. Meredith*, 572 F.2d 596, 603 (8th Cir. 1977). "Documents or information prepared by a party's agent in anticipation of litigation, at the instruction of that party's counsel, can qualify for protection under the work product doctrine." *Advanced Polymer Tech. Corp. v. Textile Mgmt. Assocs., Inc.*, Civ. No. 4:08-CV-0018-HLM, 2009 WL 10669413, at *3 (N.D. Ga. Aug. 10, 2009) (citing *Lake Shore Radiator, Inc. v. Radiator Express Warehouse*, No. 3:05-CV-1232-J-12MCR, 2007 WL 842989, at *5 (M.D. Fla. Mar. 19, 2007)). "The work product doctrine, however, 'does not protect the underlying facts an adverse party has learned, or the persons from whom that party has learned such facts or the existence or nonexistence of documents.'" *Id.* "Determining whether discovery seeks to obtain underlying facts, which are not protected by the work product doctrine, or seeks to uncover the theory of a case, which is protected by the work product doctrine, often proves difficult." *Id.* "Further, a communication may be immune from discovery as work product even though it was not made to or by a 'client' of an attorney. *Diversified Indus. Inc.*, 572 F.2d at 603. "To promote the policy of protecting an attorney's preparation for litigation recognized in *Hickman*, the work-product doctrine 'extends beyond the termination of the litigation for which the documents were prepared.'" *United States v. Adams*, Case No. 17-cr-00064-DWF-KMM, 2018 WL

5311410, at *6 (D. Minn. Oct. 27, 2018) (quoting *In re Murphy*, 560 F.2d 326, 334 (8th Cir. 1977)).

### a.    Types of Work Product

The work-product doctrine can be categorized into two: ordinary work product and opinion work product. *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000). The distinction between the two types of work product is an important one:

> Ordinary work product includes raw factual information. Opinion work product includes counsel's mental impressions, conclusions, opinions or legal theories. Ordinary work product is not discoverable unless the party seeking discovery has a substantial need for the materials and the party cannot obtain the substantial equivalent of the materials by other means. In contrast, opinion work product enjoys almost absolute immunity and can be discoverable only in very rare and extraordinary circumstances, such as when the material demonstrates that an attorney engaged in illegal conduct or fraud.

*Id.* (quotations and citations omitted). The party seeking to overcome the work-product protection bears the burden of establishing substantial need and undue burden. *Id.*

### b.    Waiver of Work-Product Protection

The work-product doctrine "is not absolute and may be waived." *Pamida Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 732 (8th Cir. 2002). The Eighth Circuit has held that a party must intend to disclose a document that is otherwise protected by the work-product doctrine to waive the protection as to that specific document. *See Pittman*, 129 F.3d at 988; *see also In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, MDL No. 15-2666 (JNE/FLN), 2017 WL 5188342, at *5 (D. Minn. March 7, 2017) (finding that "[d]isclosure to a third party of a document otherwise protected as work product waives that protection if 'it has substantially increased the opportunities for potential

adversaries to obtain the information'") (quoting Wright & Miller, *supra*, § 2024, and citing various cases). A waiver of work-product protection may also arise when the party seeking to assert the protection elects to make a testimonial use of the alleged protected materials. *United States v. Nobles*, 422 U.S. 225, 239 (1975).

The work-product doctrine may be impliedly waived when the party claiming the protection brings a claim "in which the information allegedly protected is crucial and unavailable by other means," intends to waive the protection, and "the interests [of] fairness and consistency mandate a finding of waiver." *Pamida*, 281 F.3d at 732 (citing Wigmore, *Evidence in Trial at Common Law*, § 2327 at 636 (J. McNaughton rev. 1961)). In short, the protection should not be used to shield information that underlies the allegations and claims in a case. *In re Grand Casinos, Inc.*, 181 F.R.D. 615, 622 (D. Minn. 1998).

**E.      Analysis of Plaintiff's Motion to Compel**

The Court begins with the question of Defendants' standing to oppose Plaintiff's Motion to Compel and then turns to the Motion's merits.

**1.      Defendants' Standing to Oppose Plaintiff's Motion to Compel**

Plaintiff contended at the June 2 Hearing that Defendants lacked standing to oppose Plaintiff's Motion to Compel. Defendants argued that Krook has standing because the persons whose testimony Plaintiff seeks to compel were members of Krook's criminal defense team. Plaintiff did not brief the standing issue, but Defendants note in their opposition brief that Plaintiff asserted in a February 21, 2022 letter that "Krook has no standing to challenge these subpoenas." (*See generally*, Dkt. 165; *see also* Dkt. 176 at

6-7 (citing Dkt. 177-3, Defs.' Ex. 8 at 37 (February 21, 2022 letter from Plaintiff's counsel to Defendants' counsel)).) Defendants argue that "Plaintiff provided no authority for his standing argument" and that Krook "has standing to assert work product protection and to quash a third-party subpoena because he [has] 'some personal right or privilege as to the information being sought through the subpoena.'" (Dkt. 176 at 7, 10 n. 3 (citing *Mallak v. Aitklin Cty.*, No. 13-cv-2119 (DWF/LIB), 2016 WL 9088760, at *7 (D. Minn. Dec. 22, 2016); Fed. R. Civ. P. 45(d)(3)(A)(iii)).)

Generally, a party challenging a subpoena must have "some personal right or privilege as to the information being sought through the subpoena" in order to have standing. *Mallak*, 2016 WL 9088760 at *7; *see also Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, No. 07-27 (PJS/RLE), 2007 WL 1544572, at *3 (D. Minn. May 23, 2007) (noting that "a party may raise objections in situations where the party claims some personal right or privilege relating to the documents sought"); *Meridian of Palm Beach Condo. Ass'n, Inc. v. QBE Ins. Corp.*, No. 06-81108-CIV, 2008 WL 11520258, at *2 (S.D. Fla. Jan. 22, 2008) (granting plaintiff's motion to quash subpoena to non-parties on procedural grounds). Here, in view of the fact that Plaintiff seeks the deposition testimony of non-attorney members of Krook's criminal defense team and Krook has raised objections based on work product protection, the Court finds that (at least) Krook has standing to challenge the subpoenas.[5]

---

[5]     Plaintiff did not distinguish between procedural and substantive challenges for standing purposes during the June 2 Hearing.

2.      **Procedural Deficiencies Warrant Denial of Plaintiff's Motion to Compel**

Defendants argue that Plaintiff "has not offered any proof of service for any subpoenas to his Motion" as required by Rule 45 and that Plaintiff has not provided any proof that he properly notified Ijames, Frazier, and O'Keefe of the March 17, 2022 depositions, as the only subpoenas Plaintiff provided required attendance for depositions scheduled in October 2021. (Dkt. 176 at 9-10.) Defendants also argue that Plaintiff failed to properly serve the Motion to Compel. (*Id.* at 10-11.)

As Defendants pointed out, Plaintiff did not provide proof of service for any subpoena before the June 2 Hearing. At the June 2 Hearing, Plaintiff asked the Court for an opportunity to file proofs of service showing the Initial Subpoenas for the depositions scheduled for October 25 and 26 were properly served on Ijames, Frazier, and O'Keefe, which the Court granted. (*See* Dkt. 212 at 1.) Plaintiff has now submitted the proofs showing service of the Initial Subpoenas on Ijames, Frazier, and O'Keefe, and Defendants have not argued that the form/method of service, based on those proofs, are defective. (*See* Dkt. 212-1, Pl.'s Ex. 1 at 5, 9, 11.) Defendants have suggested that Plaintiff was required to serve and provide proofs of service for amended subpoenas with the March 17, 2022 date, but neither party has cited any authority regarding that proposition. Given the proper service of the Initial Subpoenas, and the subsequent communication about deposition dates, the Court is not inclined to deny the Motion to Compel due to lack of service of amended subpoenas. However, Plaintiff should take

care to properly support his future motions at the time of filing, or risk denial of a request to supplement the record.

Plaintiff's failure to serve the Motion to Compel itself on Ijames, Frazier, and O'Keefe is more concerning. "Rule 45 is the only discovery method whereby information may be obtained from a nonparty to the suit." *Highland Tank & Mfg. Co. v. PS Int'l, Inc.*, 227 F.R.D. 374, 379 (W.D. Pa. 2005) (citing Fed. R. Civ. P. 45 advisory committee's note to 1991 amendments). Rule 45 requires "notice to the commanded person" in connection with a motion to compel for an "order compelling production or inspection," Fed. R. Civ. P. 45(d)(2)(B)(i), but does not have similar language with respect to a subpoena for deposition. Neither party cited any authority relating to Plaintiff's service requirements with respect to the Motion to Compel on Ijames, Frazier, and O'Keefe. The Court finds Rule 5 instructive.[6] *See BBK Tobacco & Foods LLP D/B/A HBI Int'l v. Cent. Coast Agric., Inc.*, Case No. 21-mc-80189-DMR, 2021 WL 5507167, at *2-3 (N.D. Cal. Nov. 24, 2021) (finding a motion to compel compliance with a subpoena was properly served on a nonparty in accordance with Rule 5 and stating "[s]ervice of written motions and discovery papers must . . . be properly served under Federal Rule of Civil Procedure 5 . . ."); *see also* Fed. R. Civ. P. 4 advisory committee's note to 1993 amendments ("Service of a subpoena is governed by Rule 45, and service of papers such as orders, motions, notices, pleadings, and other documents is governed by Rule 5.").

---

[6]   Plaintiff did not dispute that Rule 5 applied to service of motions on non-parties at the June 2 Hearing.

Under Rule 5(b)(1), because Ijames, Frazier, and O'Keefe are represented by counsel, Plaintiff was required to effectuate service of the Motion to Compel on Attorney Engh. *See* Fed. R. Civ. P. 5(b)(1). But Attorney Engh is not registered to receive ECF filings in this case and thus was not served electronically by ECF (as contemplated by Rule 5(b)(3)) when Plaintiff filed the Motion to Compel, requiring service by other means. *See* Fed. R. Civ. P. 5(b)(2)-(3).

At the hearing, Plaintiff argued that the "course of dealing between the parties" meant service of the Motion to Compel was perfected because Plaintiff emailed copies of the motion papers and the hearing date to Attorney Engh, and Attorney Engh had every opportunity to tell Plaintiff's counsel not to serve him by email. (*See* Dkt. 228 at 22:4-20; *see also* Dkt. 212 at 1.) [7] In other words, Plaintiff contends he served the Motion to Compel by "electronic means" under Rule 5(b)(2)(E) based on the absence of objection. This argument ignores the plain language of the Rule, which requires consent to electronic means "in writing." Fed. R. Civ. P. 5(b)(2)(E). Indeed, the advisory committee's notes to Rule 5 state that the Rule "authorizes service by electronic means or other means, but only if consent is obtained from the person served. The consent must be express, and cannot be implied from conduct." Fed. R. Civ. P. 5(b)(2)(E) advisory committee's note to 2001 amendment. Indeed, numerous courts have rejected Plaintiff's argument. *See, e.g.*, *Dalla-Longa v. Magnetar Cap. LLC*, 33 F.4th 693, 696 (2d Cir. 2022) ("In other words, pursuant to Rule 5, a party may serve papers by email only if the

---

[7]     Citations to transcripts are given in a transcript page:line number format.

person being served has 'consented' to service by email 'in writing.'") (quoting Fed. R.

Civ. P. 5(b)(2)(E)); *Martin v. Deutsche Bank Sec. Inc.*, 676 F. App'x 27, 29 (2d Cir.

2017) (dismissing case for failure to timely serve and rejecting Plaintiff's "implied

consent" to email service argument "because the plain language of Rule 5 requires the

recipient of electronic service to have "consented in writing,' which was not done here.");

*Klein v. Affiliated Grp., Inc.*, Civ. No. 18-cv-949 DWF/ECW, 2019 WL 1307884, at *6

(D. Minn. Mar. 22, 2019) (declining to find discovery objections waived when discovery

was served by email but responding party had not consented in writing to electronic

service).

The Court also has concerns about the timing of Plaintiff's Motion to Compel.

Plaintiff waited four months, from October 14, 2021 to February 14, 2022, to re-raise the

depositions of Ijames, Frazier, and O'Keefe with Attorney Engh and Defendants. (Dkt.

177-3, Defs.' Ex. 7 at 33; Dkt. 178, Defs.' Ex. 2 at 3.) The Pretrial Scheduling Order

entered on March 30, 2021 states:

> [S]imply because this schedule establishes a deadline for filing a particular
> non-dispositive motion does not mean that a motion brought by that deadline
> will automatically be considered to have been timely filed if the relief sought
> by the motion is likely to impact the parties' ability to meet the other
> deadlines in this Order and if it appears that with the exercise of diligence,
> the motion could have been brought sooner.

(Dkt. 13 at 1-2.)

On March 22, 2022, in his opposition to Defendants' motion to extend the

scheduling order, Plaintiff asked the Court for an amendment to the schedule because

"Plaintiff is preparing a Motion for Contempt under Fed. R. Civ. Pro. 45 against three

witnesses who refused to comply with a valid subpoena for March 17, 2022 depositions"
and "Plaintiff requests that those depositions be allowed to proceed."  (Dkt. 144 at 9.)
That was the first time Plaintiff sought relief with respect to the depositions of Ijames,
Frazier, and O'Keefe, and Plaintiff did not file a proper motion until April 13, 2022.
(Dkt. 163.)  Plaintiff has not given any sufficient reason why he did not raise the issue
once it was apparent the parties had reached an impasse in October 2021.  Under these
circumstances, the Court is not inclined to find Plaintiff was diligent in filing his Motion
to Compel.

Plaintiff's failure to properly serve the Motion to Compel on Ijames, Frazier, and
O'Keefe and lack of diligence in filing the Motion, standing alone, are sufficient grounds
to deny the Motion.  But, as explained below, the Court also denies the Motion to
Compel on substantive grounds.

### 3.   Plaintiff's Motion to Compel Is Also Denied on Substantive Grounds

As previously stated, Plaintiff claims that the work product doctrine is not
implicated by the depositions of Ijames, Frazier, and O'Keefe regarding the 2020
Criminal Interviews.  As a starting point, to the extent Plaintiff argues that because the
sought-after information relates to work performed by non-attorneys, that is by Ijames,
Frazier, and O'Keefe, it is not protected work product, the Court rejects that argument.
In *United States v. Nobles*, the Supreme Court held that:

> At its core, the work-product doctrine shelters the mental processes of the
> attorney, providing a privileged area within which he can analyze and
> prepare his client's case. But the doctrine is an intensely practical one,
> grounded in the realities of litigation in our adversary system. One of those
> realities is that attorneys often must rely on the assistance of investigators

20

and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

422 U.S. 225, 238-39 (1975).

As held by the Eighth Circuit, "[w]hile the 'work product' may be, and often is, that of an attorney, the concept of 'work product' is not confined to information or materials gathered or assembled by a lawyer." *Diversified Indus.*, 572 F.2d at 603; *see also* Fed. R. Civ. P. 26(b)(3)(A) ("[A] party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (*including the other party's attorney, consultant, surety, indemnitor, insurer, or agent*)") (emphasis added).

Plaintiff also argues that work product is inapplicable because the sought-after information is "for in-person depositions of fact witnesses and not for any documents or tangible things" and because the information Plaintiff seeks to obtain from Ijames, Frazier, and O'Keefe is factual in nature.  (Dkt. 165 at 8-10.)  But the Eighth Circuit has found work product applies to the personal recollections, notes, and memoranda of an attorney and the attorney's agents.  *See Baker*, 209 F.3d at 1054 ("Notes and memoranda of an attorney, or an attorney's agent, from a witness interview are opinion work product entitled to almost absolute immunity.") (citing *In re Grand Jury Proceedings*, 473 F.2d 840, 848 (8th Cir. 1973) (holding "attorney's personal recollections, notes, memoranda from interviews are absolutely protected work product")); *see also Wells Fargo & Co. v. U.S.*, Nos. 10-57 (JRT/JJG), 10-95 (JRT/JJG), 2013 WL 2444639, at *31 (D. Minn. June 4, 2013) ("Work product consists not only of tangible material but also of its intangible

equivalent in unwritten or oral form.") (quotations and citations omitted).  The protection

may also attach to the attorney and her agents' assembly of facts.  *See Marvin Lumber &*

*Cedar*, 168 F.R.D. at 646 ("[W]hile historical facts are not privileged, when those facts

are collated or categorized by legal counsel they may well be entitled to protection from

disclosure under the work-product doctrine.") (citing *Shelton v. Am. Motors Corp.*, 805

F.2d 1323, 1326 (8th Cir. 1986); *see also In re Grand Jury Subpoena Dated Nov. 8,*

*1979*, 622 F.2d 933, 935 (6th Cir. 1980) ("Work product consists of the tangible

and **intangible** material which reflects an attorney's efforts at investigating and preparing

a case, including one's pattern of investigation, assembling of information, determination

of the relevant facts, preparation of legal theories, planning of strategy, and recording of

mental impressions.") (emphasis added).

Plaintiff states that his interest in deposing Ijames, Frazier, and O'Keefe relates to

"their recollections as to the conversations" that took place during the 2020 Criminal

Interviews and that he intends to depose them to determine "what was said when the

person interviewed, Folendorf, Ramos, or Ramirez, [were] present," and also that "his

deposition questions will not inquire into [Ijames, Frazier, and O'Keefe's] opinions or

conclusions stated when the person interviewed was not present."  (Dkt. 165 at 4, 9-10.)

It is undisputed that Ijames, Frazier, and O'Keefe were retained by Attorneys Engh and

Short for the purpose of assisting in their defense of Krook during the Criminal Case.  In

their roles as experts and investigator, Ijames, Frazier, and O'Keefe interviewed

Folendorf, Ramirez, and Ramos in the presence of Attorneys Engh and Short.

Numerous cases stand for the proposition that by seeking Ijames, Frazier, and O'Keefe's recollections of the interview, Plaintiff seeks opinion work product entitled to the highest protection. *See Baker*, 209 F.3d at 1053-54 (finding that notes and a summary drafted by defendant's attorneys, as well notes taken by a non-attorney member of defendant's litigation team during interviews, were opinion work product even though they may have contained some factual information and noting that "[o]pinion work product includes counsel's mental impressions, conclusions, opinions, or legal theories."); *see also Advanced Polymer Tech.*, 2009 WL 10669413, at *4 (finding the plaintiffs' "deposition question to [defendants' employee who obtained information from another person at the request of defendants' counsel],which sought information concerning what [was discussed by defendants' employee and the third party], did not simply seek unprotected facts, as Plaintiffs argue, but instead sought to obtain opinion work product."); *Lake Shore Radiator, Inc. v. Radiator Express Warehouse*, No. 3:05-cv-1232-J-12MCR, 2007 WL 842989, at *5 (M.D. Fla. March 19, 2007) ("Because Bob Arnold was hired by Plaintiff to investigate certain aspects of this litigation, Bob Arnold is acting as Plaintiff's representative or agent.  Moreover, the information and documents Defendant seeks from Plaintiff were prepared or gathered by Plaintiff's agent, after instructions from Plaintiff's counsel, in anticipation of litigation.  Thus, documents prepared for or by Bob Arnold for the purpose of this litigation are protected work product, so long as they were not waived by Plaintiff."); *In re Grand Jury Proceedings*, 43 F.3d 966, 970-71 (5th Cir. 1994) (finding attorneys oral communications with third parties were opinion work product and stating "[f]urthermore, to the extent that the

documents in question reflect oral conversations made by third parties to [defendants' attorneys in a prior and separate case], *Hickman* makes it clear that discovery may be had only in a 'rare situation,' because of the danger that the attorney's version of such conversions is inaccurate and untrustworthy. Perhaps more importantly, the stricter limits on disclosure of work product which results from oral communications with third parties is also necessary due to the likelihood that such documents will reveal the attorney's mental processes or litigation strategy.") (citations omitted). Plaintiff has not cited a single case permitting the discovery he seeks, and there is extensive authority to the contrary.

Even if the information Plaintiff seeks is ordinary work product, Plaintiff has not shown a substantial need for it or that he cannot obtain the substantial equivalent by other means. Plaintiff has deposed Folendorf, Ramirez, and Ramos, and had the opportunity to question them, including about any inconsistencies in their testimony to the Grand Jury and during the Criminal Case. This weighs against permitting the depositions sought by Plaintiff. *See Baker*, 209 F.3d at 1054 ("Discovery of a witness statement to an attorney is generally not allowed if that witness is available to the other party."). Further, Plaintiff can show any inconsistencies or changes in testimony from the Grand Jury proceedings to the trial in the Criminal Case using the transcripts of those proceedings, which Plaintiff filed with his Motion to Compel. (*See* Dkt. 166 ¶¶ 4-6, 12-14; Dkt 167-3, Pl.'s Ex. D at 1-47; Dkt. 167-4, Pl.'s Ex. E at 1-25; Dkt. 167-5, Pl.'s Ex. F at 1-48; Dkt. 167-10, Pl.'s Ex. L at 1-110; Dkt. 167-11, Pl.'s Ex. M at 1-168; Dkt. 167-12, Pl.'s Ex. N at 1-64.) Plaintiff stated at the June 2 Hearing that "[w]e just would like to know what was said,

Your Honor.  I think this is just our due -- this is our due diligence, and we're just trying to figure out what happened there."  (Dkt. 228 at 14:10-18.)  Plaintiff also admitted, however, that there was no reason to question the accuracy of the interview summaries. (*Id.* at 14:19-22.)  This type of curiosity, when Plaintiff has already deposed those interviewed, has no reason to question the summaries, and has both the Grand Jury testimony and the trial testimony available to present at trial in this action, does not show substantial need for the testimony of Ijames, Frazier, and O'Keefe.  *See Baker*, 209 F.3d at 1054 (holding that a "party also does not demonstrate substantial need when it merely seeks corroborative evidence") (citing *Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997) (finding "no substantial need when documents sought would merely reinforce known inconsistencies")).

Plaintiff's other arguments are similarly unpersuasive.  He argues, somewhat contradictorily, that "[n]one of the witnesses are being deposed as expert witnesses" (Dkt. 165 at 5) while also contending that Ijames, Frazier, and O'Keefe are "required, as testifying experts, to disclose the facts they rely upon in forming their opinions" (*id.* at 9). No party has identified Ijames, Frazier, or O'Keefe as experts in this case.  The requirements of Rule 26(a)(2)(B) do not apply to them because they are not witnesses "retained or specially employed to provide expert testimony **in the case**."  Fed. R. Civ. P. 26(a)(2)(B) (emphasis added).

Plaintiff also contends that work product protection was waived as to the 2020 Criminal Interviews because Krook was required under Minnesota Rule of Criminal Procedure 9.02, subdivision 1(4), to produce summaries of those Interviews to the

prosecutor in the Criminal Case.  (*See* Dkt. 165 at 10 (citing Minn. R. Crim. P. 9.02,

subd. 1(4)(c)).  Plaintiff does not address the fact that Rule 9.02 preserves work product

protection for materials not subject to mandatory disclosure.  *See* Minn. R. Crim. P. 9.02,

subd. 3.  Further, it is axiomatic that the disclosure of work product protection applies to

the "items actually disclosed."  *Pittman*, 129 F.3d at 988.  As such, any waiver relating to

the 2020 Criminal Interviews is limited to the summaries themselves.  *See id.* (finding

that any waiver of work product protection was limited only to the materials produced

and not did not encompass other materials not produced); *see also Lake Shore Radiator*,

2007 WL 842989, at *6 (concluding that while the plaintiff's production of transcripts

resulted in a waiver of the work product doctrine as to the transcripts produced, it did

"not result in waiver of the remainder of Bob Arnold's files or investigation.").

    For all these reasons, the Court denies Plaintiff's Motion to Compel on

Substantive Grounds.[8]

### 4.    Protective Order and Attorneys' Fees

    Defendants note that under Rule 37(a)(5)(B), if a motion to compel is denied, the

Court may "issue any protective order authorized under Rule 26(c) and must, after giving

an opportunity to be heard, require the movant, the attorney filing the motion, or both to

pay the party or deponent who opposed the motion its reasonable expenses incurred in

---

[8]     Plaintiff also argues the attorney client privilege does not apply to the 2020
Criminal Interviews.  (Dkt. 165 at 5-7.)  However, because the Court has found work
product protection applies to the 2020 Criminal Interviews, it need not determine whether
attorney client privilege applies.

opposing the motion, including attorney's fees."  (Dkt. 176 at 21-22.) (citing Fed. R. Civ. P. 37(a)(5)(B).).

The Court first turns to the protective order permitted under Rule 37(a)(5)(B). Rule 26(c) permits a Court to enter a protective order forbidding certain discovery on a showing of good cause.  Fed. R. Civ. P. 26(c)(1)(A).  Defendants have standing to seek a protective order with respect to the subpoenas, and the Court has the authority to issue a protective order as to the subpoenas as a matter of "case management under Rules 16 and 26."  *See Shukh v. Seagate Tech., LLC*, 295 F.R.D. 228, 236-27 (D. Minn. 2013).

Moreover, the Court is permitted "on its own" to limit discovery if it determines that:

> (i)   the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii)  the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C).

In turn, Rule 26(b)(1) provides:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1)

Even if the Court ignores the procedural deficiencies in Plaintiff's Motion to Compel and if there were some small amount of potential testimony not protected by the work product doctrine, a protective order prohibiting the depositions of Ijames, Frazier, and O'Keefe is appropriate. This is because the sought-after testimony is unreasonably cumulative or duplicative, and also outside the scope of that permitted by Rule 26(b)(1) because it is disproportionate to the needs of the case. Plaintiff describes the testimony he seeks as "what was said when the person was interviewed, Folendorf, Ramos, or Ramirez, was present [sic]." (Dkt. 165 at 4.) He argues that what Ijames, Frazier, and O'Keefe "saw, heard, and said when they interviewed Folendorf, Ramirez, and Ramos are typical fact questions a deponent would be expected to answer." (*Id.* at 5.) Plaintiff stated in his brief that Folendorf, Ramos, and Ramirez's Grand Jury testimony are contradictory and "the explanation seems to rest with the interviews that took place on February 4, 2020"—although Plaintiff does not explain the basis for the second assertion. (*Id.* at 11.) According to Plaintiff, the testimony is relevant to questions of excessive force, punitive damages, qualified immunity, and witness credibility. (*Id.*) Again, at the June 2 Hearing, Plaintiff argued that this testimony was relevant because Folendorf, Ramos, and Ramirez allegedly changed their testimony after the 2020 Criminal Interviews, that is, from their Grand Jury testimony to their trial testimony. (Dkt. 228 at 14:3-9.)

As discussed above, Plaintiff is in possession of the Grand Jury and trial testimony of Folendorf, Ramos, and Ramirez. The Court cannot discern any reason why Plaintiff

needs anything more than the transcripts themselves to establish any alleged change in testimony. Notably, Plaintiff never says what he thinks happened during the 2020 Criminal Interviews that changed the testimony of Folendorf, Ramos, and Ramirez, nor identifies any reason to pin the reason for the alleged change on those Interviews. Plaintiff's rationale is speculative at best, including in view of Plaintiff's counsel's concession that there is no reason to question the summaries of the Interviews.

Further, whether Folendorf, Ramos, and Ramirez said something different during the 2020 Criminal Interviews, or whether something happened that caused an alleged change in testimony is, at most, marginally relevant to the claims and defenses in this action. Indeed, the fact that Plaintiff let four months elapse before re-raising the depositions, and failed to bring the work product and compensation disputes to the Court's attention until March 2022 even though the dispute was ripe as of October 2021, demonstrates the unimportance of the sought-after testimony. To the extent Plaintiff wishes to impeach those witnesses at trial in this action, he can use the transcripts that he thinks show the change in testimony. The Court finds the discovery sought by the depositions is both cumulative and duplicative to other discovery in this case (including Plaintiff's depositions of Folendorf, Ramos, and Ramirez, as well as the transcripts) and disproportionate to the needs of the case given the speculative nature of the additional information sought and its lack of relevance to the claims and defenses in this action. For all these reasons, the Court issues a protective order prohibiting Plaintiff from seeking to depose Ijames, Frazier, and O'Keefe with respect to the 2020 Criminal Interviews with Folendorf, Ramos, and Ramirez.

The Court turns to Defendants' request for attorneys' fees under Rule 37(a)(5)(B). "[T]he court must not order this payment [if the motion is denied] if the motion was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(B). The Court finds that other circumstances make an award of attorneys' fees to Defendants unjust. Although Defendants raised objections in February 2022 on work product grounds, Defendants did not state they would oppose the depositions of Ijames, Frazier, and O'Keefe in their entirety. (Dkt. 178, Defs.' Ex. 2 at 8-11.) In fact, on February 23, 2022, Defendants stated: "While we are willing to allow the depositions of the criminal defense team to proceed, Deputy Brian Krook has not waived his objections to various lines of questioning as outlined in our February 17, 2022 correspondence to you." (Dkt. 178, Defs.' Ex. 2 at 12.) However, Defendants ultimately opposed the depositions in their entirety in their opposition brief. (*See* Dkt. 176 at 22.) Under these circumstances, it would be unjust to award expenses to Defendants.

## II.   **DEFENDANTS' SANCTIONS MOTION**

### A.   **Background**

The discovery at issue—Plaintiff's Rule 26 disclosures, Interrogatory No. 17, and Request for Production ("RFP") No. 23—relates to Plaintiff's damages claim. (*See generally* Dkt. 182.) Plaintiff seeks $33 million in damages. (*See* Dkt. 51 at 3.)

Defendants claim that Plaintiff's Rule 26 disclosures are deficient as to Plaintiff's damages, as are his answer to Defendants' Interrogatory No. 17 and response to Defendants' RFP No. 23, and as a result, seek sanctions for Plaintiff's failure to comply

with this Court's Orders.  (Dkt. 180 at 1; *see also* Dkt. 182 at 2-4, 10-28.)  The Court

recites those disclosures and responses below.

### 1.      Rule 26 Disclosures

Plaintiff's most recent Rule 26 disclosures are not part of the record.  However, as

of January 12, 2022, Plaintiff disclosed the following with respect to damages:

> Compensatory Damages: Ben Evans had a life expectancy of 54 years. His
> work-life expectancy was 40 years. He was planning on becoming a
> physician's assistant who earns about $92,500 per year, for a total of
> $3,700,000.00 without benefits. William O. Evans, Jr. is 58 years old.
> Kimberly Harrell Porter is 54 years old. Brianna Evans is 32 years old;
> Matthew Evans is 30 years old and [REDACTED] is 4 years old.
>
> Attorney Fees pursuant to § 1988 of more than $50,000.
>
> Punitive Damages pursuant to § 1983 of more than $50,000.
>
> Loss of Future earnings: $4,249,560.00 based upon annual mean wage range
> for physician's assistants for MO, as documented by the US Bureau of Labor
> Statistics data for the year 2020.
>
> Evans Family Expenses: $30,100.00 as enumerated in the Evans' Family
> expenses spreadsheet.
>
> Care, Comfort, Guidance, and Support: $8,720,340.00 for the remainder of
> each of the next-of-kin's life expectancy.
>
> Loss of Life: $10,000,000.00 for the remainder of Benjamin Evans' 54 years
> of life expectancy.
>
> Punitive Damages: $10,000,000.00 as the Jury will award based on witness
> testimony.

(Dkt. 92, Defs.' Ex. 2 at 11-12; Dkt. 147-7 at 11-12.)  The total of Plaintiff's loss of

future earnings ($4,249,560), Evans family expenses ($30,100), "Care, Comfort,

Guidance, and Support" ($8,720,340), "Loss of Life" ($10,000,000), and punitive

damages ($10,000,000) is $33 million.

### 2.     Interrogatory No. 17

Interrogatory No. 17 asks Plaintiff to:

Identify all damages (including special damages), expenses, injuries, or pecuniary loss that you allege have been incurred as a result of the incident and/or that you are requesting as a result of the incident. For each type of damage, expense, injury or pecuniary loss, identify the following:

  a.  The nature of the damage, expense, injury or pecuniary loss;
  b.  The extent of the injury and the amount of damage, expense or pecuniary loss;
  c.  The manner in which you calculated the value of damage, expense, injury and pecuniary loss; and
  d.  Identify all facts, evidence and documents that relates to or supports your claim of injury, damage, expense or pecuniary loss.

(*See* Dkt. 26, Defs.' Ex. 5 at 9; Dkt. 185, Defs.' Ex. 2 at 1-8.)

Plaintiff's most recent response to Interrogatory No. 17, served on April 12, 2022,

recites as follows.

ANSWER: Benjamin Evans was a father, a son, and a brother. He was 23 years old. His daughter was an infant when he died. He was deprived of his right to live his life and to enjoy his family relationships. [REDACTED] was deprived of the support of her father. His parents and siblings have a permanent hole in their family. See Plaintiff's Demand letter, dated October 30, 2020.

**Supplemental Answer:**

**Loss of Future earnings: $4,249,560.00 based upon annual mean wage range for physician's assistants for MO, as documented by the US Bureau of Labor Statistics data for the year 2020. Plaintiff reserved the right to call an expert to testify to these damages.**

**Evans Family Expenses: $30,100.00 as enumerated in the Evans' Family expenses spreadsheet.**

**Care, Comfort, Guidance, and Support: $8,720,340.00 for the remainder of each of the next-of-kin's life expectancy. See National Vital Statistics Report, vol. 68, No.7, June 24, 2019, p. 12-15.**

**Loss of Life: $10,000,000.00 for the remainder of Benjamin Evans' 54 years of life expectancy. See National Vital Statistics Report, vol. 68, No. 7, June 24, 2019, p. 12-15.**

**Punitive Damages: $10,000,000.00 as the Jury will award based on witness testimony.**

*SUPPLEMENTAL ANSWER 4.12.2022*

Plaintiff objects to this interrogatory as calling for legal conclusions, unduly burdensome, and overly broad. Without waiving any of these objections, Plaintiff answers as follows:

a. The nature of the damage, expense, injury or pecuniary loss;

William Evans as the Trustee for the Heirs and Next-of-Kin of Benjamin Evans, deceased, is seeking to recover pecuniary damages, including loss of future earnings, monetary support, and financial contributions. Plaintiff is also requesting loss of care, comfort, aid, guidance, and support past, present, and future from the date of the wrongful death of Benjamin Evans for William Evans (father, age 56), Kim Evans (mother, age 52), Matthew Evans (brother, age 28), [REDACTED] (daughter, age l year and 10 months), and [REDACTED] (stepbrother, age 13), for their lifetimes, using the National Vital Statistics Report, vol. 68, No. 7, June 24, 2019, p. 12-15. Plaintiff is also seeking loss of life and loss of enjoyment of life damages for the loss of Benjamin Evans' life (age 23) who had a life expectancy of 54 years, according to the National Vital Statistics Report. Plaintiff is also seeking punitive damage [sic] to punish Defendants Krook and Washington County for the killing of Benjamin Evans with excessive force contrary to 42 U.S.C.A. §1983 and all defendants, individually and collectively, for conspiracy and for colluding to change their story of why Benjamin Evans was killed between their statements to the BCA on the night of his killing and their testimony to the Grand Jury and their testimony at the criminal trial.

33

b. The extent of the injury and the amount of damage, expense or pecuniary loss;

Plaintiff is seeking damages for the killing of Benjamin Evans at the hands of Defendant Krook and for the losses that Plaintiff and Next-of-Kin consequently sustained. The amount of damages, expense, or pecuniary loss stemming from the killing of Benjamin Evans are intangible. No table, book, or treatise were found giving either the first or final word on calculating or estimating these damages. Plaintiff relies on Benjamin Evans' past behavior as a dependable measure and indication of his future performance as a smart, driven, and hard-working, father, son, and brother. Furthermore, Plaintiff reviewed the following authorities as the basis for his estimate:

The deprivation of life that is prohibited by the Fourteenth Amendment includes "not only of life [itself], but of whatever God has given to everyone with life for its growth and enjoyment...." *Munn v. Illinois*, 94 U.S. 113 (1876).
The loss of life means more than being deprived of the right to exist, or of the ability to earn a living; it includes deprivation of the pleasures of life. *Sherrod v. Berry*, 629 F. Supp. 159, 163 (N.D. Ill. 1985).
"The loss of life means more than being deprived of the right to exist or of the ability to earn a living; it includes deprivation of the pleasures of life." Frye v. Town of Akron, 759 F. Supp. 1320 (1991).
"Hedonic damages may be properly defined as those damages awarded "for the loss of enjoyment of life, or for the value of life itself, as measured separately from the economic productive value that an injured or deceased person would have had." Black's Law Dictionary (6th ed.1990).

7th Cir. Civil Instructions: 7.26 Damages: Compensatory
8th Cir. Manual for Civil Instructions: 4.72 Damages: Punitive-Civil Rights
MN CIVJIG 10.25: Statement of Court and Counsel are not evidence.
MN CIVJIG 90.10: Defining term "damages."
MN CIVJIG 91.10: Damages have no exact value, daily or hourly rate.
MN CIVJIG 91.75: Factors to consider for damages-wrongful death.
MN CIVJIG 91.85: Use of Life Expectancy Tables for calculating life expectancy.
MN CIVJIG 94.10: Factors to consider for punitive damages.
Minn. Stat., §573.02, Subd. 2: Recovery is what a jury deems fair and just.

Plaintiff William Evans' opinion concerning the value of Benjamin Evans' loss of future earning capacity, using the analysis that Dr. Justin King provided, Plaintiff is requesting between $4,695,497 and $5,744,697

lifetime earnings. Plaintiff's valuation of the loss of Benjamin Evans' care, comfort, guidance, aid, and support is $8,720,340; his valuation of Benjamin Evans' loss of life and loss of enjoyment of life from his work, family and friends is $10,000,000; and his valuation of the sum of money to punish the defendants, individually and collectively, as punitive damages is $10,000,000. Evans family expenses arc $28,003.35, which is the amount of expenses without any expenses for mental health treatment. Plaintiff is not claiming any expenses for Next-of-Kin mental health treatment as previously disclosed.

c. The manner in which you calculated the value of damage, expense, injury and pecuniary loss; and

Dr. Justin King, Plaintiff's vocational expert, provided a wage loss analysis profile for Benjamin Evans as detailed in his expert report. Dr. King analyzed two scenarios, one based on a lifetime earnings as a firefighter and the other based on lifetime earnings as a physician assistant from 24 to 67 years of age, including fringe and retirement benefits. The Evans family kept a spreadsheet of expenses relating to the death of Benjamin Evans and those expenses and upon simple addition, reached the number above. As to care, comfort, guidance, aid, and support, loss of life, and punitive damages, see answer to subdivision d, above.

(Dkt. 185, Defs.' Ex. 2 at 1-4 (formatting original).)

As for paragraph (d), "all facts, evidence and documents that relates to or supports your claim of injury, damage, expense or pecuniary loss," Plaintiff identified all deposition testimony to date, his expert reports, and included a four-page list of documents. (*Id.* at 4-8.)

### 3.   RFP No. 23

RFP No. 23 seeks "[a]ny and all documents which Plaintiff claims relates in any manner to his claim for damages in this matter." (Dkt. 26, Defs.' Ex. 6 at 15; Dkt. 184, Defs.' Ex.1 at 3-5.) Plaintiff listed a large number of documents in response. (Dkt. 184, Defs.' Ex. 1 at 3-5.)

**B.     Relief Requested**

In their Sanctions Motion, Defendants seek an Order as follows:

1. Plaintiff's claims for "care, comfort, guidance, and support" damages and "loss of life" damages are struck from the Complaint, including:

    ¶ 73: "Plaintiff, by reason of Evans's death and injury, has suffered pecuniary loss and has incurred expenses for the cost of Evans's funeral expenses, the administration of Evans's estate ~~and the loss of Evans's care, comfort, guidance and support~~."

    ¶ 77: "Plaintiff claims damages for the wrongful death of Evans and his loss of income, ~~services, companionship~~, and for funeral and burial expenses under 42 U.S.C. § 1983."

2. Plaintiff is prohibited from [presenting] evidence in support of claimed non-economic damages at trial for loss of care, comfort, aid, guidance, services, companionship, loss of life, or loss of enjoyment of life for Benjamin Evans or his heirs and next of kin.

3. Plaintiff is prohibited from presenting any specific figures or calculations for non-economic damages at trial.

4. Defendants are awarded attorney's fees and costs associated with enforcing the Court's Orders on December 2, 2021 and March 29, 2022, and Defendants' Motion to Amended the Amended [sic] Pretrial Scheduling Order (ECF No. 124).

(Dkt. 180at 1-2.) (strikethrough in original).

On May 6, 2022, Plaintiff filed an opposition to Defendants' Sanctions Motion.

(Dkt. 187.)  The Court held a hearing on the Motion on June 2, 2022.  (Dkt. 201.)

36

C.      **Summary of Proceedings and Orders**

The Court provides a summary of relevant proceedings and Orders below.

1.      **December 2021 Hearing**

On December 2, 2021, the Court held a hearing on Defendants' Motion to Compel, Extend Pretrial Scheduling Order and Seek Sanctions filed on October 29, 2021 ("December 2021 Hearing"). (*See* Dkts. 19, 76, 83.) That motion sought, in part, an order requiring Plaintiff to supplement his Rule 26 disclosures, answer to Interrogatory No. 17, and response to RFP No. 23. (Dkt. 19 at 1.)

As to the Rule 26 disclosures, Defendants argued at the December 2021 Hearing that although Plaintiff had supplemented his disclosures to break down the $33 million in damages sought into five separate categories, Plaintiff failed to provide the basis, means, and calculations for the different categories. (Dkt. 83 at 7:16-10:16.)

At the December 2021 Hearing, Defendants argued that Plaintiff supplemented his answers to Interrogatory No. 17 and RFP No. 23 on November 2, 2021, but that the supplementation failed to comply with Rule 26(a)(1)(A)(iii) because Plaintiff did not provide the basis for the damages sought and failed to categorize those damages into economic and noneconomic damages (including whether the damages sought for care, comfort, guidance, and support pertained to financial or economic damages). (*Id.* at 7:7-10:16.) At the hearing, Plaintiff argued that the damages sought for care, comfort, guidance, and support was derived from Decedent's comfort and support to his heirs and maintained that it is difficult to place a value on Decedent's life. (*Id.* at 11:13-12:19.)

At the December 2021 Hearing, citing Rule 26 of the Federal Rules of Civil Procedure and *Henderson v. City of Woodbury*, Civ. No. 15-3332 (RHK/FLN), 2016 WL 11020056 (D. Minn. July 22, 2016), the Court reminded Plaintiff of his "requirement to identify and provide a computation for [each category of] damages that are sought," including "the basis and the means for arriving at the amount" and to "make available for inspection and copying under Rule 34 the documents and other evidentiary material that the party intends to rely on." (*Id.* at 13:3-17:3.)  The Court ordered Plaintiff to supplement his response to RFP No. 23 to the extent he is "relying on any documents for purposes of damages" and to "provide the computation for the categories of damages in response to [Interrogatory No. 17] and in [his] supplemental initial disclosures" ("December 2021 Order"). (*Id.*)  The Court ordered Plaintiff to provide this supplementation by January 7, 2022. (*Id.* at 61:25-62:11; *see also* Dkt. 76.)

### 2.    March 29, 2022 Hearing

On March 29, 2022, the Court held a hearing on Defendants' Motion for Order to Show Cause, Motion to Compel, and to Seek Sanctions ("March 2022 Hearing") which was filed on January 28, 2022 ("January 28 Sanctions Motion") and sought, in part, an order imposing sanctions on Plaintiff for his failure to comply with the Court's December 2021 Order and requiring Plaintiff to supplement his Rule 26 disclosures, answer to Interrogatory No. 17, and response to RFP No. 23. (Dkt. 85 at 1; *see also* Dkt. 87; Dkt. 158.)

At the March 2022 Hearing, Defendants argued that Plaintiff failed to timely supplement his discovery by the January 7, 2022 deadline and instead, served his

supplementation on January 12, 2022.  Defendants stated that the only remaining issue with respect to Plaintiff's response to RFP No. 23 was Plaintiff's production and identification of Decedent's firefighter certificates from St. Charles, including the Hamzat certificates.  Defendants claimed that Plaintiff's January 2022 answer to Interrogatory No. 17 was still deficient as it failed to provide the basis, means, and calculations for the damages sought, including for loss of life and care, comfort, guidance, and support.  In response, Plaintiff claimed that he did not have any specific basis or calculations at which he arrived at the $10 million sought for loss of life and that he utilized life expectancy tables for Decedent's next of kin, including his parents, minor child, brother, and stepbrother, in calculating the $8.7 million sought for care, comfort, guidance, and support.  Defendants asked the Court to prevent Plaintiff from claiming damages sought for loss of life and care, comfort, guidance, and support.

The Court explained at the March 2022 Hearing that Rule 37 permits Defendants to seek to preclude Plaintiff from seeking certain damages given the deficiencies with Plaintiff's January 2022 discovery responses made in response to the Court's oral order at the December 2021 Hearing.  In particular, Plaintiff failed to provide the basis and calculations for the damages sought even though it was apparent that he made some calculations in arriving at certain damages.  The Court gave as an example the fact that Plaintiff represented that he referenced life expectancy tables for the heirs and next of kin in computing his claim for $8.7 million sought for care, comfort, guidance and support, but still failed to set forth that "math" in his interrogatory response.  The Court nonetheless gave Plaintiff another opportunity to supplement his answer to Interrogatory

39

No. 17 to include the basis and means for arriving at the damages sought for care, comfort, guidance, and support and loss of life, or to state if there was no basis used other than the intrinsic value of human life. The Court ordered Plaintiff to make this supplementation by April 12, 2022 and ensure that the supplementation complied with the Court's December 2021 and March 2022 Orders, otherwise the Court would entertain a motion for sanctions consistent with Rule 37(b)(2)(A) ("March 2022 Order"). Plaintiff's Rule 26 disclosures was not addressed at the March 2022 Hearing, but the Court took the January 28 Sanctions Motion under advisement as to Defendants' request for civil contempt and sanctions. (Dkt. 158.)

### 3.    April 2022 Supplementation

In April 2022, Plaintiff supplemented his answer to Interrogatory No. 17 and response to RFP No. 23 ("April 2022 Supplemental Responses"). Based on the record, Plaintiff did not supplement his Rule 26 disclosures.

### 4.    May 16 Order

On May 16, 2022, the Court issued a written order on Defendants' January 28 Sanctions Motion ("May 16 Order"). (Dkt. 192.) The May 16 Order stated:

> With respect to Interrogatory No. 17, the Court ordered Plaintiff on December 2 "to provide the computation for the categories of damages in response to the interrogatory [request] and in [his] supplemental initial disclosures," clearly state whether he is unable to provide the basis for any particular damages category, and identify the documents used in calculating damages, including "checks," "receipts," and all other documents relied on. (Dkt. 83 at 13:3-17, 14:1-15, 15:6-11.) Plaintiff's supplemental response to this Interrogatory [No. 17] is completely devoid of any such calculations. (*See* Dkt. 95 at 5-6.) While Plaintiff references data by the U.S. Bureau of Labor Statistics and the National Vital Statistics Report as sources for damages calculations, he does not provide any computation or explanation.

For example, Plaintiff seeks "Care, Comfort, Guidance, and Support" damages in the amount of $8,720,340.00 "for the remainder of each of the next-of-kin's life expectancy" and cites the National Vital Statistics Report, vol. 68, No. 7, June 24, 2019, p. 12-15.  (Dkt. 95 at 6.)  There is no explanation of how Plaintiff calculated this $8,720,340.00 amount (*see id.*), even though Plaintiff's counsel's argument at the March 29 Hearing made it clear that there was some sort of computation for each of the decedent's parents, child, brother, and stepfather.  Plaintiff should have included these computations in the response.

(*Id.* at 31-32.)

The Court further stated in the May 16 Order that:

Plaintiff's non-economic damages in this case include over $8.7 million for "Care, Comfort, Guidance, and Support," $10 million in "Loss of Life," and $10 million in punitive damages.  (Dkt. 95 at 5-6; *see also* Dkt. 93 at 11-12.)  Plaintiff, however, has failed to provide any computation for the damages or the basis for those figures.  (*See id.*)  At the December 2 Hearing on the Motion to Compel, citing Rule 26 of the Federal Rules of Civil Procedure and *Henderson v. City of Woodbury*, Civ. No. 15-3332 (RHK/FLN), 2016 WL 11020056 (D. Minn. July 22, 2016), the Court reminded Plaintiff of his "requirement to identify and provide a computation for damages that are sought" and ordered Plaintiff to supplement his Rule 26 disclosures accordingly.  (Dkt. 83 at 13:3-25, 16:12-15.)  Plaintiff's January 12, 2022 supplemental Rule 26 disclosures did not do so.  (*See* Dkt. 93.)

Courts in this District have found that a plaintiff may be foreclosed from suggesting a specific amount of damages to the jury if the plaintiff intends to suggest such an amount but fails to provide a computation or the evidence and basis for the damages in its Rule 26 disclosures.  *See Lewis v. City of Burnsville*, Civ. No.19-1117 (ECT/BRT), 2020 WL 3496990, at *4 (D. Minn. June 29, 2020) ("[I]f Plaintiff intends to ask the jury for a specific dollar amount of such damages at trial—or to suggest any figures, or possible ranges—Plaintiff is required to provide it to Defendants along with the basis for that figure.  Plaintiff cannot 'reserve' such disclosure until after fact discovery closes.  Further, even if Plaintiff does not intend to ask for a specific amount (or suggest any figure or range) but intends to offer evidence supporting any non-economic award, Plaintiff must disclose responsive discovery regarding the claim. . . . 'While it is true that the ultimate amount of non-economic damages, if any, to be awarded Plaintiff will be determined by a jury, in this Court's view, that does not relieve the Plaintiff from disclosing any specific evidence they intend to utilize at trial in support of

their request for emotional distress from disclosing any dollar range they intend to request from the jury. Otherwise, Plaintiff could surprise the defendants at trial with a specific request of $1,000,000 for claimed emotional harm that was never previously disclosed contrary to the spirit and intent of the applicable discovery Rules.'") (cleaned up); *see also Henne v. Great River Reg'l Libr.*, No. 19-cv-2758 (WMW/LIB), 2021 WL 6804560, at *19-20 (D. Minn. Jan. 4, 2021) ("If Plaintiff does not provide information regarding any specific amount of punitive or emotional distress damages that she will be claiming at trial at this juncture, then she may be precluded from requesting a specific amount at trial. Moreover, Plaintiff must also provide Defendants with the basis for her claimed non-economic damages, including the facts that support her claims for emotional distress and punitive damages, as well as, the methodologies used to calculate any non-economic damage figures.") (citations omitted)).

The Court did not address Plaintiff's Rule 26 disclosures at the March 29 Hearing, although the Court did find Plaintiff's supplementation of his response to Interrogatory No. 17 (directed to damages and served on the same day) did not comply with the December 2 Order, and gave him the opportunity to again supplement his response to Interrogatory No. 17 by April 12, 2022. (*See* Dkt. 158 at 1-2.) Further, the Court previously ordered Plaintiff to supplement his Rule 26 disclosures at the December 2 Hearing. (Dkt. 83 at 13:3-15:11.) In view of the fact that Defendants have since filed a motion for sanctions relating to Plaintiff's non-economic damages, namely an alleged failure to supplement his Rule 26 disclosures and response to Interrogatory No. 17 in compliance with the Court's order at the March 29 Hearing (Dkt. 180), the Court will address these issues in connection with the Defendants' motion filed on April 29.

(*Id.* at 34-35.)

## D.    The Parties' Arguments as to Defendants' Sanctions Motion

### 1.    Defendants' Brief

In support of their current sanctions request, Defendants contend that Plaintiff's April 2022 Supplemental Responses made in response to the Court's March 2022 Order yet again fail to "'set forth the basis and the means for arriving at the amount that they're seeking and a calculation for the damages that are sought' for their claimed damages for

42

Care, Comfort, Guidance, and Support ($8,720,340.00) and Loss of Life ($10,000,000.00)." (Dkt. 182 at 1-2, 16-28.) Defendants claim Plaintiff's answer to Interrogatory No. 17 does not specify the basis and facts supporting his claimed damages or answer subparts (a)-(d) of that Interrogatory "as was ordered at the March 29, 2022 hearing" and that Plaintiff's answer does not comply with the requirements for relying on business records under Rule 33(d). (*Id.* at 7, 10-16.) Defendants contend that in answering Interrogatory No. 17 and RFP No. 23, Plaintiff provided a list of hundreds of documents that were previously produced, but that Plaintiff failed to link any of those documents to the different damages sought in violation of the Court's December 2, 2022 order requiring Plaintiff "to provide specificity within the voluminous documents to Defendants by identifying the documents by title (and by page number if it is a large document)." (*Id.* at 12-13.)

Defendants also claim that the April 2022 Supplemental Responses do not show Plaintiff's calculation for the damages sought and that Plaintiff's incomplete responses "must be treated as a failure to disclose or respond, and the appropriate sanction under Rule 37 at this stage in litigation is to strike Plaintiff[']s claims for Care, Comfort, Guidance, and Support and Loss of Life damages, and prohibit Plaintiff from preventing evidence in support of these claims at trial." (*Id.* at 1-2, 10-11, 16-18.) Defendants contend Plaintiff has had two prior opportunities to fix these deficiencies but has nonetheless failed to do so. (*Id.* at 2)

Defendants claim that on January 12, 2022, Plaintiff supplemented his discovery responses and after Defendants pointed out the deficiencies in those responses, Plaintiff

responded that he was in the "process of engaging an expert to assist with damages calculations" and would "supplement his Expert Disclosures by the deadline[.]"  (*Id.* at 4.)  On February 24, 2022, Plaintiff served supplemental expert disclosures identifying Dr. Justin King as an expert and that the disclosure was accompanied by a statement that "Dr. King will testify at trial" but no expert report was provided at that time.  (*Id.* at 5.)  Then, on March 23, 2022, Plaintiff supplemented his expert disclosures (after the March 1, 2022 deadline) and provided a report dated February 23, 2022 by Dr. King which "only provides the basis, means, and calculations for the loss of earnings claim, and not for any other claimed damages of Plaintiff."  (*Id.*)  In addition, Defendants argue that at the March 29, 2022 hearing on the parties' prior motions, the Court found that Plaintiff's supplemental answer to Interrogatory No. 17 was inadequate and did not comply with its December 2, 2021 order and that Plaintiff was again ordered to supplement his answer to Interrogatory No. 17 by April 12, 2022.  (*Id.* at 5-6.)  Defendants further argue that on April 11, 2022, Plaintiff supplemented his responses to Defendants' RFPs, which included an updated response to RFP No. 23, but that Plaintiff's response did not provide documents Plaintiff relied on in calculating his claimed damages for care, comfort, guidance and support and loss of life.  (*Id.* at 6-7.)

Defendants also contend that on April 12, 2022, Plaintiff served them with an unexecuted version of his supplemental answers to Interrogatory No. 17 and then served an executed version of his answer to that Interrogatory on April 13, 2022.  (*Id.* at 7.)  However, according to Defendants, Plaintiff's answer does not differentiate between special damages and non-economic damages and "still does not 'set forth the basis and

44

the means for arriving at the amount that they're seeking and a calculation for the damages that are sought'" for care, comfort, guidance and support or loss of life, which Plaintiff was ordered to provide at the December 2, 2021 hearing, "or answer subparts (a)-(d) of Interrogatory 17, as was ordered at the March 29, 2022 hearing." (*Id.* at 7, 10-28.)

Defendants assert prejudice due to Plaintiff's "evasive and incomplete disclosures" because "by the time this Motion is heard, the deadline to complete fact discovery (June 1, 2022) will have passed, and Defendants' expert identities and disclosures are due on or before July 1, 2022," depriving Defendants and their experts "of any meaningful opportunity to rebut the calculations." (*Id.* at 31-33.) Defendants therefore ask the Court not to provide Plaintiff with another opportunity to supplement his discovery responses at this stage of the case. (*Id.* at 33.)

According to Defendants, the April 2022 Supplemental Responses willfully violate the Court's December 2, 2021 and March 29, 2022 orders, warranting sanctions under Rule 37(b)(2)(A)(ii) and (iii), including the striking of Plaintiff's claims for non-economic damages and for Plaintiff to be prohibited from presenting evidence of non-economic damages, or presenting specific figures or calculations for those damages, to the jury.[9] (*Id.* at 2-7, 28-34.) Defendants also seek attorneys' fees incurred in bringing their Sanctions Motion due to Plaintiff's noncompliance with the Court's Orders as well as attorneys' fees incurred in bringing their prior Motion to Amend the Amended Pretrial

---

[9]    Defendants also "reserve[d] the right to bring *Daubert* Motions or Motions in Limine to exclude Plaintiff from presenting evidence at trial."  (Dkt. 182 at 28 n.7.)

Scheduling Order ("Motion to Amend") (Dkt. 124), given Plaintiff's non-compliance with the Court's Order at the December 2, 2021 hearing. (*Id.* at 34-36.) Defendants contend that Plaintiff's "lack of candor and failure to cooperate in discovery has required Defendants to expend significant amounts of time on discovery motions just to get basic information that the Court ordered Defendants are entitled." (*Id.* at 36.)

### 2.    Plaintiff's Brief

Plaintiff responds that he has complied with this Court's orders by providing "answers and supplementations to Defendants' Interrogatory 17, identifying categories of damages, economic and noneconomic." (Dkt. 187 at 1.) Plaintiff contends that he itemized his damages with specific figures allotted to each damages category, provided supporting documentation to Defendants, as well as Dr. King's expert report and "a narrative of the basis of Plaintiff's figures and the legal authority Plaintiff relied on in arriving at those figures, acknowledging fully that Plaintiff's figures were an attempt at quantifying the unquantifiable intangible and that the jury is the ultimate authority on noneconomic damages." (*Id.*) Plaintiff claims that on January 12, 2022, he "provided Defendants with the National Vital Statistics Report as the measure of the life expectancy of each of the heirs and the next-of-kin as the basis for the care, comfort, guidance, and support damages and loss of Benjamin Evans' life" and that "his noneconomic damages are incapable of calculation." (*Id.* at 2-3.) Moreover, according to Plaintiff, Defendants will not suffer prejudice or "be surprised at trial with specific evidence or figures presented to the jury that they have never heard of." (*Id.* at 1, 9.) Plaintiff further asserted he that "explained that these damages are intangible and not capable of being

calculated and that Plaintiff relies upon Benjamin Evans' past behavior as a dependable measure and indication of his performance as a smart, driven, and hard-working, father, son, and brother." (*Id.* at 3.) Plaintiff contends that he has broken down his original $33 million in total damages and "provided a specific figure for each category, economic and noneconomic." (*Id.* at 7.)

Plaintiff maintains that granting Defendants' requested relief would be "an invasion of Plaintiff's constitutional right to have his case evaluated by a jury on the merits." (*Id.* at 2.) Plaintiff contends that sanctions under Rule 37 are unwarranted because "Plaintiff fulfilled his obligation under Rule 26, compl[ied] with this Court's Order, disclos[ed] his numbers and the evidentiary basis of his claim," that there are "constitutional limits, stemming from the Due Process Clause of the Fifth and Fourteenth Amendments, on the imposition of sanctions pursuant to Rule 37," and that the "numbers for noneconomic damages are estimates and are based solely on his assessment of his claim in the context of the evidentiary record already in this case." (*Id.* at 8-10.) Plaintiff states that if he "attempts to introduce a figure or evidence at trial that Defendants have never heard of, then this Court may prevent Plaintiff from doing so. That is as far as this Court needs to go." (*Id.* at 9.)

### 3.    June 2 Hearing

The Court will not recite all of the parties' arguments at the June 2 Hearing, as they did not differ from those in their briefs. However, relevant to Defendants' Sanctions Motion, Plaintiff's counsel revealed the origin of the $33 million damages demand during

the June 2 Hearing, which apparently the Decedent's minor brother testified to during his

deposition two days earlier.

> MS. HADDON:  And he told him where the number 33 went [sic], and the number 33 is the jersey number that the brothers have shared. Okay? This is an important number for this family. It is tattooed on the brother's arm as he showed Mr. Flynn. So that's where that aggregate number came from.
>
> And then we were left with breaking that number down as best as we could for all of the damages that we think we are entitled to as per the statutes and as per the claims that are being advanced by plaintiff into different numbers.  We told them exactly what each of those numbers were.
>
> Do we -- do we have a mathematical calculation that tells me exactly what the -- what his minor daughter is entitled to -- excuse me -- entitled to versus his mother versus his stepbrother versus his other brother? No, I don't, Your Honor, and we are not expecting to be putting in front of the jury any mathematical calculation that would say that. The only computation that we have are the actual numbers that add to the number 33, and that is it.
>
> So we've given them everything that that number has been based on; his work history, his educational records, pictures, videos, you name it.  I mean, Mr. Evans probably has signed something like, I don't know, over 20 authorizations.  Benjamin Evans and his family are basically an open book to these defendants, which is, as it should be.
>
> You know, we have been really forthcoming with what it is that we are basing our evaluation on.  Is it -- you know, is it perfectly mathematical? We don't believe that these non-economic damages are amenable to these mathematical calculations.  They are -- you know, who knows what -- you know, what the loss for a mother is. That's for the jury to decide.  Who knows what the loss for a minor daughter is?  That's for the jury to decide.  And the jury will decide that based on the record in the court.

(Dkt. 228 at 32:17-34:1.)

**F.      Legal Standard**

**1.      Rule 26(a)(1)(A)**

Rule 26(a)(1)(A)(iii) requires a plaintiff to state in his initial disclosures:

[A] **computation** of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

Fed. R. Civ. P. 26(a)(1)(A)(iii) (emphasis added).  Under Rule 26(e), a party must timely supplement or correct his Rule 26(a) disclosures "if the party learns that in some material respect the disclosure or response is incomplete or incorrect."  Fed. R. Civ. P. 26(e).

**2.      Rule 37(b)(2)(A)**

Under Rule 37(b), a Court may sanction a party for failing to comply with a discovery order.  *See* Fed. R. Civ. P. 37(b)(2)(A).  These sanctions may include:

(i)      directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)     prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)    striking pleadings in whole or in part;

(iv)    staying further proceedings until the order is obeyed;

(v)     dismissing the action or proceeding in whole or in part;

(vi)    rendering a default judgment against the disobedient party; or

(vii)   treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii).

Under Rule 37, a court "may impose sanctions on a party for failure to make initial disclosures, including computation of damages and supporting documents." *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, Civ. No. 17-5009 (JRT/KMM), 2020 WL 5813291, *4 (D. Minn. Sept. 30, 2020) (citing Fed. R. Civ. P. 37(c)(1)(C); Fed. R. Civ. P. 26(a)(1)(A)). "The Court has 'wide discretion' to provide a remedy or sanction for a party's failure to make a timely disclosure of damages calculations as required by Federal Rule of Civil Procedure 26, including exclusion of the related evidence at later motions, hearings, or at trial." *Id.* (citing *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008)). The Court considers the following factors in determining whether to impose sanctions under Rule 37: "(1) the reason for the noncompliance; (2) the surprise and prejudice to the opposing party; (3) the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial; and (4) the importance of the information or testimony." *Taylor Corp. v. Georgia-Pacific Consumer Prods. LP*, Civ. No. 19-1918 (DWF/TNL), 2022 WL 3647856, *2 (D. Minn. Aug. 24, 2022) (citing *Wegener*, 527 F.3d at 692).

"To justify [severe sanctions], Rule 37 requires: '(1) an order compelling discovery, (2) a willful violation of that order, and (3) prejudice to the other party.'" *Sentis Gr., Inc. v. Shell Oil Co.*, 559 F.3d 888, 899 (8th Cir. 2009) (quoting *Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir. 2000)). "A finding of willfulness is not required to impose sanctions less severe than dismissal, default judgment, or striking of pleadings." *Mgmt. Registry*, 2020 WL 1910589, at *12.

In accordance with Rule 37(b)(2)(C), "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorneys' fees, caused by the failure [to obey an order to provide or permit discovery,] unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). "Oral proceedings compelling discovery that 'unequivocally give a litigant notice' of the discovery required are a sufficient basis for Rule 37(b)(2) sanctions." *Mgmt. Registry*, 2020 WL 1910589 at *14 (citations omitted) (cleaned up).

## G. Analysis of Defendants' Sanctions Motion

### 1. Whether Plaintiff Violated the Court's December 2021 and March 2022 Orders

#### a. RFP No. 23

Defendants reference RFP No. 23 several times in their brief, but do not appear to request any specific relief or sanction based on that request. (*See, e.g.*, Dkt. 182 at 2, 6, 13, and 14 n.3.) Defendants seem to be making the point that Plaintiff's response to RFP No. 23, which seeks "[a]ny and all documents which Plaintiff claims relates in any manner to his claim for damages in this matter," does not cure the deficiencies in Plaintiff's Rule 26 disclosures and response to Interrogatory No. 17 because it simply lists a large number of documents (indeed, it appears to list almost every document produced by Plaintiff in the case). (*See id.* at 14 n.3 ("Plaintiff's Fifth Supplemental Answers to Request for Documents from Defendants also are of no use to Defendants to identify facts responsive to Plaintiff's claimed damages for Care, Comfort, Guidance, and

Support, and Loss of Life.  Plaintiff does not cite a single page number and does not refer to documents by title in Plaintiff's Response to Request for Production of Documents No. 23.") (citations omitted).)

Further, at the March 2022 Hearing, Defendants represented that the only remaining issue as to RFP No. 23 pertained to Plaintiff's production/identification of Decedent's firefighter certificates from St. Charles Fire Academy, including Hazmat certificates.  (*See* Dkt. 227 at 18:4-19:20.)  Plaintiff's April 11, 2022 response to RFP No. 23 lists various firefighter records from St. Charles Fire Academy by title with those documents produced.  (*See* Dkt. 184, Defs. Ex. 1 at 5, 8-12.)  Accordingly, to the extent Defendants seek sanctions with respect to RFP No. 23, the Court denies Defendants' Sanctions Motion.

> **b.    Plaintiff's Rule 26 Disclosures and Response to Interrogatory No. 17**

The Court turns to the Plaintiff's Rule 26 disclosures and response to Interrogatory No. 17.

Plaintiff's violations of the Court's Orders and Rule 26 are straightforward.  At the December 2021 Hearing, the Court ordered Plaintiff "to supplement to provide the computation for the categories of damages in response to the interrogatory response [sic] and in your supplemental initial disclosures" and stated "you need to explain how you got at that number" and "explain your math."  (Dkt. 83 at 14:1-15.)  The Court explained "the concern here is that you have some kind of calculation or documents or evidence that is, you know, in your head and you know what's going on but it's not been disclosed to

defendant yet." (*Id.* at 14:21-24.) The Court ordered Plaintiff "to supplement your response to the Interrogatory Number 17 to answer the questions that are asked and supplement your initial disclosures as to damages." (*Id.* at 14:24-15:2.)

Then, at the March 2022 Hearing, the Court explained to Plaintiff's counsel that their January 2022 supplemental response to Interrogatory No. 17 was still deficient because "there are no calculations [for the $10 million sought for loss of life and $8.7 million sought for care, comfort, guidance, and support] . . . I did order you to explain where the numbers are coming from and I'm not seeing it." (Dkt. 227 at 24:8-15.) In response, Plaintiff's counsel noted that an expert had provided a computation for loss of earnings but said the $10 million for loss of life was just a number selected by the family and that there was nothing to back it up "in terms of documents or anything." (*Id.* at 24:18-25:15.) As for the approximately $8.7 million sought in care, comfort, guidance, and support, the Court asked how the number broke down by the heirs and next of kin, and Plaintiff's counsel responded:

> MS. HADDON: Sure. We have provided the life expectancy tables. There are several members of the family. His parents are in their late fifties to early sixties. He has got a small child who is, I believe, a kindergartener at this point.
>
> He has an older brother who is just a few years older than he is, and then he has a stepbrother. So those are, that's what that is based on is their life expectancy and his life expectancy.

(*Id.* at 25:20-26:3.)

The Court then found that Plaintiff's January 12 supplementation did not comply with the December 2021 Order "for a number of reasons, including because it does not

explain the basis for the calculations," and noted that the failure to comply could result in an order precluding Plaintiff from seeking certain damages.  (*Id.* at 26:17-28:10.)  Based on Plaintiff's counsel's response to the question about the $8.7 million, the Court found it was "apparent . . . that there is math behind the calculation of 8.7 million dollars for care, comfort, guidance, and support" in view of the "reference to several next of kin and their expectancies, but none of that math is set forth in the interrogatory responses." (*Id.* at 27:3-12.)  The Court ordered Plaintiff (again) to supplement his response to Interrogatory No. 17 and explained: "if you're seeking damages for the care, comfort, guidance and support for the decedent's child based on life expectancy, you need to say this person is expected to live X years, and we think based on this report that is the value of that." (*Id.* at 27:13-18.)  The Court also cautioned Plaintiff that "if the supplementation [ordered at the March 2022 Hearing] doesn't comply with my order, my December order and my order now, then I will entertain a motion for sanctions consistent with 37(b)(2)(A) and the remedies that are available there." (*Id.* at 28:7-10.)

On May 16, 2022, the Court issued a written order awarding attorneys' fees and costs to Defendants for those fees incurred in enforcing the Court's December 2, 2021 Order and bringing the Motion for Order to Show Cause, Motion to Compel, and to Seek Sanctions filed on January 28, 2022.  (Dkt. 192 at 1-37, 58-59.)  Plaintiff appealed the May 16 Order to U.S. District Judge Michael J. Davis, and that appeal is still pending. (Dkt. 196.)  Plaintiff did not, however, appeal any aspect of the March 2022 Order requiring supplementation.

The Court concludes that Plaintiff violated its December 2021 and March 2022 Orders in at least two respects.  The first relates to Plaintiff's overall damages claim for $33 million and how Plaintiff computed the amounts sought for various categories of damages.  Plaintiff seeks $33 million because the Decedent and his brother used the number "33" on athletic jerseys and Plaintiff then broke the $33 million number down for all the categories of damages to which he thinks he is entitled.  (Dkt. 228 at 32:17-34:1.)  The origin of the $33 million demand and how Plaintiff allocated it among the categories of damages are responsive to paragraph (d) of Interrogatory No. 17, which asks Plaintiff to "[i]dentify all facts, evidence and documents that relates to or supports your claim of injury, damage, expense or pecuniary loss," and to paragraph (c), which seeks "[t]he manner in which you calculated the value of damage, expense, injury and pecuniary loss."  Plaintiff first demanded $33 million in **October 2020** (Dkt. 187 at 7), but not until the deposition of the Decedent's brother two days before the June 2 Hearing did Plaintiff reveal the basis for the $33 million demand, or that the specific numbers associated with each category of damages were not based on anything other than a breaking down of that number "as best as [they] could" (Dkt. 228 at 32:17-34:1).

Plaintiff's refusal to provide this information in response to Interrogatory No. 17 is a clear violation of the Court's December 2021 Order requiring Plaintiff "to supplement to provide the computation for the categories of damages in response to the interrogatory response [sic] and in your supplemental initial disclosures," "explain how you got at that number," and "explain your math."  (Dkt. 83 at 14:1-15.)  It also is a violation of the Court's March 2022 Order requiring Plaintiff to supplement his response to Interrogatory

No. 17 to explain the basis for the calculations, or, as the Court put it during the March 2022 Hearing, "explain what is going on with your damages estimate." (Dkt. 227 at 28:1-4.) Plaintiff's end-of-discovery revelation that the Plaintiff decided to seek $33 million based on a shared jersey number and then back-calculated damages per category from that number also substantiates Defendants' (and the Court's) concern "that you [Plaintiff] have some kind of calculation or documents or evidence that is, you know, in your head and you know what's going on but it's not been disclosed to defendant yet." (Dkt. 83 at 14:21-24.) Moreover, this information falls within the scope of Rule 26, which required Plaintiff to provide "a computation of each category of damages claimed," Fed. R. Civ. P. 26(a)(1)(A)(iii), and to supplement their Rule 26 disclosures "in a timely manner," Fed. R. Civ. P. 26(e). Plaintiff first demanded $33 million in October 2020 (Dkt. 187 at 7), and there is absolutely no reason why Plaintiff did not reveal this basis when he served his first Rule 26 disclosures, or state that he back-calculated the allocation of damages per damages category to include specific amounts for each category when supplementing on January 11, 2022 (Dkt. 147-7 at 11-12). Plaintiff has given no explanation for why he did not disclose the basis for the $33 million demand and his back-calculation until Defendants deposed the Decedent's minor brother on May 31, 2022, the day before discovery closed in this matter.

The second violation of the Court's Orders is Plaintiff's ongoing refusal to provide any explanation of how he used the "National Vital Statistics Report, vol. 68, No. 7, June 24, 2019, p. 12-15" to arrive at (or break down by heirs and next of kin) the $8,720,340 sought for the "loss of care, comfort, aid, guidance, and support past, present, and future

56

from the date of the wrongful death of Benjamin Evans for William Evans (father, age 56), Kim Evans (mother, age 52), Matthew Evans (brother, age 28), L E (daughter, age 1 year and 10 months), and T E , (stepbrother, age 13), for their lifetimes."  (Dkt. 183-2, Defs.' Ex. 2, at 2.)  Defendants sought "[t]he manner in which you calculated the value of damage, expense, injury and pecuniary loss" in Interrogatory No. 17(c).  To date, notwithstanding two Orders requiring Plaintiff to respond to this Interrogatory, Plaintiff still has not answered that question.  Perhaps Defendants could guess at Plaintiff's calculations and reasoning, but the December 2021 Order and March 2022 Order both required Plaintiff to provide the computation and reasoning.  Further, Rule 26 requires "a **computation** of each category of damages claimed by the disclosing party."  Fed. R. Civ. P. 26(a)(1)(A)(iii) (emphasis added).  Plaintiff has failed to comply with those Orders and Rule 26 with regard to his demand for $8,720,340 in "Care, Comfort, Guidance, and Support" for the five heirs and next of kin identified in his response to Interrogatory No. 17.  The Court has similar concerns with Plaintiff's demand for $10,000,000 in "Loss of Life" damages, which Plaintiff asserts is both "intangible" yet somehow based on his life expectancy.  (Dkt. 189-3, Pl.'s Ex. 4 at 2 (citing National Vital Statistics Report); Dkt. 196 at 5 (asserting "loss of life and loss of enjoyment of life damages for the loss of Benjamin Evans' life" are "intangible").)  Plaintiff has not explained how he arrived at $10,000,000 based on the Decedent's life expectancy.

Plaintiff and Defendants both cite *Sandoval v. American Building Maintenance Industries, Inc.*, 267 F.R.D. 257 (D. Minn. 2007), in support of their respective positions.

(Dkt. 187 at 4-6; Dkt. 182 at 23, 29, 33.)  The Court addresses *Sandoval* in detail below to explain why it supports the imposition of sanctions.

In *Sandoval*, the plaintiffs sought over $1.1 million in compensatory damages. 267 F.R.D. at 280.  In answering the defendants' interrogatory seeking the nature, amount, basis, and manner or method by which that amount was calculated, the plaintiffs stated, in part, that they had suffered "significant 'garden variety' emotional distress, . . . [a]s adverse treatment has continued and the litigation and discovery are ongoing, it is difficult to state with precision the full amount of damages sustained," and that they intended to prove the full amount at trial.  *Id.* at 280-81.  In response to the defendants requests for clarification as to whether plaintiffs were seeking specific amounts for emotional distress or intended to leave it to the jury to decide, plaintiffs stated that "[a]s to emotional distress damages, they are difficult to quantify with precision in sex harassment, discrimination, and retaliation cases like this," noted their belief of expected recovery of at least $1.1 million in emotional distress damages, and stated it "would be premature now to attempt to state exactly how much damages (emotional distress and punitive) will be requested and recovered at trial because factual discovery and litigation continue . . . *On behalf of our 11 clients, we also reserve the right to request specific amounts of damages from the jury at trial*."  *Id.* at 281-82.

The *Sandoval* court discussed the various ways in which courts have interpreted the language of Rule 26(a)(1)(C) regarding a party's obligation as it relates to providing calculations for compensatory damages pertaining to emotional distress and the requirements under that Rule where the plaintiff suggests a specific amount to the jury.

*Id.* at 282.  Ultimately, the *Sandoval* court noted that the plaintiffs in that case had

reserved their right to request specific amounts of damages from the jury and found:

> To the extent that plaintiffs do not intend to suggest a specific amount to the jury for emotional distress damages, this Court will not require them to disclose a computation of these damages. **However, if plaintiffs do intend to suggest a specific amount to the jury for emotional distress damages, plaintiffs shall be required to provide to defendants the basis for this figure**. **After all, if plaintiffs present a specific amount to the jury for compensatory damages, then presumably they have a basis and a means for arriving at the amount they are seeking**. In short, in that situation, the calculation for emotional distress damages is not necessarily vague, and it would be unfair to defendants if plaintiffs could submit a specific dollar amount for damages to the jury without defendants having the opportunity to discover the basis for the claim and the opportunity before trial to rebut that basis. Further, this Court will not allow plaintiffs to wait until the eve of trial to provide defendants with this information. This case has been ongoing since May, 2006 and plaintiffs should have some idea of the amount they wish to seek for emotional damages. As such, to the extent that plaintiffs intend to suggest a specific amount to the jury for emotional distress damages, they shall have until December 1, 2007 to provide a calculation for compensatory damages in compliance with Rule 26(a)(1)(C) and in response to Interrogatory No. 7.  **If plaintiffs do not provide this information by this date, they will not be allowed to suggest a specific amount to the jury for emotional distress damages.**

*Id.* at 282-83 (emphasis added) (footnote omitted).

Plaintiff attempts to distinguish the facts of this case from the facts in *Sandoval* by

arguing that Defendants here have been made well aware of the figures Plaintiff "had

placed on his loss.  Unlike the plaintiffs in *Sandoval*, <u>Plaintiff has not reserved any

amounts nor withheld any disclosures for trial</u>" as he has provided specific figures for

each category of damages sought which are "his best estimate of his profound losses and

[the damages] will ultimately be awarded by the jury" and that he has provided

Defendants with "everything" he used in evaluating this case.  (Dkt. 187 at 7 (formatting

original).)  Plaintiff misses the point.  The *Sandoval* court explained that, "if plaintiffs do intend to suggest a specific amount to the jury for emotional distress damages, plaintiffs shall be required to provide to defendants the basis for this figure" and that "[a]fter all, if plaintiffs present a specific amount to the jury for compensatory damages, then presumably they have a basis and a means for arriving at the amount they are seeking." 267 F.R.D. at 282-83.  That is precisely the case here.  Plaintiff intends to suggest specific amounts to the jury, but did not provide "the basis for this figure" or the "means for arriving at the amount they are seeking" (that is, the jersey number and the back-calculation) until the day before fact discovery closed—notwithstanding two Orders requiring Plaintiff to "explain your math" and "provide the computation for the various categories of damages" (Dkt. 83 at 14:10-15; Dkt. 227 at 27:20-21) and Rule 26's requirement for a computation of damages.

Plaintiff's reliance on the District of Minnesota cases *Henderson v. City of Woodbury*, *supra*, and *Lewis v. City of Burnsville*, *supra*, (Dkt. 187 at 6) is similarly misplaced.  In *Henderson*, the court required the plaintiff to "provide Defendants with an itemized calculation of the amount of damages she intends to present to the jury" for non-economic damages because "[i]t is unfair to Defendants to allow Plaintiff to present a specific dollar amount for damages to the jury without Defendants having an opportunity to rebut the calculations prior to trial."  2016 WL 11020056, at *6.  *Henderson* does not stand for the proposition that disclosing merely a "specific" amount without the computation or calculation is sufficient.  The *Lewis* court found that "if Plaintiff intends to ask the jury for a specific dollar amount of such damages at trial—or to suggest any

60

figures, or possible ranges—Plaintiff is required to provide it to Defendants along with the basis for that figure" and that "even if Plaintiff does not intend to ask for a specific amount (or suggest any figure or range) but intends to offer evidence supporting any non-economic award, Plaintiff must disclose responsive discovery regarding the claim." 2020 WL 3496990, at *4. Here, Plaintiff withheld the basis for the $33 million (the jersey number) and the computation or calculation as to the damages categories (that is, the fact that Plaintiff began with $33 million and allocated that amount among categories) until the day before fact discovery closed. Further, Plaintiff still has not provided any calculation or computation for the $8,720,340 in "Care, Comfort, Guidance, and Support" or $10, 000, 000 "Loss of Life" damages he seeks. Plaintiff's protracted delay in explaining where the $33 million demand came from and how Plaintiff arrived at the amounts sought for each damages category, refusal to explain how he calculated the $8,720,340 in "Care, Comfort, Guidance, and Support" damages (both how Plaintiff used the National Vital Statistics Report and calculated damages for each heir and next of kin), and refusal to explain how he arrived at $10,000,000 in "Loss of Life" damages based on the Decedent's life expectancy violated the December 2021 and March 2022 Orders, as well as Rule 26.

The Court concludes that sanctions under Rule 37(b)(2)(A) and Rule 37(c)(1) are necessary to prevent Plaintiff from additional violations of Orders and the Rules going forward. The Court addresses whether Plaintiff's failure to comply with the December 2021 and March 2022 Orders and Rule 26 was substantially justified or harmless in the next section and which sanctions the Court should impose in the next sections.

## 2.      Whether Plaintiff's Failure Was Substantially Justified or Harmless

The Court has carefully considered whether the Plaintiff's non-compliance was substantially justified or harmless, as well as (for purposes of an award of attorneys' fees and costs), whether "other circumstances make an award of expenses unjust." *See* Fed. R. Civ. P. 37(b)(2)(C), 37(c)(1).  "The Eighth Circuit has set forth four factors that the Court should consider in determining whether a failure to disclose was justified or harmless: (1) the importance of the excluded material; (2) the explanation for failing to comply with the disclosure rules; (3) the potential prejudice from allowing the material to be used at trial; and (4) the availability of a continuance to cure such prejudice." *US Salt, Inc. v. Broken Arrow, Inc.*, Civ. No. 07-1988 (RKH/JSM), 2008 WL 2277602, at *4 (D. Minn. May 30, 2008), *aff'd*, 563 F.3d 687 (8th Cir. 2009) (citing *Citizens Bank v. Ford Motor Co.*, 16 F.3d 965, 966 (8th Cir. 1994)).

The Court begins with the excluded material.  Given that the damages for "Care, Comfort, Guidance, and Support" and "Loss of Life" total $18,720,340, the basis and computation of these amounts are extremely important, as is the basis for seeking a total amount of $33 million.  According to Plaintiff, as of his May 6, 2022 opposition brief, he "withholds nothing, not his numbers, not his evidentiary basis, nor his legal basis." (Dkt. 187 at 9.)  This is plainly untrue, as Plaintiff was withholding the origin of the $33 million demand and the fact that he worked backwards from $33 million to arrive at the specific amounts for each category as of that date.  The Court cannot fathom why it took three discovery motions for Plaintiff to reveal what turned out to be a very simple basis (a jersey number) and very simple computation (allocation of that number among five

categories of damages), and Plaintiff has never explained why he delayed so long. Plaintiff's lack of explanation "prevents the Court from concluding that the failure was substantially justified. Put simply, it was not." *Mgmt. Registry*, 2020 WL 6121450, *12.

As to how loss of "Care, Comfort, Guidance, and Support" and "Loss of Life" were calculated and allocated (including use of the National Vital Statistics Report), Plaintiff argues in his opposition brief that he disclosed the National Vital Statistics Report "as the measure of the life expectancy of each of the heirs and the next-of-kin as the basis for the care, comfort, guidance, and support damages and loss of Benjamin Evans' life" on January 12, 2022 and on April 12, 2022, "Plaintiff stated that he is seeking loss of care, comfort, aid, guidance, and support past, present, and future from the date of the wrongful death of Benjamin Evans for the lifetimes of his heirs and next-of-kin." (Dkt. 187 at 2.) Based on these statements, Plaintiff may be allocating the loss among the heirs and next of kin based on some pro rata distribution based on life expectancy. Plaintiff also may be allocating among the heirs and next of kin based on the nature of their relationship. Or Plaintiff may be allocating among the heirs and next of kin based on both factors, or other some undisclosed factors. If any of those are true, Plaintiff has no reason for not disclosing the allocation or factors.

The Court also recognizes that Plaintiff may have no specific allocation per heir and next of kin, instead seeking an aggregate amount for them, in which case the National Vital Statistic Report appears to have no relevance to the demand.[10] If the

_____

[10]    If Plaintiff is taking the position that he cannot allocate the $8,720,340 among the heirs and next of kin, this would not excuse Plaintiff's non-compliance, as the Court

Report is relevant to an aggregate demand, Plaintiff has not explained how. Indeed, Plaintiff has represented that such damages are intangible and that the estimates, have "no yard stick," are unquantifiable, and not capable of calculation. (*See* Dkt. 187 at 1, 3, 7, and 9.) However, Plaintiff continued to tie the demand for "Care, Comfort, Guidance, and Support" to the heirs and next of kin's life expectancies based on the National Vital Statistics Report without any calculation for what each heir and next of kin sought based on their life expectancy. The fact that neither Defendants nor the Court can understand how Plaintiff is using the National Vital Statistic Report in the calculation (if at all) or what, if any, the allocation is among the heirs and next of kin demonstrates Plaintiff's failure to comply with the December 2021 and March 2022 Orders and Rule 26. At this point, Plaintiff has had multiple opportunities to make his allocation (or lack thereof) clear, and has given no explanation why he has not done so. His failure is not substantially justified.

As to prejudice, at this point, Defendants have suffered prejudice because their only opportunity to probe the origin of the $33 million demand was during their deposition of the Decedent's minor brother the day before fact discovery closed. Moreover, Defendants will be prejudiced if Plaintiff presents arguments or evidence in support of those non-economic damages which Defendants did not have the chance to explore during discovery.

---

addressed this possibility at the March 2022 Hearing. Specifically, in response to counsel's question about the absence of "tables" supporting their demand, the Court responded: "You've put the numbers out there. If you don't have a basis for them other than the intrinsic value of human life, then you have to say that." (Dkt. 227 at 29:5-22.)

Finally, while a continuance could theoretically cure the prejudice, this would further prolong resolution of this matter, and Plaintiff's pattern of practice suggests that it would be to no avail.

For all these reasons, the Court concludes Plaintiff's violations of the Court's December 2021 and March 2022 Orders and Rule 26 are not substantially justified or harmless.

### 3.    Which Sanctions Should Be Imposed

Defendants ask the Court for various sanctions, including (1) striking Plaintiff's claims for "care, comfort, guidance, and support" and "loss of life" damages from the Complaint, (2) prohibiting Plaintiff from presenting evidence in support of claimed non-economic damages at trial for loss of care, comfort, aid, guidance, services, companionship, loss of life, or loss of enjoyment of life for Benjamin Evans or his heirs and next of kin, (3) prohibiting Plaintiff from presenting any specific figures or calculations for non-economic damages at trial, and (4) awarding Defendants their attorneys' fees and costs associated with enforcing the December 2021 and March 2022 Orders and attorneys' fees incurred in bringing their Motion to Amend.  (Dkt. 180 at 1-2.)

The Court turns to the appropriate sanction for Plaintiff's conduct.  The Court first considers Defendants' request that Plaintiff's demand for "Care, Comfort, Guidance, and Support" and "Loss of Life" be stricken from the Complaint.  Striking a damages demand is a severe sanction that requires a finding of willfulness.  *See Mgmt. Registry*, 2020 WL 1910589, at *12.  Although Plaintiff has not complied with the December 2021 and March 2022 Orders or Rule 26, based on the Court's observations of counsel and

65

Plaintiff's attempts (albeit unsuccessful) to properly supplement, the Court does not believe Plaintiff's non-compliance was willful.  Striking these damages demands from the Complaint would be excessive in view of the Court's finding of non-willfulness.

The Court next considers Defendants' request that the Court prohibit Plaintiff from presenting evidence to support any specific calculations for non-economic damages at trial for loss of care, comfort, aid, guidance, services, companionship, loss of life, or loss of enjoyment of life for Benjamin Evans or his heirs and next of kin.  Such a prohibition is certainly within the range of reasonable sanctions.  *See Montoya v. Retiree Health Care Auth.*, No. 18-cv-578 JCH/JRF, 2019 WL 2718689, at *4-5 (D.N.M. June 7, 2019) (prohibiting Plaintiff from, among other things, "requesting a specific amount [in emotional distress damages] because she failed to disclose any such facts, documentation, or support of any kind beyond her general averment that her emotional distress damages total $300,000") (citing numerous authorities), *R. & R. adopted*, 2019 WL 2717115, at *1; *Henne*, 2021 WL 6804560, at *20 ("If Plaintiff does not provide information regarding any specific amount of punitive or emotional distress damages that she will be claiming at trial at this juncture, then she may be precluded from requesting a specific amount at trial.") (citations and quotations omitted).  However, because Plaintiff provided some (albeit, incomplete) information about the amounts sought and because Plaintiff has represented that his non-economic damages are intangible, that the estimates have "no yard stick," are unquantifiable, and they are not capable of calculation (Dkt. 187 at 1, 3, 7, and 9), the Court finds that the appropriate sanction is to preclude Plaintiff from introducing any evidence or argument in support of his claims for loss of "Care, Comfort,

Guidance, and Support" and "Loss of Life" beyond that specifically disclosed in his narrative responses to Interrogatory No. 17 as of the April 12, 2022 supplementation and through deposition testimony.[11]

To clarify, the Court provides a non-exhaustive list of what Plaintiff may not present at trial. Plaintiff may not provide any computation of how the damages for loss of "Care, Comfort, Guidance, and Support" are allocated among the heirs and next of kin. Plaintiff may not present any argument as to how the National Vital Statistics Report is relevant to loss of "Care, Comfort, Guidance, and Support" or "Loss of Life" that was not specifically stated in the April 12, 2022 narrative response to Interrogatory No. 17. While Plaintiff may present the Decedent's minor brother's testimony about the jersey number to the extent he testified about it during his deposition, Plaintiff may not present any other evidence about the jersey number. In other words, Plaintiff is limited to his narrative responses to Interrogatory No. 17 and his deposition testimony with respect to non-economic damages. This addresses Defendants' concern that Plaintiff may present evidence or argument to support or explain his non-economic damages that will be a surprise to Defendants. *See Lewis,* 2020 WL 3496990 at *4 ("[E]ven if Plaintiff does not intend to ask for a specific amount (or suggest any figure or range) but intends to offer evidence supporting any noneconomic award, Plaintiff must disclose responsive discovery regarding the claim. . . . 'While it is true that the ultimate amount of non-

---

[11]    The Court will permit Plaintiff to rely on testimony corresponding with deposition testimony because Defendants had the opportunity to examine those witnesses during the depositions.

economic damages, if any, to be awarded Plaintiff will be determined by a jury, in this

Court's view, that does not relieve the Plaintiff from disclosing any specific evidence

they intend to utilize at trial in support of their request for emotional distress from

disclosing any dollar range they intend to request from the jury.") (cleaned up); *see also*

*Montoya*, 2019 WL 2718689 (prohibiting plaintiff from "introducing specific pecuniary

evidence concerning the severity of her distress that could have been produced under

Rule 26(a)(1)(A)(iii)"); *Henderson*, 2016 WL 11020056 at *6 ("It is unfair to Defendants

to allow Plaintiff to present a specific dollar amount for damages to the jury without

Defendants having an opportunity to rebut the calculations prior to trial."); *US Salt*, 2008

WL 2277602, at *4 ("The purpose of discovery 'is to narrow the issues, *to eliminate*

*surprise,* and to achieve substantial justice.'") (quoting *Greyhound Lines, Inc. v.*

*Miller,* 402 F.2d 134, 143 (8th Cir. 1968)).

Lastly, Defendants seek attorneys' fees incurred in bringing their Motion to

Amend (Dkt. 124) and attorneys' fees incurred in enforcing the December 2021 and

March 2022 Orders.  The Motion to Amend sought an extension of the scheduling order

because "(1) Plaintiff has failed to comply with the Court's December 2, 2021 Order and

repeatedly flouted the Federal Rules of Civil Procedure, (2) Defendants are still waiting

on needed records from third-parties, and (3) Defendants' counsel has incurred

unexpected complications with her pregnancy resulting in work restrictions."  (*See* Dkt.

124 at 1.)  The Court recognizes that Plaintiff's failure to comply with the December

2021 Order is part of the reason this case has been delayed, but is not persuaded that an

extension would not have been necessary for other reasons (which the Motion to Amend

acknowledges).  The Court therefore denies the request for attorneys' fees incurred in connection with the Motion to Amend.

The Court "must" order Plaintiff, Plaintiff's counsel, or both, to pay the reasonable expenses, including attorneys' fees, "caused by" a party's failure to obey a discovery order, "unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).  Further, Rule 37 permits the Court to "order payment of the reasonable expenses, including attorney's fees, caused by the failure" to comply with Rule 26.  Fed. R. Civ. P. 37(c)(1).

With respect to Defendants' request for attorneys' fees incurred in enforcing the December 2021 Order, the Court awarded such fees in the May 16 Order, and therefore denies that request as moot.  (*See* Dkt. 192 at 58.)

Defendants' request for attorneys' fees and costs incurred in enforcing the March 2022 Order is another matter.  For the reasons stated in Section II.G.2, Plaintiff's violations of the Court's Orders and Rule 26 were neither substantially justified nor harmless.  As to whether other circumstances make an award of expenses Defendants incurred in enforcing the March 2022 Order unjust, Plaintiff did not identify any circumstances in his opposition (financial or otherwise) which would render such an award unjust.[12]  The Court finds that no circumstances make an award of expenses

---

[12]   "Moreover, 'financial indigence by itself does not necessarily make an award of expenses unjust.'"  *Popescu v. City of San Diego*, No. 15-CV-01657-BAS-JLB, 2017 WL 747940, at *5 (S.D. Cal. Feb. 27, 2017) (quoting *Garity v. Donahoe*, No. 11cv01805, 2014 WL 1168913, at *5 (D. Nev. Mar. 21, 2014)).  Additionally, regarding Plaintiff's claims that granting Defendants' requested relief would be an invasion of his constitutional right, "the imposition of sanctions preventing [Plaintiff] from introducing

relating to enforcing the March 2022 Order unjust.  Further, as the Court explained to counsel how Plaintiff needed to supplement his Rule 26 disclosures and response to Interrogatory No. 17 at the December 2021 and March 2022 Hearings and gave Plaintiff two opportunities to do so before Defendants filed the present Sanctions Motion, the Court finds it is appropriate to award sanctions against both Plaintiff and Plaintiff's counsel, as "the attorney advising that party."  Fed. R. Civ. P. 37(b)(2)(C).

The Court therefore orders Plaintiff, Plaintiff's counsel, or both to reimburse Defendants for their reasonable attorneys' fees and costs incurred in connection with enforcing the March 2022 Order.  Defendants shall serve a declaration of their legal counsel setting forth the amount of reasonable attorneys' fees and costs they seek in connection with bringing Defendants' Sanctions Motion within fourteen (14) days of the date of this Order.  If Plaintiff does not agree to the amount of the attorneys' fees and costs, he may submit his dispute to the Court within seven (7) days after receiving the amount, and Defendants may file a response to Plaintiff's filing within seven (7) days later.

### III.    JOINT SEALING MOTIONS

The Court turns to the Joint Sealing Motions.  The parties agree or otherwise do not object to the continued sealing of Docket Entries 167-1, 167-2, 167-3, 167-4, 167-5, 167-6, 167-7, 167-8, 167-9, 167-10, 167-11, 167-12, 167-13, 167-14, 178, 184, 185, and 189 on the basis that these documents contain juvenile data, confidential medical data,

---

undisclosed evidence [does] not result in a constitutional violation." *Harre v. Muegler*, 113 F.3d 909, 911 (8th Cir. 1997) (citations omitted).

information that have been sealed by Washington County District Court, and are designated as confidential pursuant to the governing protective order. (Dkt. 209 at 3-4; Dkt. 210 at 3-7.)

Based on these representations and the Court's review of the documents, the Court concludes that the need to maintain the information in the above entries under seal outweighs the public's right of access. *See* Fed. R. Civ P. 5.2; D. Minn. LR 5.6(d) *advisory committee's note*; *IDT Corp. v. eBay*, 709 F.3d 1220, 1224 (8th Cir. 2013). However, given that these documents were filed in conjunction with non-dispositive motions, the Court emphasizes that this decision is not determinative as to whether this information will remain sealed in the future to the extent that it is filed and considered by the Court with respect to future dispositive motions. *See In re Baycol Prod. Litig.*, No. 08-CV-5758 (MJD/ECW), 2021 WL 1893897, at *4 (D. Minn. May 11, 2021). To the extent that there is any future disagreement relating to whether a specific docket entry should remain unsealed, the Court expects the parties to conduct a robust meet and confer to attempt to resolve any dispute prior to filing any joint motion for continued sealing.

## IV.   <u>ORDER</u>

For the reasons stated above, and based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.   Plaintiff's Motion to Compel and for Contempt (Dkt. 163) is **DENIED**. Plaintiff is prohibited from seeking the depositions of Steve Ijames, Steven Frazier, and William O'Keefe in connection with this action.

2.     Defendants' request for attorneys' fees incurred in opposing Plaintiff's Motion to Compel and For Contempt (Dkt. 163) is **DENIED**.

3.     Defendants' Motion for Rule 37 Sanctions (Dkt. 180) is **GRANTED IN PART AND DENIED IN PART** as follows:

    a.  The Motion is **GRANTED** insofar as Plaintiff is precluded from introducing any evidence or argument in support of his claims for loss of "Care, Comfort, Guidance, and Support" and "Loss of Life" beyond that specifically disclosed in his narrative responses to Interrogatory No. 17 as of the April 12, 2022 supplementation and through deposition testimony;

    b.  The Motion is **DENIED** as to Defendants' request for attorneys' fees and costs incurred in bringing Defendants' Motion to Amend the Amended Pretrial Scheduling Order (Dkt. 124);

    c.  The Motion is **DENIED AS MOOT** as to Defendants' request for attorneys' fees and costs incurred in enforcing the December 2021 Order; and

    d.  The Motion is **GRANTED** as to Defendants' request for attorneys' fees and costs incurred in enforcing the March 2022 Order, including those reasonable fees incurred in complying with predicates for bringing this Motion, such as sending necessary deficiency correspondence and meeting and conferring.  Such attorneys' fees and costs shall be payable by Plaintiff, Plaintiff's counsel, or both.

4.      Defendants shall serve on Plaintiff a declaration of their legal counsel setting forth the amount of reasonable attorneys' fees and costs they seek in connection with bringing Defendants' Motion for Rule 37 Sanctions (Dkt. 180) within fourteen (14) days of the date of this Order.  If Plaintiff does not agree to the amount of the attorneys' fees and costs, he may submit his dispute to the Court by filing a response within seven (7) days after receiving the amount, and Defendants may file a reply to Plaintiff's filing within seven (7) days later.

5.      The parties' Joint Motions for Continued Sealing (Dkts. 209, 210) are **GRANTED**.  Based on the parties' agreement and the Court's review, Docket Entries 167-1, 167-2, 167-3, 167-4, 167-5, 167-6, 167-7, 167-8, 167-9, 167-10, 167-11, 167-12, 167-13, 167-14, 178, 184, 185, and 189 will remain **SEALED**.


DATED: November 23, 2022              *s/Elizabeth Cowan Wright*
                                      ELIZABETH COWAN WRIGHT
                                      United States Magistrate Judge