# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

William O. Evans, Jr., as Trustee for the
Heirs and Next-of-Kin for Benjamin
Evans,

        Plaintiff,

    v.

Brian J. Krook, in his individual and
official capacity, Washington County,
Minnesota,

        Defendants.

**MEMORANDUM OF LAW &
ORDER**
Case No. 20-cv-2474 (MJD/ECW)

---

J. Ashwin Madia, Zane A. Umsted, Madia Law, LLC, Elham B. Haddon, Peter
S. Sandberg, Sandberg Law Firm, for Plaintiff.

Vicki A. Hruby, Joseph E. Flynn, Jake W. Peden, Jardine, Logan & O'Brien
PLLP, for Defendants.

---

## I.  INTRODUCTION

This matter is before the Court on the following motions: **(1)** Defendants

Brian J. Krook ("Krook") and Washington County's (the "County" and

collectively with Krook, "Defendants") Motion for Summary Judgment (Doc.

231); **(2)** Defendants' Motion to Strike Plaintiff's Exhibit 3 (Doc. 291); **(3)**

1

Defendants' Motion to Exclude Expert Testimony of Dr. Justin King (Doc. 246); and **(4)** Defendants' Motion to Exclude State Expert Jeffrey Noble (Doc. 251).

Krook shot and killed Plaintiff William O. Evans, Jr.'s ("Plaintiff") son, Benjamin Evans ("Evans") after a 40-minute standoff in Lake Elmo, Minnesota during which Evans kneeled in a crosswalk in the middle of the night with a gun to his head. Krook claims he shot Evans because the gun Evans was holding to his head momentarily pointed through Evans' head in the direction of Krook and other officers when Evans turned to look behind himself. Plaintiff denies that the gun was ever pointed at the officers and points to a variety of evidence that he says demonstrates his son posed no immediate threat to anyone but himself that night. Krook's qualified immunity defense hinges on which party is correct. Because the record demonstrates that there are genuine factual disputes over whether Evans' gun was ever pointed at the officers and whether Evans otherwise posed an immediate threat to them, the Court will deny Krook's Motion for Summary Judgment.

The Court will, however, grant summary judgment dismissing Plaintiff's claim against Washington County. Plaintiff claims the County also caused

Evans' death by failing to train its officers to issue proper warnings before using deadly force.  The Court finds insufficient evidence to support this claim.

The Court will also deny Defendants' Motion to Strike one of Plaintiff's exhibits and grant in part and deny in part Defendants' motions seeking to exclude from trial two of Plaintiff's expert witnesses.  On the expert motions, the Court also finds that Defendants are entitled to sanctions against Plaintiff for Plaintiff's failure to abide by the expert witness disclosure rules during discovery.

## II.    BACKGROUND

### A.    The April 12, 2018 Killing of Benjamin Evans

#### 1.    911 Receives Two Calls About Evans

Around midnight on April 12, 2018, 911 received two calls about Evans. (Doc. 234, Exs. 1-2.)  The callers reported that Evans was experiencing a suicidal episode and was armed with a handgun.    Evans was distressed over the recent end of his relationship with his girlfriend.

The callers reported that Evans had been drinking throughout the day and had sent text messages to them and others suggesting he intended to commit suicide that night.  (Doc. 234, Ex. 1.)  Evans had worked as a firefighter and EMT

in the past.  (See Part III D 3 a, infra.)  He was in training to become a firefighter again with the Lake Elmo Fire Department.  (See id.)

Before leaving home with his handgun, Evans put on his firefighter dress uniform and wrote suicide notes to his family and others.  (Doc. 234, Ex. 3 at 54, 56; Ex. 4 at 598, 601, 652; Ex. 5 at 6.)

The callers told the dispatcher that they thought Evans would "just shoot himself sooner" if a police squad car approached him with its lights and sirens on.  (Doc. 234, Ex. 1.)  The callers also told the dispatcher that they were not sure if Evans would be cooperative with responding officers.  (Id., Ex. 2.)

## 2.  Deputy Joshua Ramirez Locates Evans Kneeling in the Street in Lake Elmo with a Gun to his Head

Within minutes of the 911 calls, Washington County Deputy Joshua Ramirez arrived in downtown Lake Elmo in his squad car to look for Evans. (Doc. 234, Ex. 9 at 2-3; Doc. 281, Ex. 3.)  As requested, Ramirez searched for Evans with his siren, overhead lights, and headlights turned off.  (Doc. 234, Ex. 4 at 596-600, 651-652; Doc. 281, Ex. 3.)

By 12:17 a.m., Ramirez had located Evans.  (Doc. 234, Ex. 15; Doc. 281, Ex. 3.)  Evans was kneeling in the dark in a crosswalk at 34th Street North and Lake Elmo Avenue with a handgun held to his head.  (Doc. 234-1, Ex. 11 (Scene

Diagram); Doc. 281, Ex. 2 at 54:21-24; Ex. 3 at 00:05-00:16.)  Ramirez quickly

stopped and reversed his car onto a sidewalk so that his car faced Evans, thus

allowing his dashboard camera to capture the rest of the encounter on video.

(Doc. 234, Ex. 11, Ex. 31; Doc. 281, Ex. 3.)  As discussed below, however, the

quality of this video and the other available video footage of the encounter is

poor.

After parking his car, Ramirez got out and took cover behind the rear

driver's side of his vehicle.  (Doc. 234, Ex. 13 (Ramirez Body-Worn Camera

Footage); Ex. 14 (Ramirez BWC Transcript); Ex. 15 (Combined Audio

Transcript).)  From this position, Ramirez began using Crisis Intervention Tactics

to try to deescalate the situation and convince Evans to drop the gun.  (Doc. 234,

Ex. 9.)

### 3.  Ramirez Negotiates with Evans

At least eight other officers arrived on the scene after Ramirez.  (Doc. 281,

Ex. 2 at 128; Ex. 3 at 130-31; Ex. 4 at 1637, 1639.)  They set up a perimeter around

Evans to prevent traffic or civilians from passing near the scene.  (Doc. 234, Ex.

11; Doc. 281, Ex. 1 at 1074:12-14.)  There were individuals inside nearby homes

and businesses.  When these civilians tried to exit, officers yelled at them to go

back inside.  The officers also sent out a "Code Red"—a system-generated

message sent to cellphones and landlines in the vicinity—advising the public to "stay in your homes and shelter in place."  (Doc. 234, Ex. 20 at 05:14; Ex. 27, (Code Red Record); Ex. 30 (Krook Squad Video) at 00:37:44.)

At 12:18 a.m., Ramirez began negotiating with Evans.  (Doc. 281, Ex. 3; Doc. 234, Ex. 15.)  Ramirez repeatedly asked Evans to put the gun down and allow the officers to help him.  (Doc. 234, Ex. 15.)  However, Evans did not comply and remained kneeling in the crosswalk with the handgun pointed at his head, occasionally dropping it down and holding it against his chest.  (Id.)

At 12:23 a.m., Evans yelled to the officers that "this is not suicide by cop," adding that he was "not going to make you kill me."  (Id.)

At 12:26 a.m., another officer, Deputy Michael Ramos, began trying to assist Ramirez with the negotiations.  (Id. ("My name is Michael man I'm here with Josh okay.  Can you tell me what happened . . . ").)  Ramos and Ramirez had been with Washington County for 11 and 22 months, respectively, while Krook had 8 years of experience.  (Doc. 281, Ex. 4 at 659, 862, 1043-44, Ex. 18 at 1.)

Ramos and Ramirez learned that Evans had been a fellow first responder and tried to use this information to build a dialogue with him.  (Doc. 234, Ex. 15.) Evans yelled to the officers, "You guys are drawn and you should be . . . [t]here's

a weapon in a civilian's hand where you feel threatened." (Id.)  Evans added, "I should have done this before you guys got here." (Id.)

Evans alluded to his troubles with his ex-girlfriend throughout the negotiations with Ramirez and Ramos.  At 12:30 a.m., he asked for a phone call with her.  (Id.)  The officers declined the request, believing it to be too risky.

At 12:32 a.m., Krook told the other officers that he was approaching from behind Ramos and Ramirez with a less-lethal beanbag shotgun.  (Id.)  Krook took position near Ramirez's squad car, setting the beanbag shotgun down next to him.  Like the other officers, he drew his service weapon and trained it on Evans.

When Krook arrived, he had just finished a 9-hour shift from 2:30 to 11:30 p.m. (Doc. 281, Ex. 2 at 124.)  He had not left the Washington County Law Enforcement Center for home yet when the calls about Evans came in around midnight.  (Id. at 123-124.)  Initially, Sergeant Folendorf told Krook not to respond to the call because she believed there were already enough officers responding.  (Id. at 124; Doc. 234, Ex. 17 at 12; Ex. 18 at 23.)

As Folendorf was driving to the scene, however, she realized she had forgotten her body-worn camera.  (Doc. 281, Ex. 2 at 126; Doc. 234, Ex. 17 at 12.)  She called Krook and asked him to bring her a camera.  (Doc. 281, Ex. 2 at 128.)

The two met in a nearby parking lot, at which point Folendorf changed her mind and asked Krook to join her on the call.  (Id.)

Also at 12:32 a.m., Evans told the officers, "I'm not gonna hurt you" and added, "I'm not a danger . . . I know how this works."  (Doc. 234, Ex. 15)

At 12:34 a.m., Folendorf decided, after observing the situation for a few minutes, to retreat to better cover to attempt to contact SWAT and a trained crisis negotiator.  (Doc. 234, Ex. 3 at 58, 134-135, 142; Ex. 4 at 610, 865-66, 1007-08, 1013, 1621; Ex. 17 at 6; Ex. 18 at 4-5; Ex. 19 (Folendorf Dep.) at 39-40; Ex. 20, (Folendorf BWC).)  Folendorf, however, was not successful in obtaining assistance from either SWAT or a crisis negotiator.  (Doc. 234, Ex. 17 at 6.)

At 12:35 a.m., Ramirez told Evans, on Krook's suggestion, that if Evans put the gun down, the officers would allow him to call his ex-girlfriend.  (Doc. 234, Ex. 15; Doc. 281, Ex. 3.)

At 12:36 a.m., Evans took the magazine out of his gun and threw it into the street in front of him.  (Id.)  Ramirez then asked Evans if there was still a bullet left in the chamber and Evans confirmed there was, but told the officers that "it's for me, not you."  (Id.)  Ramirez continued trying to convince Evans to put down the gun in exchange for allowing Evans to call his ex-girlfriend.  (Id.)

At 12:41 a.m., Evans dropped the gun to his chest and looked behind himself.  Evans made similar body movements dozens of times throughout the encounter.  (See Doc. 281, Ex. 3A-3RR.)  But this time Krook asked Ramos, "What's he fucking looking at?"  (Id.)  Ramos responded, "Just making sure no one is behind him."  (Id.)  The following exchange then occurred between Evans and Ramirez:

> Evans:      I, I will trade a round, the only round in chamber.
> Ramirez:    Yep.
> Evans:      For a minute with her [Evans's ex-girlfriend].
> Ramirez:    And I want to do that, but I need you to put the gun down for me.  Okay?  And I will give you as many minutes as you need.
>
> *      *      *
>
> Ramirez:    Benjamin, please.  Let me, let me give you that minute.
> Evans:      It's not hard.
> Ramirez:    I need you to –
> Evans:      It's not a simple trade.  By any means, but I'm asking for a minute with her to eliminate your threat.  Whether the round goes through me or, towards you, that is the end of the threat.
> Krook:      Tell him we can't get the phone to him unless he puts down the gun.
> Evans:      I am asking to talk to her.
> Ramirez:    Look, Benjamin, I want to give you that phone call.
> Evans:      Why is that difficult? Why is that a hard thought?
> Ramirez:    Benjamin—
> Evans:      I'm done! I quit!
> Ramirez:    I can't give you that phone call until you drop that gun. Now put that, take that round out of the chamber.  Okay, Benjamin?

9

Evans:        It's not gonna happen, bud.

(Doc. 234, Ex. 15.)

At 12:43 a.m., Evans told the officers, "I'm not going to fucking hurt you. I'm not here for you.  I'm here for me."  (Id.)

Over the next few minutes, Evans continued to demand a phone call with his ex-girlfriend and Ramirez continued to tell him that he could not give him a phone unless he put down the gun.  Krook supported this decision.  (Id. ("You don't want to call her.  Cause we don't want to spark him . . . we really don't even want to give him the phone because he may end it.").)

At 12:50 a.m., Evans began a two-minute countdown and Krook remarked, "I can't tell where the gun's pointed."  (Id.)  Krook suggested that Ramirez ask Evans for his ex-girlfriend's phone number, apparently to distract Evans from the countdown.  (Id.)  Ramirez asked for the number, but Evans could not remember it and his cell phone battery was dead.  (Id.)

At 12:52 a.m., Krook suggested that he get the beanbag shotgun ready and Folendorf agreed.  (Id. at 32 (Folendorf: "Um, if we're getting down to the last wire.  I don't think we have an option.").)  Krook told the other officers, "Here's the plan . . . if we get down to the last second, we're gonna less lethal him."  (Id.;

10

<u>see also</u> Doc. 234, Ex. 17 at 16 (Folendorf: stating that Krook "gave us some sort of indication that he had uh a clear view of the young man.  And that he believed he would be able to fire a less lethal round at him.").)

Evans, however, stopped the countdown and continued talking with the officers.  (Doc. 281, Ex. 2 at 70, 138-139 (Folendorf: "I think Deputy Ramirez really did a great job of kind of settling him down to the point – I don't want to say he forgot, but he stopped the countdown.").)

At 12:54 a.m., Evans again told the officers that he did not plan to force them to shoot him.  (Doc. 234, Ex. 15 at 34 ("I am not gonna force you into a shooting!  I don't want you to take my life! . . . I just want to take my own . . . [a]nd I'm not gonna fucking put my gun on you and make you kill a 23 year old kid because he was upset . . ..").)

At 12:55 a.m., Evans again turned his head and upper body to look behind himself while holding the gun to his head.  (Doc. 281, Ex. 3.)  This movement caused Krook audible agitation.  (Doc. 234, Ex. 15 at 35 ("Fuckin' A.  If he does that again—").)

Ramirez continued talking with Evans about the phone call.  Evans asked Ramirez if giving his dad's phone number to the officers would be helpful and Ramirez responded by asking Evans if he wanted to talk with his dad.  (Id.)

At 12:56 a.m., Evans told Ramirez,

> If nothing else, this is a testament to the Washington County metro's Sheriff Department de-escalation tactics.  I mean, you guys are good. I appreciate the . . . You guys are actually incredible professionals.  I mean, I'm not joking with you.  It isn't a joke.

(Id.)  At the same time Evans made this statement, Krook remarked to the other officers that he was "getting uncomfortable with [Evans] turning his head just so you know."  (Id. at 36.)  However, neither Krook nor any of the other officers ever warned Evans to stop turning his head.

Evans then told the officers,

> I don't want to give you a reason to stop the threat.  Before I talk to her.  I don't want to kill myself!  I want, once I talk to her.  [sic]

(Id. at 36.)  Ramirez again asked Evans to put the gun down and Evans declined, telling Ramirez that "it's not gonna happen until I talk to her."  (Id.)

### 4.  After 40 Minutes of Negotiations, Krook Shoots Evans

At 12:57 a.m., Evans turned to look behind himself again while he was talking to the officers.  As Evans was midway through a sentence, Krook shot him four times in rapid succession.  (Doc. 234, Ex. 15 at 36, Ex. 31; Doc. 281, Ex.

3.)  Krook did not warn Evans to stop turning his head or say anything else to Evans before he shot.  (Id.)  Folendorf, Ramirez, and Ramos later told investigators that, at first, they thought Krook had shot Evans with the beanbag shotgun like the officers had been discussing just minutes earlier.  (Doc. 281, Ex. 2 at 69:6-15 (Ramirez); id. at 107:10-15 (Ramos); id. at 144:6-19 (Folendorf).)

After Krook fired the initial four shots, he rushed toward Evans with his gun drawn.  Several other officers on the scene, including Ramirez, Ramos, and Folendorf, also approached Evans.  As they approached Evans, the deputies repeatedly ordered him to drop the gun.  (Doc. 234, Ex. 15 at 36-37; Ex. 31 at 06:04.)

Krook stood over Evans and turned on his flashlight while yelling at Evans and trying to kick the gun away from Evans' hand.  (Doc. 234, Ex. 15 at 37 (Krook: "I'm kicking it. I'm kicking it.")  The video footage shows that Evans still had some control over the weapon at this moment.  (Doc. 234, Ex. 3 at 71, 89-90, 109-10, 148-49; Ex. 4 at 625-26, 853-55, 890, 1035, 1261-62, 1647-50, 1707.)  But the parties dispute where the gun was pointed.

As Krook stood over Evans, another one of the approaching officers, Joshua Hutchins, shouted, "He's pulling!"  (Doc. 234, Ex. 15.)  Hutchins later

testified that he saw Evans' finger making a motion near the trigger.  (Doc. 234, Ex. 4 at 1262, 1272-76; Ex. 32 at 7; Ex. 49 (Hutchins BWC).)  Krook then took a step back and fired two more rounds and paused for approximately two seconds before firing a final round at Evans.

Krook was the only officer on the scene who fired.  Evans never fired.  The deputies loaded Evans into an ambulance, and he was pronounced dead at the hospital.  (Doc. 281, Ex. 31 at 8:30-11:20.)

### 5.  A Grand Jury Indicts Krook for Second-Degree Manslaughter and Krook is Acquitted at Trial

The Minnesota Bureau of Criminal Apprehension interviewed the officers who were present during the standoff in the immediate aftermath of the incident. The BCA then conducted a lengthy investigation into the incident.

The Ramsey County Attorney's Office later convened a grand jury to investigate Evans' death.  (Doc. 281, Ex. 2.)  In July 2019, the grand jury returned an indictment charging Krook with second-degree manslaughter for killing Evans.  (Id. at 259.)  In March 2020, a jury acquitted Krook of this charge.  (Doc. 281, Ex. 1 at 1916.)

## III.   DISCUSSION

### A.   Defendants' Motion for Summary Judgment

14

### 1.      Federal Rule of Civil Procedure 56

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Id. at 323.  "A dispute is genuine if the evidence is such that it

could cause a reasonable jury to return a verdict for either party; a fact is material

if its resolution affects the outcome of the case."  Amini v. City of Minneapolis,

643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248, 252 (1986)).

Even though the Court reviews the evidence in the light most favorable to

the non-moving party on summary judgment, the Court "cannot ignore

incontrovertible evidence" that "clearly contradicts" the non-moving party's

factual allegations.  Wallingford v. Olson, 592 F.3d 888, 892 (8th Cir. 2010).  This

includes unchallenged video recordings.  See Scott v. Harris, 550 U.S. 372, 381

(2007) (reviewing "the facts in the light depicted by the videotape" on summary

judgment).

### 2.    Qualified Immunity

"[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wallingford, 592 F.3d at 891 (quoting Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (quotation omitted)). "The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." Id. (quoting White v. McKinley, 519 F.3d 806, 813 (8th Cir. 2008)). However, when a defendant moves for summary judgment on qualified immunity grounds, the plaintiff bears the burden to present evidence from which a reasonable jury could find the defendant officer has violated the plaintiff's constitutional rights. Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997).

To determine whether a police officer is entitled to qualified immunity, the Court applies a two-part test, which asks "(1) whether, taking the facts in the light most favorable to the injured party, the alleged facts demonstrate that the official's conduct violated a constitutional right; and (2) whether the asserted

constitutional right is clearly established." Id. (quoting Clemmons v. Armontrout, 477 F.3d 962, 965 (8th Cir. 2007)).

### 3.    Objective Reasonableness

In cases involving claims of excessive use of force like this one, courts determine whether a police officer has satisfied the first part of the qualified immunity test by applying an "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 386 (1989). Under this standard, the use of force is not constitutionally excessive if the officer's actions were "objectively reasonable in light of the facts and circumstances confronting them." Id. at 397. Courts evaluate the reasonableness of an officer's use of force "by looking primarily at the threat present at the time he deployed the deadly force." Banks v. Hawkins, 999 F.3d 521, 526 (8th Cir. 2021) (emphasis in original) (citing Gardner v. Buerger, 82 F.3d 248, 253 (8th Cir. 1996)). In applying this standard, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97.

It is not objectively reasonable for a police officer to shoot someone who is only threatening self-harm.  See, e.g., Partridge v. City of Benton, 929 F.3d 562, 566 (8th Cir. 2019); Cole v. Carson, 935 F.3d 444 (5th Cir. 2019); Weinmann v. McClone, 787 F.3d 444, 446–47 (7th Cir. 2015); Bennett v. Murphy, 274 F.3d 133 (3d Cir. 2002) ("If, as the plaintiff's evidence suggested, David Bennett had stopped advancing and did not pose a threat to anyone but himself, the force used against him, i.e. deadly force, was objectively excessive.").

When confronted with an individual experiencing a suicidal episode then, the Constitution only permits police officers to shoot the individual if they have probable cause to believe he poses "an immediate threat of death or serious bodily injury" to the officers or others.  See, e.g., Cole Est. of Richards v. Hutchins, 959 F.3d 1127, 1132 (8th Cir. 2020) (quoting Billingsley v. City of Omaha, 277 F.3d 990, 993 (8th Cir. 2002)).  And when the suicidal individual is also armed with a firearm, as in any other case involving a confrontation with an armed individual, officers may not shoot the individual unless he "point[s] the firearm at another individual or take[s] similar 'menacing action.'"  Cole Est. of Richards v. Hutchins, 959 F.3d 1127, 1132 (8th Cir. 2020) (citing Partridge, 929 F.3d at 566); Partridge v. City of Benton, Arkansas, No. 21-3001, 2023 WL

18

3940536, at *3 (8th Cir. June 12, 2023) (reversing and remanding for trial based on factual dispute over whether suicidal teenager pointed gun at officers).

It is undisputed that Evans never took direct aim at Krook or anyone else on the night of April 12, 2018.  Instead, this case turns on whether Evans was taking "menacing action" with his firearm at the "precise moment" Krook decided to shoot him.  Cole ex rel. Richards, 959 F.3d at 1133 (quoting Schulz v. Long, 44 F.3d 643, 648 (8th Cir. 1995); Banks, 999 F.3d at 526.  Viewing the facts in the light most favorable to Plaintiff, as the Court must on summary judgment, the Court finds that genuine factual disputes over whether Evans was taking "menacing action" toward Krook or anyone else when Krook shot him preclude summary judgment on the issue of objective reasonableness.

Defendants' primary basis for claiming Krook's actions were objectively reasonable is their claim that Evans' gun was momentarily pointed at Krook through Evans' head when Evans turned his upper body to look behind himself at 12:57 a.m.  But the Court has carefully reviewed the video footage and is unable to determine whether Evans' gun was pointed through Evans' head at Krook or anyone else.

Plaintiff denies that the gun was ever pointed at the officers, through

Evans' head or otherwise.  (Doc. 280 at 9.)  To support this allegation, Plaintiff

cites grand jury testimony from the primary negotiator on the scene, Ramirez.

Ramirez provided the following testimony to the Grand Jury:

> Q.  Okay.  Did [Evans] ever point the gun at you –
> A.  No.
> Q.  – or any of the other officers?
> A.  No.
>
> \*       \*       \*
>
> Q.  Did [Evans] do anything that caused you to consider shooting
> him?
> A.  No.
> Q.  So did you feel any immediate threat to your safety or the safety
> of the other officers that would cause you to shoot him?
> A.  No.
>
> \*       \*       \*
>
> Q.  Okay.  And fair to say that just before the shots were fired there
> was – you were engaging [in] conversation with him, with Evans?
> A.  Yes.
> Q.  And there wasn't anything that you saw that would provoke you
> to fire your weapon –
> A.  No.
> Q.  – is that fair?
> A.  Yes.

(P-Ex. 2 at 65-66, 83.)

Thus, even assuming that momentarily causing a gun to be pointed

through one's own head at an officer could justify the use of deadly force,

summary judgment would still be inappropriate because the record contains a factual dispute over this allegation.  See Weinmann, 787 F.3d at 449 ("The critical problem with [the officer's] argument, as the district court recognized, is that the way in which Jerome was holding the gun is disputed.") (emphasis in original).

But even ignoring the factual dispute over whether the gun was pointed at officers, there are several other pieces of evidence that preclude the Court from deciding that Evans' movement was sufficiently "menacing" to justify the use of deadly force.  Indeed, both officers Ramirez and Ramos, who were located next to Krook during the standoff, testified to the Grand Jury that Evans' movement did not cause them to feel the need to shoot Evans.  (Doc. 281, Ex. 2 at 83 ("Q. There wasn't anything that you saw that would provoke you to fire your weapon[?] Ramirez: No."); id. at 103 ("Q.  Was that act of moving his head, was that giving you any concerns? Ramos: No.")  In fact, Ramos, Ramirez, and Folendorf all testified that they initially believed Krook had shot Evans with the less-lethal shotgun given that this weapon was sitting next to Krook and the officers had been discussing using it against Evans just a few minutes earlier. (Doc. 281, Ex. 2 at 69:6-15 (Ramirez); id. at 107:10-15 (Ramos); id. at 144:6-19 (Folendorf).)

Further, Evans' conduct during the nearly 40-minute negotiation that led up to the shooting also weighs against finding Evans' movement at 12:57 a.m. to be a "menacing action."  Evans had turned his body similarly dozens of times previously during the standoff.  (Doc. 281, Ex. 3A-3RR.)  When Krook asked what Evans was doing during one such movement 15 minutes before he fired, Ramos told Krook that Evans was "[j]ust making sure no one is behind him." (Doc. 234, Ex. 15.)

Evans also repeatedly told the officers throughout the standoff that he had no intention of harming them.  (See, e.g., Doc. 234, Ex. 15 ("this is not suicide by cop"); ("I'm not gonna hurt you . . . I'm not a danger"); ("I'm not going to fucking hurt you.  I'm not here for you."); ("I am not gonna force you into a shooting!"); ("I don't want to give you a reason to stop the threat.").)  Evans even discarded the magazine from his gun, telling the officers as he threw it into the street, "[t]here's your threat to your guys" and confirming that the remaining bullet in the gun was "for me, not you."  (Doc. 234, Ex. 15.)

Evans was still actively participating in the negotiations with Ramirez and Ramos right up to the moment Krook shot him.  Indeed, Evans was midway

22

through a sentence when Krook fired, negating any inference that Evans was about to pull the trigger.

The fact that the standoff had lasted for nearly 40 minutes by the time Krook decided to shoot also weighs against a finding that Evans posed an "immediate" threat to the officers.  See Bennett ex rel. Est. of Bennett v. Murphy, 120 F. App'x 914, 916 (3d Cir. 2005) (finding officer's decision to shoot armed, suicidal individual unreasonable where "[a]lmost an hour passed between the time the state troopers first arrived on the scene, and the time [the man] was shot").

The cases Defendants cite involving armed, suicidal individuals where officers' actions were determined to be objectively reasonable are, thus, distinguishable because they involved rapidly evolving confrontations in close proximity to officers.  Garczynski v. Bradshaw, 573 F.3d 1158, 1168 (11th Cir. 2009) (officers shot man after he pointed a gun directly at them as they tried to force entry into his vehicle); Evans v. United States, 728 F. App'x 554, 556 (6th Cir. 2018) (officers shot man after he tried to remove gun from holster during officers' forced entry into residence to arrest suspect on charges of distributing child pornography); Thurman v. Hawkins, No. CIV. 13-50-GFVT, 2014 WL

4384387, at *4 (E.D. Ky. Sept. 3, 2014) (officers shot domestic violence and assault

suspect during forced entry into his residence after missing the suspect with a

Taser).

On this point, Defendants urge the Court to consider Conlogue v.

Hamilton, 906 F.3d 150 (1st Cir. 2018).  In Conlogue, the court found an officer's

decision to shoot an armed, suicidal individual to be objectively reasonable even

though the shooting occurred after a standoff that lasted more than three hours.

Id. at 156-57.  But the individual in Conlogue took obvious menacing actions in

the moments leading up to the shooting.  He yelled obscenities at the officers,

retrieved another weapon partway through the standoff, "shaped his fingers like

a gun, and pointed the simulated gun at [the officers]," began moving closer and

closer to the officers, and finally "displayed a fully loaded magazine, placed the

magazine into his gun" and began pointing it in the officers' direction.  Id. at 153.

Evans did not take similar menacing actions in the moments leading up to the

shooting.

Beyond the factual dispute over whether Evans' gun was ever pointed at

Krook or anyone else, the above-described facts, taken together and viewed in

the light most favorable to Plaintiff, demonstrate that whether Evans was taking

"menacing action" with his gun is genuinely in dispute, thus precluding summary judgment on the issue of objective reasonableness.

Defendants, however, argue that Evans also verbally threatened to shoot at officers. They highlight Evans' statement that "[w]hether the round goes through me or, towards you, that is the end of the threat." (Doc. 234-1, Ex. 15.) But Defendants' take this statement out of the context of the dialogue Evans was having with Ramirez at the time.

Viewing Evans' alleged threat through the summary judgment lens, Evans was simply offering to trade his last round for a phone call with his ex-girlfriend. (See Doc. 234, Ex. 15.) Indeed, Ramos testified before the Grand Jury that Evans never said his last bullet was for law enforcement, contradicting the interpretation of this exchange Defendants now advance. (Doc. 281, Ex. 2 at 106.) Plaintiff also points out that Krook did not bring up this alleged threat during his BCA interview or during his criminal trial as part of his justification for firing on Evans. (See Doc. 234-11, Ex. 18.); see also Cole v Carson, 935 F.3d 444, 449, 453-55 (5th Cir. 2019) (en banc) (affirming denial of summary judgment in qualified immunity case where officers attempted to rely on alleged verbal threat they only "remembered . . . four years later, after this litigation had commenced").

The parties also dispute whether Ramirez and Ramos' repeated requests that Evans put the gun down throughout the 40-minute negotiation were sufficient warnings.  See Est. of Morgan v. Cook, 686 F.3d 494, 497-98 (8th Cir. 2012).  The Eighth Circuit has noted that "where it is feasible, a police officer should give a warning that deadly force is going to be used."  Id.  In Morgan, the parties disputed whether the officer should have given the decedent a more specific warning before shooting, but the court found that the officer who used deadly force "did not have time to utter a more specific warning ('Stop, or I'll shoot.') before firing."  Id.  Here, Plaintiff argues Krook had ample opportunity to warn Evans to stop moving his body during any of numerous earlier occasions when Evans turned his body in a similar fashion during the standoff.

Again, viewing the facts in the light most favorable to Plaintiff as the Court must at this procedural stage, Krook or one of the other officers had sufficient time to provide "a more specific warning" such as "stop turning your body, or I'll shoot."  Id.  Krook was audibly agitated by the way Evans was moving his body at 12:41 a.m. ("What's he fucking looking at?"), but he did not warn Evans to stop these movements during the period of more than 15 minutes that followed this comment.  (See Doc. 234-1, Ex. 15.)

26

The parties also dispute whether Krook's fifth, sixth, and seventh shots were objectively reasonable.  Defendants allege Evans pointed the gun in the officers' direction as he slumped down after being shot the first four times.  Defendants also cite officer Hutchins' statement that he saw Evans' finger moving near the trigger as the officers approached.  (Doc. 234, Ex. 49 (Hutchins BWC) at 03:02.)  Defendants contend Evans was merely in the process of dropping the gun after being shot, in compliance with the officers' commands.  In fact, Defendants allege that Evans had already dropped the gun by the time Krook fired the final shot.  Defendants rely on the video footage of these shots and also testimony from Krook, Folendorf, and Ramirez stating that the gun was going "down" and "going towards the ground" when Krook fired this second volley.  (Doc. 234, Ex. 2 at 74; Ex. 18; Doc. 281, Ex. 1 at 1035.)

Again, the videos are not conclusive as to these allegations regarding Krook's second volley of shots and a reasonable jury could credit either set of allegations.  However, if Evans was indeed attempting to set down his gun, or had dropped it altogether, when Krook fired, then these shots would constitute excessive force.  See Partridge, 2023 WL 3940536, at *3 ("defendants will be liable if Schweikle 'never pointed the gun at the officers' but instead 'moved his gun in

compliance with commands to drop his gun.'") (quoting Partridge, 929 F.3d at

565, 567); Cole ex rel. Richards, 959 F.3d at 1133 ("deadly force that is reasonable

while the suspect poses a threat is no longer reasonable once the threat is no

longer present") (quotation omitted). Accordingly, the Court will deny

Defendants' summary judgment motion on the issue of objective reasonableness

as it relates to Krook's fifth, sixth, and seventh shots as well.

       Finally, in assessing the reasonableness of Krook's conduct, the Court is

mindful of the unique issues presented by qualified immunity cases involving

the use of force against armed individuals experiencing mental health crises.

Unlike other use of force scenarios, despite being armed, Evans was not

suspected of committing any crime. See, e.g., Partridge, 929 F.3d at 565

(considering fact that the decedent "was not suspected of a crime" as part of

objective reasonableness inquiry); Weinmann, 787 F.3d at 449 (noting that no one

told the 911 dispatcher or the responding officer that plaintiff "was going to

harm the responding officer"); see also Ching v. City of Minneapolis, No. 021-

CV-2467 (KMM/DTS), 2022 WL 4364790, at *5 n.5 (D. Minn. Sept. 21, 2022)

("Where 'the person seized is not a suspect, has committed no crime when the

police approach . . . the importance of the governmental interests alleged to

justify the intrusion is necessarily diminished") (quoting Ludwig v. Anderson, 54 F.3d 465, 471 (8th Cir. 1995)).

Courts must be especially mindful in cases like this one where the immediacy of the threat posed by a person in crisis is questionable, lest the qualified immunity defense expand so far that it swallows every situation in which an officer uses deadly force against an armed individual experiencing a mental health crisis. Cf. Weinmann, 787 F.3d at 449 ("Essentially, [Defendant's] argument proves too much. If we were to adopt it, we would be saying that officers are entitled, when responding to a suicide call, to use deadly force any time they forcibly enter a single-entrance room. We are aware of no ruling that permits this sort of shoot-on-sight response to this class of encounters.").

The Court also cannot accept Defendants' arguments regarding objective reasonableness in this case given the apparent frequency with which officers encounter this exact type of situation, i.e., armed individuals experiencing suicidal episodes. See, e.g., Partridge, 929 F.3d at 566; Rogers, 885 F.3d at 1121; Cole, 935 F.3d at 444; Conlogue, 906 F.3d at 151; Evans, 728 F. App'x at 556; McKenney v. Mangino, 873 F.3d 75, 84 (1st Cir. 2017); Weinmann, 787 F.3d at

446–47; <u>Partlow</u>, 774 F.3d at 502; <u>Thurman</u>, 2014 WL 4384387, at *4; <u>Garczynski</u>, 573 F.3d at 1168; <u>Bennett</u>, 274 F.3d at 136; <u>Anderson</u>, 2022 WL 4540125, at *5.

### 4. Clearly-Established Law

Having found that factual disputes preclude summary judgment on the first step of the qualified immunity analysis, the Court now turns to the second step. At the second step, the Court asks "whether the asserted constitutional right is clearly established." <u>Clemmons</u>, 477 F.3d at 965. The Plaintiff has the burden to demonstrate that the relevant law is clearly established. <u>Hanson as Tr. for Layton v. Best</u>, 915 F.3d 543, 548 (8th Cir. 2019) (citing <u>Monroe v. Ark. State Univ., 495 F.3d 591</u>, 594 (8th Cir. 2007)).

The Eighth Circuit has explained that "[f]or a right to be clearly established, the law must have been sufficiently clear, at the time of the official's conduct, to put every reasonable official on notice that what he was doing violated that right." <u>Cole ex rel. Richards</u>, 959 F.3d at 1134 (citations omitted). "Earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, but the critical question is not whether prior cases present facts substantially similar to the present case but whether prior cases would have put a reasonable officer on

30

notice that the use of deadly force in these circumstances would violate the

individual's right not to be seized by the use of excessive force." Id.

Applying this approach, the Court finds that the law applicable to Krook's

encounter with Evans was clearly established as of April 12, 2018.  The primary

consideration applicable to Krook's decision to shoot was whether he had

probable cause to believe Evans posed an "immediate threat of death or serious

bodily injury to others." Cole ex rel. Richards, 959 F.3d at 1132.  The mere fact

that Evans was holding a gun to his head was not enough to justify deadly force.

Id.  Rather, Evans needed to "point the firearm at another individual or take

similar menacing action." Id.

The Eighth Circuit held in Cole that this legal standard was clearly

established as of the date of the incident in that case, October 25, 2016, which is

more than a year before Krook encountered Evans on April 12, 2018.  Id. at 1134.

Further, the Eighth Circuit's application of the law in Cole was not novel, it

followed the same standard that federal appellate courts have applied in similar

cases involving confrontations with armed, suicidal individuals prior to 2018.

See, e.g., Bennett, 274 F.3d at 136 ("If, as the plaintiff's evidence suggested, [the

decedent] had stopped advancing and did not pose a threat to anyone but

31

himself, the force used against him, i.e. deadly force, was objectively excessive.");

McKenney, 873 F.3d at 81 ("A police officer's use of deadly force . . . is reasonable

(and, therefore, constitutional) only when 'at a minimum, a suspect poses an

immediate threat to police officers or civilians.'").

In fact, in Weinmann, the Seventh Circuit found this legal standard to be

clearly established, relying on precedents from the United States Supreme Court

dating back to the 1980's.  787 F.3d at 450 (citing Graham v. Connor, 490 U.S. 386

(1989) and Tennessee v. Garner, 471 U.S. 1 (1985)).  The Seventh Circuit also

noted that, even without these precedents, it would still find the law to be clearly

established because "shooting a suicidal person who is neither resisting arrest

nor threatening anyone save himself" would be "plainly excessive conduct."  Id.

at 451.  Even without the Eighth Circuit's decision in Cole, a "robust consensus of

cases of persuasive authority" like this may also establish that the law was

clearly established in a qualified immunity case.  Quraishi v. St. Charles Cnty.,

986 F.3d 831, 838-39 (8th Cir. 2021).

The above-described standard for the use of force in encounters with

armed individuals "would have put a reasonable officer on notice that the use of

deadly force in these circumstances would violate the individual's right not to be

seized by the use of excessive force." Cole, 959 F.3d at 1134. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that a reasonable officer in Krook's position would have known that the use of deadly force against an armed, suicidal individual who did not point his gun at anyone but himself, removed all but one bullet from his gun, repeatedly told officers that he did not intend to harm anyone but himself, all while kneeling in the same place for nearly 40 minutes while surrounded by officers, would be constitutionally excessive under clearly-established federal precedents.

Further, this notice inquiry is less of a hypothetical in this case than in others because Plaintiff has submitted a 2016 training bulletin from the Washington County Sheriff's Department that describes essentially the same standard as the one described above. (Doc. 281, Ex. 5 (discussing Tenorio v. Pitzer, 802 F.3d 1160, 1166 (10th Cir. 2015) (denying summary judgment in qualified immunity case where officer shot suicidal man armed with a knife).)

Defendants, on the other hand, argue that, as of April 12, 2018, it was not clearly established that law enforcement officers are prohibited from shooting suicidal individuals when an officer reasonably believes that a bullet may travel through the individual's body and strike another individual. Defendants'

argument, however, simply highlights the same factual dispute that precluded summary judgment on the issue of objective reasonableness. This dispute is over whether Evans' gun was ever pointed at the officers and, relatedly, whether a reasonable officer in Krook's position would have perceived Evans as taking some sort of "menacing action" when Krook shot him. A jury must make this determination.

Finally, the clearly-established precedents cited above also apply to Krook's fifth, sixth, and seventh shots. If Evans was in the process of dropping his gun, or had actually dropped it altogether, when Krook fired these final three shots, then clearly established law prohibited this use of force. This is a straightforward application of the well-established rule that officers may not use deadly force against an individual, even an armed individual, unless the individual poses "an immediate threat of death or serious bodily injury" to someone other than himself. <u>Cole ex rel. Richards</u>, 959 F.3d at 1132 (citing <u>Billingsley v. City of Omaha</u>, 277 F.3d 990, 993 (8th Cir. 2002)).

Because a reasonable jury could find the predicate facts necessary to bring Krook's use of force within the scope of clearly established constitutional

prohibitions, the Court will not grant summary judgment to Defendants based on this second prong of the qualified immunity analysis either.

**B.     Plaintiff's Failure-to-Train Claim Against Washington County**

Defendants also move for summary judgment on Plaintiff's § 1983 failure-to-train claim against Washington County.  In their opposition to Defendants' motion on this claim, Plaintiff explains that this claim is premised on Washington County's alleged failure to train its deputies to issue warnings before using deadly force.  (Doc. 280 at 57.)

Failure-to-train liability is an offshoot of liability under [Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978)] in which "the failure to provide proper training may be fairly said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."  Erickson v. Pope Cnty., Minnesota, No. 19-CV-3061 (SRN/LIB), 2022 WL 17411091, at *38 (D. Minn. May 6, 2022) (citing City of Canton v. Harris, 489 U.S. 378, 390 (1989)).  To succeed on a failure-to-train claim, a plaintiff must prove that: "(1) the county's training practices were inadequate; (2) the county was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train' reflects the county's deliberate or conscious choice; and (3) an alleged deficiency in the training procedures actually caused

35

the plaintiff's injury.  Id. (citing Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996)).  A failure to train claim also "cannot succeed without evidence that the government entity 'received notice of a pattern of unconstitutional acts committed by its employees.'"  Id. (citing Atkinson v. City of Mountain View, 709 F.3d 1201, 1216-17 (8th Cir. 2013)).

Defendants' first argument for dismissal of this claim is their contention that Plaintiff failed to articulate his failure-to-train claim in his Complaint. Plaintiff's Complaint, however, does allege that Washington County "failed to properly train, supervise and discipline deputies with respect to the policies and procedures mandated for police confrontations or other involvement with emotionally disturbed persons . . . where force may have to be used to resolve the incident."  (Doc. 1 ¶ 68.)  The Complaint also alleges that Washington County caused constitutional violations of Evans' rights "by reasons of its practice and custom, with deliberate indifference, of failing to properly train, supervise and discipline deputies, including Krook, in the proper use of deadly force."  (Id. ¶ 78.)

The Court finds that Plaintiff's Complaint provided sufficient notice to Defendants that Plaintiff was asserting a failure-to-train claim.  Defendants had

the opportunity to explore the specific contours of this claim, such as its relationship to warnings, through discovery.  Thus, the Court declines to dismiss this claim on the basis of inadequate pleadings.

The Court will, however, dismiss this claim because Plaintiff has not provided sufficient evidence to demonstrate a genuine factual dispute over whether Washington County "'received notice of a pattern of unconstitutional acts committed by its employees.'"  Erickson, 2022 WL 17411091, at *38 (citing Atkinson, 709 F.3d at 1216–1217).

There is no evidence of a "pattern" of Washington County deputies using deadly force against individuals without giving sufficient warnings.  Indeed, Plaintiff does not dispute Defendants' assertion that the County's only other officer-involved shooting occurred decades before the incident with Evans.  (Doc. 234, Ex. 40 at 13:22-25.)

Further, Defendants have submitted Washington County training bulletins on the use of deadly force from 2016, 2017, and 2018, all of which instructed deputies to warn individuals that deadly force may be used when it is reasonable to do so.  (Doc. 298, Ex. 50.)  The Court finds that this training meets the Constitutional minimum for warnings, as explained by the Eighth Circuit in Cole

37

and elsewhere.  Cole ex rel. Richards, 959 F.3d at 1133-1134; Est. of Morgan, 686 F.3d at 497-98.

In response to these documents, Plaintiff relies on Washington County Training Sergeant Joseph's Zerwas's testimony from Krook's criminal trial and a 2018 Washington County policy on crisis intervention incidents.  (Doc. 281, Ex. 1 at 1721-1726; Doc 234, Ex. 44.)  But Plaintiff takes Zerwas's testimony out of context.  He did not testify that Washington County never trains its deputies to issue warnings before using deadly force, he testified that commands like "drop the gun!" may be sufficient depending on the circumstances.  (Doc. 281, Ex. 1 at 1714-1715, 1724-1725.)  Plaintiff similarly takes Washington County's policy on crisis intervention incidents out of context.  This policy is dedicated to a specific type of incident, while the County's more general policy on the use of deadly force did require deputies to issue warnings where it is reasonable to do so. (Doc. 234, Ex. 50.)

The Court finds that Plaintiff's evidence is insufficient to allow a reasonable jury to conclude that Washington County had notice of a pattern of constitutional violations or that any inadequate training regime was the cause of

Krook's decision to shoot Evans.  Accordingly, the Court will grant summary

judgment dismissing Plaintiff's claim against the County.

### C.    Defendants' Motions to Strike Plaintiff's Exhibit 3

In conjunction with filing their reply in support of their motion for

summary judgment, Defendants also filed a motion to strike Plaintiff's Exhibit 3

from the record.  (Doc. 294.)  Plaintiff's Exhibit 3 is a two-part exhibit.  Plaintiff's

counsel created Exhibit 3 by brightening the footage from Ramirez's dash-cam

video and syncing it with the audio from Ramos and Ramirez's body-worn

cameras.  The second part of Exhibit 3 is a series of 44 still images taken from the

brightened dash-cam footage.  Plaintiff explains that these 44 images depict each

time Evans moved his head throughout the 40-minute standoff in a similar

manner to the final time he moved his head immediately before Krook shot him.

Defendants argue Exhibit 3 must be stricken from the record for at least

three reasons: (1) Plaintiff failed to disclose it during discovery; (2) the video was

not prepared by an expert; and (3) Plaintiff cannot offer this exhibit at trial

because it would require his counsel to become a witness in his own case.

In support of their first argument, Defendants rely on Federal Rules of

Civil Procedure 26(a)(1) and 37(c)(1).  Rule 26(a)(1)(A)(ii) requires a party to

disclose "all documents, electronically stored information, and tangible things

that the disclosing party has . . . and may use to support its claims or defenses."

Rule 37(c)(1) provides sanctions for violating Rule 26(a)(1)'s disclosure

requirements, barring parties from using the undisclosed evidence "on a motion,

at a hearing, or a trial, unless the failure was substantially justified or is

harmless."

Defendants point out that Exhibit 3 was not disclosed with Plaintiff's Rule

26(a)(1) initial disclosures, nor was it disclosed in response to Defendants'

discovery request asking Plaintiff to produce all "enhancements or other visual

representations of the scene of the subject incident."  (Doc. 26 at 13.)

Defendants, however, do not dispute that the three <u>components</u> of Exhibit

3 were timely disclosed, i.e., Ramos and Ramirez's body-worn camera footage

and Ramirez's dash-cam footage.  Indeed, Defendants disclosed these videos to

Plaintiff.

The issue then turns on whether Plaintiff was required to disclose the

combination of these three components during discovery.  Neither party cites

case law dealing squarely with the issue.  Plaintiff, however, cites several cases

where courts considered similar exhibits consisting of synchronized audio and

video footage without any challenge from the parties.  See <u>Meehan v. Thompson</u>,

763 F.3d 936, 938 n.1 (8th Cir. 2014); <u>Gibbs v. City of Bridgeport</u>, 2018 WL

4119588, at *1 (D. Conn. Aug. 29, 2018); <u>Powell v. Staycoff</u>, 2019 WL 2524771, at

*3 n.4 (D. Minn. June 19, 2019); <u>Trafton v. City of Woodbury</u>, 799 F. Supp. 2d 417,

427 n.4 (D.N.J. 2011).

The Court need not resolve the issue of whether Plaintiff was obligated to

disclose the combined Exhibit 3 during discovery, however, because even if this

nondisclosure was a technical violation of Rule 26, it was "harmless" under Rule

37. Plaintiff's counsel created Exhibit 3 by simply syncing two audio files and a

video file together and turning up the brightness on the video using a widely-

available computer program. As Plaintiff's counsel put it at oral argument, most

of counsel's work consisted of "pressing play" on three files at the same time.

As for turning up the brightness on the video, this would appear to <u>help</u>

Defendants in their argument that Evans pointed the gun at officers through his

head when he turned. However, as discussed above, the poor video quality

prevents the Court from accepting this allegation in the context of summary

judgment even with the brightened video.

In any event, counsel's use of basic computer skills to create Exhibit 3 is no

different than the skills attorneys often use to create demonstratives for oral

41

argument and trial.  Given the rudimentary skills needed to create Exhibit 3 and the fact that Plaintiff disclosed it well in advance of trial, Defendants have not suffered any prejudice that could warrant Rule 37 sanctions.

In support of their argument that creating Exhibit 3 required an expert, Defendants cite several cases where parties decided to use experts to enhance videos.  See, e.g., United States v. Seifert, 351 F. Supp. 2d 926, 927 (D. Minn. 2005); Marks v. Bauer, No. CV 20-1913 ADM/JFD, 2023 WL 1478015, at *14 (D. Minn. Feb. 2, 2023).  But these cases are inapposite because they do not analyze the issue of when an "enhancement" becomes so different from the original audio or video file that the retention of an expert is required.

The Court finds that Exhibit 3 does not cross the line into the realm of an expert enhancement for two reasons.  First, as discussed above, creating Exhibit 3 only required basic computer skills.  Syncing audio and video files and turning up the brightness on a computer monitor does not require expert assistance.  Elifritz v. Fender, 460 F. Supp. 3d 1088, 1103 (D. Or. 2020) ("It does not require specialized education, experience, or training to use computer software to line up an audio file and a video file and play them simultaneously, and the Court does

not require the opinion of an expert to determine whether the synchronization of those files is accurate.").

Second, Defendants do not identify any specific inaccuracies in the combined file.  Instead, Defendants simply raise questions about <u>potential</u> inaccuracies.  (Doc. 294 at 11–12.)  Plaintiff readily answered these questions in his briefing by explaining how counsel created Exhibit 3.  (Doc. 281, Declaration of Zane Umsted; Doc. 301, Opp'n to Mtn. to Strike, at 5–13.)

As for Defendants' third argument, Minnesota Rule of Professional Conduct 3.7 does not prohibit the Court from considering Exhibit 3 as part of the summary judgment record either.  Rule 3.7 provides:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> > (1) the testimony relates to an uncontested issue;
> >
> > (2) the testimony relates to the nature and value of legal services rendered in the case; or
> >
> > (3) disqualification of the lawyer would work substantial hardship on the client.

Minn. R. Prof. Cond. 3.7.  Defendants argue that Plaintiff is attempting to "insulate" Exhibit 3 from testing through cross-examination by introducing the evidence through an attorney who is prohibited from testifying at trial under Rule 3.7.

Rule 3.7, however, deals with the disqualification of attorneys, not the exclusion of evidence. The Rule on its own does not provide a basis to strike an exhibit from the record. And Defendants do not seek to disqualify Plaintiff's counsel from this case.

Even if Defendants were seeking to disqualify counsel under Rule 3.7, that motion would be premature because it is not clear that Plaintiff's counsel is a "necessary witness" at trial. Plaintiff may try to lay a foundation for Exhibit 3 through other means at trial, including through the testimony of the officers whose cameras provided the components of this Exhibit. Any possible objections to this manner of admitting Exhibit 3 are not properly before the Court at this time and, thus, the Court finds that Rule 3.7 does not warrant the exclusion of Exhibit 3. See Gen. Mills, Inc. v. Kellog Co., No. CV 06-3686 (JMR/AJB), 2007 WL 9735202, at *2 (D. Minn. July 11, 2007) (denying motion brought under Rule 3.7 as premature).

Moreover, Defendants have not provided the Court with any authority authorizing the filing of a separate "motion to strike" a summary judgment exhibit like the one Defendants filed here. Plaintiff did not raise this argument, but courts in this District have questioned the authority for filing such a motion.

See <u>Carlson Mktg. Grp., Inc. v. Royal Indem. Co.</u>, No. 04-CV-3368, 2006 WL 2917173, at *2 (D. Minn. Oct. 11, 2006).  For this and the other reasons expressed above, the Court will deny Defendants' Motion to Strike.

Defendants also objected to Plaintiff's oral argument slideshow at the April 25, 2023 motions hearing as raising new arguments and case law.  It is unclear what relief Defendants sought via this oral objection.  This Court certainly does not condone raising new arguments at oral argument, but in this instance, Defendants did not explain which arguments contained in Plaintiff's slideshow were new.  In any event, Defendants presented a fulsome argument in response to Plaintiff at the motions hearing.  Accordingly, the Court finds that awarding Defendants any further relief is unnecessary.  Cf. <u>Jensen as next friend s of Jensen v. Minnesota Dep't of Hum. Servs.</u>, No. CV 09-1775 (DWF/BRT), 2020 WL 6205722, at *3 (D. Minn. Oct. 22, 2020) (declining to strike unsolicited reply brief where party adequately responded to arguments raised in the brief during oral argument).

### D.   Defendants' Motions to Exclude Plaintiff's Experts

#### 1.   Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993)

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

The role of trial courts is to serve as "gatekeepers to 'ensure that the proffered expert testimony is both relevant and reliable.'" Wagner v. Hesston Corp., 450 F.3d 756, 758 (8th Cir. 2006) (quoting Anderson v. Raymond Corp., 340 F.3d 520, 523 (8th Cir. 2003)). In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court provided some general observations for the lower courts to consider in making determinations as to whether an expert's testimony is relevant and reliable, such as whether it has been tested, subjected to peer review and publication, the known or potential rate of error, and whether it is generally accepted. 509 U.S. 579, 592-95 (1993).

In <u>Kumho Tire Company, Ltd. v. Carmichael</u>, the Court extended the

<u>Daubert</u> reasoning to non-scientist experts stating:

> We conclude that <u>Daubert's</u> general principles apply to the expert
> matters described in Rule 702.  The Rule, in respect to all such
> matters, establishes a standard of evidentiary reliability.  It requires
> a valid . . . connection to the pertinent inquiry as a precondition to
> admissibility.  And where such testimony's factual basis, data,
> principles, methods, or their application are called sufficiently into
> question, . . . the trial judge must determine whether the testimony
> has a reliable basis in the knowledge and experience of the relevant
> discipline.

526 U.S. 137, 149 (1999) (internal quotations omitted and cleaned up).

Challenges to the factual basis of expert testimony go "to the credibility of

the testimony, not the admissibility, and it is up to the opposing party to examine

the factual basis for the opinion on cross-examination.  Only if the expert's

opinion is so fundamentally unsupported that it can offer no assistance to the

jury must such testimony be excluded."  <u>Bonner v. ISP Tech, Inc.</u>, 259 F. 3d 924,

929-30 (8th Cir. 2001) (quoting <u>Hose v. Chicago Northwestern Transp. Co.</u>, 70 F.

3d 968, 974 (8th Cir. 1996)).

## 2.  Rules Governing Disclosure and Supplementation of Expert Reports

The Federal Rules of Civil Procedure require experts who are retained or specially employed to provide expert testimony at trial to provide a written report.  See Fed. R. Civ. P. 26(a)(2)(B).  The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

Id.

Federal Rule of Civil Procedure 26(e) requires parties to "supplement" the disclosures they make during discovery, including expert reports disclosed pursuant to Rule 26(a)(2)(B).  A party must provide a supplement "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective

information has not otherwise been made known to the other parties during the
discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).

Rule 26(e) does not, however, allow parties to disclose new expert
opinions under the guise of supplementation.  <u>Am. Nat. Prop. & Cas. Co. v.
Stutte</u>, No. 3:11-CV-219, 2015 WL 2095868, at *4 (E.D. Tenn. May 5, 2015).  In
general, an expert report that merely corrects errors pointed out by an opposing
party is not a "supplement" within the meaning of Rule 26(e).  <u>Petrone v. Werner
Enterprises, Inc.</u>, 940 F.3d 425, 434 (8th Cir. 2019).

"The disclosure mandates [of] Rule 26 are given teeth by the threat of
sanctions in Rule 37."  <u>Vanderberg v. Petco Animal Supplies Stores, Inc.</u>, 906 F.3d
698, 702 (8th Cir. 2018).  "If a party fails to provide information or identify a
witness as required by Rule 26(a) or (e), the party is not allowed to use that
information or witness to supply evidence on a motion, at a hearing, or at a trial,
unless the failure was substantially justified or is harmless."  Fed. R. Civ. P.
37(c)(1).

When evaluating whether a failure to disclose was substantially justified
or harmless courts consider:

> 1) the importance of the excluded material; 2) the explanation of the
> party for its failure to comply with the required disclosure; 3) the

potential prejudice that would arise from allowing the material to be
used at Trial, or on a Motion; and, 4) the availability of a continuance
to cure such prejudice.

Transclean Corp. v. Bridgewood Servs., 101 F. Supp. 2d 788, 795-96 (D. Minn.

2000), vacated in part on other grounds, 290 F.3d 1364 (8th Cir. 2002).

District courts, however, have "wide discretion" in fashioning an

appropriate sanction under Rule 37.  Wegener v. Johnson, 527 F.3d 687, 692 (8th

Cir. 2008).  Rule 37(c)(1) reflects this discretion, noting that "[i]n addition to or

instead of" striking untimely disclosed evidence, a court "may order payment of

the reasonable expenses, including attorney's fees, caused by the failure" or

"may impose other appropriate sanctions."  Fed. R. Civ. P. 37(c)(1).

### 3.   Motion to Exclude Dr. Justin King's Reports and Testimony

#### a.   Background Relevant to Dr. King's Vocational Assessment

Evans began trying to become a firefighter while he was still in high

school.  Evans volunteered for 4 years for the Monarch Fire Protection District in

Missouri where he was from.  (Doc. 277, Ex. A at 47.)  After graduating from high

school, Evans completed firefighter coursework at St. Charles County Fire

Academy in Missouri.  (Id.)  He also obtained his EMT license.  (Id. at 37.)  He

joined the Marine Corps and, later, the Air Force as a teenager, but had to leave

50

basic training due to injuries.  (Doc. 258, Ex. 16 (Workers Compensation Records); Ex. 23.)

From 2015 to 2016, Evans was a volunteer firefighter at Wright City Fire Protection in Missouri.  (Doc. 255, Ex. 17 at WABASHA020; Doc. 94 at 2.)  He also began working as a firefighter for the City of St. Louis, Missouri in late 2016.  (Doc. 255, Ex. 17 at WABASHA020.)  However, he lost his jobs at the Wright City and St. Louis fire departments because he sustained a "severe heat related injury" during a training exercise.  (Id.)

In the summer of 2017, Evans applied to be an EMT for the City of Wabasha, Minnesota.  A background check report accompanying his application stated that Evans "had a pre-existing condition that prevented him from continuing to work as a firefighter."  (Id. at WABASHA026.)

In early 2018, Evans applied for a position at the Lake Elmo, Minnesota Fire Department.  (Id., Ex. 14 at 2 (noting that Evans was "working towards becoming a volunteer firefighter for the City of Lake Elmo").)  According to a letter from the LEFD, Evans "was not far enough along in the [hiring] process" to "receive a 'Conditional Job Offer' to become a Firefighter."  (Id., Ex. 18.)  But Evans' parents testified that the LEFD had accepted him as a volunteer

firefighter, that he had been issued his firefighting gear, and that he would be paid for any volunteer calls he went on.  (Doc. 277, Ex. A at 57; Ex. B.)

Defendants also submitted records of BCA interviews with two Lake Elmo firefighters who testified that Evans was doing training exercises with their department, that they enjoyed his presence at the fire house, and that he would often show up there to socialize with the firefighters.  (Doc. 290, Exs. 41-42.)  In fact, they told the BCA that Evans had stopped by the firehouse and talked with them the evening before the standoff that led to his death.  (Id.)

In April 2018, Evans was on leave from an EMT job due to a shoulder injury.  (Doc. 258, Ex. 14 at 2; Ex. 15.)  He was not enrolled in college at the time and had not finished his undergraduate degree.  (Id., Ex. 14; Ex. 17.)

As noted above, Evans was wearing his firefighter dress uniform at the time of his death.  (Doc. 277, Ex. B at 47.)  He signed a suicide note, "In His Service, Benjamin Evans, Firefighter – EMT."  (Id., Ex. G.)

### b.    Dr. King's Reports

As part of his alleged damages in this case, Plaintiff asserts a claim for lost wages on behalf of his son.  Dr. King is Plaintiff's vocational expert, who intends to testify in support of this claim at trial.

On November 2, 2021, Plaintiff served his initial expert disclosures, but did not identify Dr. King as one of his experts.  (Doc. 258, Ex. 6.)  On February 24, 2022, Plaintiff served supplemental expert disclosures, in which he identified Dr. King for the first time.  (Doc. 130-3 at 22-23.)  Plaintiff did not, however, provide a written report from Dr. King with this disclosure.

The Amended Pretrial Scheduling Order required Plaintiff to disclose all of his experts and their accompanying reports by March 1, 2022.  (Doc. 81.)

On March 22, 2022, Plaintiff's counsel served another set of supplemental expert disclosures, this time including a written report from Dr. King.  (Doc. 152-1.)  Despite being disclosed on March 22, 2022, Dr. King's report was dated February 23, 2022.  (Doc. 258, Ex. 14.)  Plaintiff's counsel explained that she served the report three weeks late because she "needed to confer with Dr. King prior to serving his report, and had difficulty coordinating a time."  (Doc. 275 at 20.)  In his first report, Dr. King calculated Plaintiff's lost wage damages for two different career paths – firefighter and physician's assistant.  (Doc. 258, Ex. 14.)

On December 1, 2022, Defendants filed their present motion seeking to exclude Dr. King's report and testimony from trial.

On January 26, 2023, after retaining new counsel, Plaintiff disclosed a "supplemental" report from Dr. King.  (Doc. 277-4; Doc. 277-10 at 4.)  As part of this new report, Dr. King disclosed an additional damages calculation for a scenario in which Evans worked as an EMT until age 67.  (Id.)

> c.    Portions of Dr. King's Expert Disclosures Fail to Comply with the Pretrial Scheduling Order, Rule 26, and <u>Daubert</u>

Defendants ask the Court to exclude Dr. King from trial due to Plaintiff's failure to disclose his reports in compliance with Rule 26 and the Amended Pretrial Scheduling Order.

Beginning with Dr. King's January 26, 2023 supplemental expert report, Dr. King's EMT wage loss theory is plainly untimely given that Plaintiff's expert disclosures were due nearly a year earlier under the Court's Scheduling Order. Plaintiff offers no explanation for the untimeliness of this disclosure.  Nor does this report qualify as a supplement under Rule 26(e) because it is an entirely new opinion that was not disclosed in Dr. King's earlier report.  See <u>Petrone</u>, 940 F.3d at 434 ("Plaintiffs' expert was 'materially altering, not merely clarifying his original report,' and there is no evidence that Plaintiffs subsequently learned of information that was previously unknown or unavailable to them.").  The Court will, therefore, grant Defendants' motion as it relates to Dr. King's new EMT

wage loss theory and preclude Dr. King from providing any testimony related to this opinion at trial. ELCA Enters., Inc. v. Sisco Equip. Rental & Sales, Inc., 53 F.3d 186, 190 (8th Cir. 1995) (rejecting a party's "eleventh-hour attempt to switch basis for its alleged damages").

Next, Dr. King's physician's assistant wage loss theory is too speculative to be admissible under Rule 702 and Daubert. Evans was not enrolled in any physician's assistant degree program and Plaintiff relies on a few statements Evans and his parents made concerning Evans' interest in possibly pursuing this career path in the future. See Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) ("Where lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects."). The Court will, therefore, grant Defendants' motion as it relates to Dr. King's physician's assistant wage loss theory and preclude Dr. King from providing any testimony related to this opinion at trial

This leaves Dr. King's firefighter wage loss theory. Defendants argue that this opinion is also unduly speculative given that Evans had suffered many workplace injuries, which left it doubtful whether he could ever work as a

firefighter again.  Defendants rely heavily on the comment in a background check completed as part of Evans' 2017 application to become an EMT for the City of Wabasha, which stated that Evans "had a pre-existing condition that prevented him from continuing to work as a firefighter."  (Doc. 277, Ex. A at WABASHA026.)  Defendants also point to a variety of questionable assumptions underlying Dr. King's mathematical calculations related to this theory.

The Court finds that Dr. King's firefighter wage loss theory is not so "fundamentally unsupported" that it must be excluded from trial.  Bonner, 259 F. 3d at 929-30.  Unlike his physician's assistant theory, Dr. King's firefighter theory is supported by the fact that Evans had completed numerous firefighter training programs and was in training to become a firefighter for the Lake Elmo Fire Department.  The statement from the Wabasha background check on which Defendants rely is not a medical assessment.  Moreover, it is unlikely that Evans would have invested the time and energy necessary to become a firefighter for Lake Elmo if he was medically unable to perform the job.  As such, Defendants' arguments concerning Dr. King's firefighter theory go to its weight, not admissibility, and they may present these arguments through cross-examination at trial.

Defendants also argue that Dr. King's firefighter theory should be excluded because it was disclosed three weeks after the deadline found in the Amended Pretrial Scheduling Order.  This argument calls for an analysis under Rule 37(c)(1) and the factors described in the <u>Transclean</u> case to determine whether the late disclosure was "substantially justified or harmless."  101 F. Supp. 2d at 795-96.  ("(1) the importance of the excluded material; 2) the explanation of the party for its failure to comply with the required disclosure; 3) the potential prejudice that would arise from allowing the material to be used at Trial, or on a Motion; and, 4) the availability of a continuance to cure such prejudice.").

First, the material is "important" in the sense that Dr. King's firefighter opinion represents Plaintiff's only remaining wage loss opinion admissible at trial.

Second, Plaintiff has provided some explanation for disclosing the opinion three weeks late by explaining that the lateness was due to counsel's inability to meet with Dr. King due to scheduling difficulties.

Third, Defendants argue they have been prejudiced by this late disclosure because throughout discovery Plaintiff represented that he intended to rely on

his physician's assistant wage loss theory, and the firefighter theory was disclosed with little time left in discovery. But Plaintiff points out that Defendants questioned Plaintiff's parents about his firefighting history at their depositions and Defendants' expert was able to author a comprehensive rebuttal report highlighting the deficiencies in Dr. King's firefighter theory.

Defendants further contend that they are prejudiced because Dr. King did not disclose a complete list of the documents he reviewed in authoring his report. Plaintiff, however, has not identified any new information that was disclosed in Dr. King's January 26, 2023 supplement containing this "facts and data" disclosure that prejudiced their ability to produce a complete rebuttal report.

As for the fourth factor, trial is not imminent in this case, meaning there is plenty of time for Defendants to depose Dr. King regarding his firefighter opinion to cure any prejudice Defendants may have suffered, something Defendants apparently declined to do during the expert discovery period. Indeed, at oral argument, Plaintiff's counsel conceded that if a deposition of Plaintiff's experts were ordered, Plaintiff would pay Defendants' reasonable costs and attorney's fees associated with the deposition.

On balance, the Court finds that these factors weigh against the harsh remedy of excluding Dr. King's firefighter theory from trial altogether based on Plaintiff's initial counsel's disclosure of this theory three weeks late. Instead, one of the lesser sanctions suggested by Rule 37(c)(1) is more appropriate to alleviate any prejudice Defendants may have suffered due to the untimeliness of Dr. King's firefighter theory and other disclosures. The Court will, therefore, exercise its "wide discretion" in fashioning an appropriate sanction by allowing Defendants to depose Dr. King in advance of trial. Wegener, 527 F.3d at 692. The Court also orders Plaintiff's counsel to pay the reasonable costs and attorney's fees associated with this deposition.

### 4. Motion to Exclude Jeffrey Noble's Reports and Testimony

#### a. Background Relevant to Noble's Use-of-Force Opinions

The State of Minnesota retained Noble as an expert witness on police practices and use of force during its investigation and prosecution of Krook. (Doc. 255, Ex. 27 (Expert Retention Agreement).) On April 17, 2019, Noble authored a report entitled "Re: Officer-Involved Shooting of Benjamin Evans." (Id., Ex. 29.) Noble testified as an expert before the grand jury and at trial in Krook's criminal proceedings. (Id., Ex. 31 at 197-230; Ex. 34.)

On November 2, 2021, Plaintiff identified Noble as one of his experts in his initial expert disclosures in this case.  (Doc. 234, Ex. 6.)  Plaintiff did not provide any further disclosures related to Noble's testimony on or before Plaintiff's March 1, 2022 deadline to disclose written expert reports under the Amended Pretrial Scheduling Order.

In January 2023, after retaining new counsel and receiving Defendants' motion seeking to exclude Noble, Plaintiff disclosed an updated C.V. for Noble, an updated list of Noble's publications and testimony, and a signed copy of his 2019 expert report.  The updated disclosures identified a new book and two new articles Noble authored, as well as 99 new cases where Noble served as a consulting expert, 63 new cases where he has provided expert opinions, and 45 new cases in which he has testified since February 2020.

Plaintiff also conceded in his response to Defendants' motion that he had not formally retained Noble to serve as his expert in this case "until very recently."  Defendants contend that this statement means Plaintiff must not have retained Noble until January 2023, when Plaintiff served the above-described updated disclosures from Noble.

> **b.** **Plaintiff Failed to Comply with Rule 26's Expert Disclosure Requirements for Noble**

At the outset, Defendants note that their motion seeking to exclude Noble is "based exclusively on Plaintiff's failure to comply with the disclosure requirements of Rule 26(a)(2)(B)." (Doc. 252 at 7 n.4.)  Accordingly, the Court will not engage in a traditional <u>Daubert</u> analysis to determine if Noble's 2019 report is admissible under Federal Rule of Evidence 702 at this time.

Instead, Defendants argue that Noble should be precluded from testifying at trial because Plaintiff improperly attempted to "piggyback" off the reports Noble produced in the criminal case against Krook.  Defendants contend that this tactic is improper for two threshold reasons.  First, Plaintiff was prohibited from using Noble's expert materials from the criminal case in this civil proceeding by Noble's retention agreement with the Ramsey County Attorney's Office ("RCAO").  That agreement states that Noble's work papers were the property of the RCAO unless otherwise agreed upon.  (Doc. 255-9, Ex. 27.)  Second, Defendants argue that Noble must be excluded because Plaintiff did not formally retain Noble "until very recently," meaning Plaintiff's earlier expert disclosure in this case identifying him as one of Plaintiff's experts was misleading.

The Court finds that neither of these two arguments provides a basis to exclude Noble.  First, Defendants do not cite any precedent holding that an

expert's alleged breach of an agreement with a third party can serve as a basis to exclude the expert. Thus, any violation of Noble's retention agreement with the RCAO is a matter to be dealt with between Noble and the RCAO; it does not affect the admissibility of Noble's testimony in this case.

Second, Plaintiff's failure to formally retain Noble prior to the end of expert discovery also does not affect the admissibility of Noble's testimony in this case. Plaintiff's initial counsel's lack of candor during discovery was certainly regrettable, but in identifying Noble as one of his experts before retaining him, Plaintiff subjected himself to an inherent sanction by running the risk that Noble would not show up to testify in this case.

Further, the primary case on which Defendants rely to seek exclusion of Noble based on Plaintiff's alleged failure to retain him earlier is distinguishable from the present case. See Browning v. City of Balch Springs, No. CIV. A.3:96-CV-1411P, 1997 WL 361632, at *2 (N.D. Tex. June 20, 1997). In Browning, unlike here, the party failed to disclose an expert report and failed to retain an expert prior to the close of expert discovery. Id. at *2, *5. Whereas, here, Plaintiff did disclose a report from Noble, albeit a deficient one.

Next, Defendants argue that Noble should be precluded from testifying because the 2019 expert report Plaintiff disclosed during discovery did not comply with the disclosure requirements under Federal Rule of Civil Procedure 26(a)(2)(B)(i)-(vi).  There is no doubt that Noble is subject to the requirements of Rule 26(a)(2)(B) as an expert who is "retained or specially employed to provide expert testimony," as opposed to non-retained experts who need not author reports under Rule 26(a)(2)(C).  Noble cannot qualify as a non-retained expert because he had no "ground-level involvement" in the events giving rise to this litigation.  Downey v. Bob's Disc. Furniture Holdings, Inc., 633 F.3d 1, 6 (1st Cir. 2011).  Rather, Noble was retained after the fact to provide expert assistance to the State of Minnesota in its investigation and criminal prosecution of Krook.

The Court also finds that Plaintiff failed to fully comply with the disclosure requirements for retained experts under Rule 26(a)(2)(B).  The 2019 expert report from Noble that Plaintiff disclosed during discovery failed to include several of the components that Rule 26(a)(2)(B) requires.  The report was not signed by Noble, violating Rule 26(a)(2)(B).  The report did not specifically identify all of the "facts or data" Noble reviewed in forming his opinions, violating Rule 26(a)(2)(B)(ii).  The report did not include an updated C.V. or a list

63

of all of his publications from the last 10 years, violating Rule 26(a)(2)(B)(iv). The

Report did not include "a list of all other cases in which, during the previous 4

years, [Noble] testified as an expert at trial or by deposition," violating Rule

26(a)(2)(B)(v). Finally, the report also failed to include a "statement of

compensation," violating Rule 26(a)(2)(B)(vi).

It appears from the parties' briefing that Plaintiff has now remedied these

nondisclosures by providing Defendants with the information that was missing

from Noble's initially-disclosed report. The Court, however, cannot ignore

Plaintiff's failure to abide by the deadlines found in the Amended Pretrial

Scheduling Order by failing to disclose these supporting components of Noble's

report prior to the March 1, 2022 deadline.

### c.    Appropriate Sanction

Having found that Plaintiff failed to properly disclose Noble's expert

report prior to the relevant deadline, the Court turns to the appropriate sanction

for this nondisclosure. As with Dr. King, the parties direct the Court to the four

factors from the <u>Transclean</u> case to determine which sanction is appropriate

under Federal Rule of Evidence 37(c)(1). 101 F. Supp. 2d at 795-96. ("(1) the

importance of the excluded material; 2) the explanation of the party for its failure

to comply with the required disclosure; 3) the potential prejudice that would arise from allowing the material to be used at Trial, or on a Motion; and, 4) the availability of a continuance to cure such prejudice."). Defendants argue the Transclean factors warrant the exclusion of Noble from trial altogether or, in the alternative, an order limiting his testimony to the content of his 2019 expert report. (Doc. 252 at 25-26.)

First, Noble's testimony is important to Plaintiff's case. Transclean, 101 F. Supp. 2d at 795-96. Noble is Plaintiff's only expert on police use-of-force now that Plaintiff has agreed to withdraw his three other previously-identified experts on this topic.

Second, Plaintiff has no explanation for his failure to comply with the disclosure requirements under Rule 26(a)(2)(B) and the Amended Pretrial Scheduling Order. Plaintiff suggests that his initial counsel mistakenly believed Noble was not required to author a new report in this litigation because he was a non-retained expert subject only to Rule 26(a)(2)(C). But Defendants point out that Plaintiff's own expert disclosures identifying Noble belie this contention by disclosing a written report for Noble and stating that he was being disclosed "pursuant to Rule . . . 26(a)(2)(B)." (Doc. 255-3, Exs. 6-7 (emphasis added).)

65

Third, Defendants argue they have been prejudiced by Plaintiff's failure to disclose updated information about Noble's recent publications and testimony. Defendants were unable to analyze the new book, two articles, and dozens of cases in which Noble has provided expert services since his 2019 report. Now that Defendants have this information, however, they have not identified any instance where Noble contradicted the statements he made in his 2019 report or otherwise departed from the methodology he used in that report. This type of impeachment material is the usual reason parties are required to disclose their expert's prior testimony and publications. Given that Defendants have not identified any such material from Noble's latest disclosures, the record weighs against a finding of significant prejudice to Defendants.

Fourth, no continuance is necessary to remedy Plaintiff's nondisclosure because trial is not imminent in this case.

The Court finds, based on its analysis of these factors, that the harsh sanction of excluding Noble from trial altogether based on Plaintiff's failure to disclose the supporting documentation required by Rule 26(a)(2)(B)(i)-(vi) is not the appropriate sanction under Rule 37(c)(1). As with the deficiencies associated with Dr. King's disclosures, however, the Court finds that the deficiencies

associated with Plaintiff's disclosure of Noble's opinions warrant some of the alternative, lesser sanctions offered by Rule 37(c)(1).

As with Dr. King, the Court grants Defendants leave to depose Noble reasonably in advance of trial.  This will allow Defendants to question Noble about his newly-disclosed publications and prior testimony.  Further, Plaintiff's counsel shall be responsible for paying the reasonable costs and attorney's fees associated with this deposition, should Defendants choose to take this deposition.

Finally, Defendants request an award of their costs and attorney's fees associated with bringing their motion to exclude Noble.  Defendants rely on Rolandson v. Ethicon, Inc., No. 15-CV-537 (ECT/DTS), 2020 WL 2086279, at *10 (D. Minn. Apr. 30, 2020).  But the noncompliant party's conduct in Rolandson was egregious.  The plaintiff violated a clear order concerning expert discovery, allowed an expert to destroy crucial evidence, and disclosed two entirely new experts and reports more than 10 months past the relevant deadlines.  Id. at *6-*9.  The defendants suffered obvious prejudice to their ability to mount a defense.  Id. at *8-*9.  When faced with sanctions motions stemming from this misconduct,

the plaintiff responded with arguments the court found "disingenuous" and "knowingly wrong." Id. at *7.

By contrast, the Court finds that Plaintiff's failure to disclose the supporting documentation for Noble's report required under Rule 26(a)(2)(B)(i)-(vi) is not nearly as egregious or prejudicial as the plaintiff's behavior in Rolandson. Plaintiff should have disclosed this supporting documentation earlier, but the Court finds that the sanctions it has already imposed in allowing Defendants to depose Noble at Plaintiff's cost are sufficient. Further, there is not sufficient evidence before the Court to find that Plaintiff committed these nondisclosures in bad faith. And Plaintiff voluntarily withdrew three of his experts after Defendants filed their initial memorandum of law related to this motion.

Based on this record, the Court will exercise its discretion to deny Defendants' request for further sanctions in the form of an award of costs and attorneys' fees incurred in bringing their motion to exclude Noble. See Wegener, 527 F.3d at 692. Apart from the award of sanctions discussed above, Defendants' motion to exclude Noble from testifying at trial is denied.

**ORDER**

Based on the foregoing reasons, and the files, records, and proceedings

herein, **IT IS HEREBY ORDERED** that:

1.   Defendants' Motion for Summary Judgment **(Doc. 231)** is
     **GRANTED IN PART AND DENIED IN PART** as follows:

     a.   Defendants' Motion is **DENIED** as to Plaintiff's claim under 42
          U.S.C. § 1983 against Brian J. Krook; and

     b.   Defendants' Motion is **GRANTED** as to Plaintiff's claim under 42
          U.S.C. § 1983 against Washington County and the County is
          hereby **DISMISSED WITH PREJUDICE** from this action.

2.   Defendants' Motion to Strike **(Doc. 291)** is **DENIED**.

3.   Defendants' Motion to Exclude Dr. King's Reports and Testimony
     **(Doc. 246)** is **GRANTED IN PART AND DENIED IN PART** as
     follows:

     a.   The Motion is **GRANTED** insofar as Dr. King is precluded from
          testifying at trial concerning lost wage damages Evans could
          have earned as a physician's assistant;

     b.   The Motion is **GRANTED** insofar as Dr. King is precluded from
          testifying at trial concerning lost wage damages Evans could
          have earned as an EMT;

     c.   The Motion is **DENIED** insofar as Dr. King may testify at trial
          concerning lost wage damages Evans could have earned as a
          firefighter;

     d.   The Motion is **GRANTED** insofar as Plaintiff shall allow
          Defendants to depose Dr. King at a date reasonably in advance of
          trial and Plaintiff's <u>counsel</u> must pay Defendants' reasonable

costs and attorney's fees incurred in preparing for and taking Dr. King's deposition;

 e. If the parties cannot agree on the amount of reasonable costs and attorney's fees to which Defendant is entitled related to Dr. King's deposition, they must promptly notify the Court, at which point the Court will determine an appropriate resolution to the parties' dispute.

4.  Defendants' Motion to Exclude Jeffrey Noble's Reports and Testimony **(Doc. 251)** is **GRANTED IN PART AND DENIED IN PART** as follows:

 a. The Motion is **GRANTED** insofar as Plaintiff shall allow Defendant to depose Noble at a date reasonably in advance of trial and Plaintiff's <u>counsel</u> must pay Defendants' reasonable costs and attorney's fees incurred in preparing for and taking Noble's deposition;

 b. If the parties cannot agree on the amount of costs and attorney's fees to which Defendants are entitled, they must promptly notify the Court, at which point the Court will determine an appropriate resolution to the parties' dispute.

 c. The Motion is **DENIED** as to all other requested relief.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  July 6, 2023       <u>s/Michael J. Davis</u>
            Michael J. Davis
            United States District Court